1  MCDERMOTT WILL & EMERY LLP
   Terrence P. McMahon (71910)
2  tmcmahon@mwe.com
   William G. Gaede III (136184)
3  wgaede@mwe.com
   Andrew A. Kumamoto (178541)
4  akumamoto@mwe.com
   3150 Porter Drive
5  Palo Alto, CA  94304-1212
   Telephone:    (650) 813-5000
6  Facsimile:    (650) 813-5100

7  MCDERMOTT WILL & EMERY LLP
   John R. Fuisz (*pro hac vice*)
8  jfuisz@wme.com
   Stephen Shahida (*pro hac vice*)
9  sshahida@wme.com
   600 13th Street, N.W.
10 Washington, DC 20005-3096
   Telephone:    (202) 756-8000
11 Facsimile:    (202) 756-8087

12 Attorneys for *StemCells, Inc. and*
   *StemCells California, Inc.*
13

14              IN THE UNITED STATES DISTRICT COURT

15        IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

16                      OAKLAND DIVISION

17 STEMCELLS, INC., a Delaware corporation,         Case No.  C-08-02364 CW
   and STEMCELLS CALIFORNIA, INC., a
18 California corporation,                          **DECLARATION OF ANDREW A.**
                                                    **KUMAMOTO IN SUPPORT OF**
19                          Plaintiffs,             **PLAINTIFFS' MEMORANDUM IN**
                                                    **OPPOSITION TO DEFENDANTS'**
20 v                                                **MOTION TO DISMISS, STAY OR**
                                                    **TRANSFER**
21 NEURALSTEM, INC., a Delaware
   corporation, KARL K. JOHE, an individual,        Date:    July 10, 2008
22 and I. RICHARD GARR, an individual,              Time:    2:00 p.m.
                                                    Courtroom 2, 4th Floor
23                          Defendants.
                                                    **Hon. Claudia Wilken**
24

25       I, Andrew A. Kumamoto, declare as follows:

26       1.      I am a partner with McDermott Will & Emery LLP and counsel for Plaintiffs

27 StemCells, Inc. and StemCells California, Inc. in the above-captioned matter.

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

2.    I am submitting this declaration in support of Plaintiffs' Memorandum in Opposition to Defendants' Motion To Dismiss, Stay or Transfer.

3.    I have knowledge of the following, and if called as a witness, could and would testify competently to the contents herein.

4.    Attached as Exhibit 1 is a true and correct copy of Neuralstem Inc.'s SEC Form 10-Q, filed May 15, 2008.

5.    Attached as Exhibit 2 is a true and correct copy of StemCells, Inc. Press Release entitled "StemCells, Inc. Granted Key U.S. Patent Covering Composition of Neural Stem Cells Derived from Any Tissue Source, Including Embryonic," dated April 23, 2008.

6.    Attached as Exhibit 3 is a true and correct copy of Neuralstem's Press Release entitled "Neuralstem Sues StemCells, Inc. Over New Patent," dated May 7, 2008.

7.    Attached as Exhibit 4 is a true and correct copy of Neuralstem's Complaint for Declaratory Judgment of Patent Unenforceability, Invalidity, and Non-Infringement, filed in the District of Maryland, Case No. 08-CV-01173-AW, on May 7, 2008.

8.    Attached as Exhibit 5 is a true and correct copy of StemCells' Complaint for Patent Infringement, filed in the Northern District of California, Case No. C 08-02364, on May 7, 2008.

9.    Attached as Exhibit 6 is a true and correct copy of StemCells' First Amended Complaint for Patent Infringement, Trade Libel and Violation of Business and Professions Code Section 17200, filed in the Northern District of California, Case No. C 08-02364, on May 9, 2008.

10.    Attached as Exhibit 7 is a true and correct copy of D. Cizkova et al, *Functional Recovery in Rats with Ischemic Paraplegia After Spinal Grafting of Human Spinal Stem Cells*, NEUROSCIENCE 147:546-560 (2007).

11.    Attached as Exhibit 8 is a true and correct copy of the Case Management and Scheduling Order for Reassigned Civil Cases, filed in the Northern District of California, Case No. C 08-02364, on May 12, 2008.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

1    12.    Attached as Exhibit 9 is a true and correct copy of StemCells' Memorandum In

2 Support of Defendants' Motion to Extend Time to Answer or Respond to Amended Complaint,

3 filed in the District of Maryland, Case No. 08-CV-01173-AW, on June 2, 2008.

4    13.    Attached as Exhibit 10 is a true and correct copy of Neurospheres Holding Ltd.

5 Notice of a Lawsuit and Request to Waive Service of a Summons, filed in the District of

6 Maryland, Case No. 08-CV-01173-AW, on June 2, 2008.

7    14.    Attached as Exhibit 11 is a true and correct copy of Neuralstem's Response to

8 StemCells, Inc. and StemCells California, Inc.'s Motion to Extend Time to Answer or Otherwise

9 Respond to Amended Complaint and Motion to Strike Neurospheres Holding, Ltd.'s Request to

10 Waive Service of a Summons, filed in the District of Maryland, Case No. 08-CV-01173-AW, on

11 June 4, 2008.

12    15.    Attached as Exhibit 12 is a true and correct copy of the Order Granting StemCells'

13 Motion to Extend Time to Answer or Respond to Amended Complaint, from the District of

14 Maryland, Case No. 08-CV-01173-AW, ordered on June 4, 2008 and filed June 5, 2008.

15    16.    Attached as Exhibit 13 is a true and correct copy of the Order Staying and Closing

16 the Case, filed in the District of Maryland, Case No. 06-CV-01877-AW, on June 25, 2007.

17    17.    Attached as Exhibit 14 is a true and correct copy of *Ex Parte* Reexamination Filing

18 Data from the United States Patent and Trademark Office, dated December 31, 2007.

19    18.    Attached as Exhibit 15 is a true and correct copy of Transaction History for Patent

20 Application Nos. 90/008,366, and 90/008,367, dated June 18, 2008.

21    19.    Attached as Exhibit 16 is a true and correct copy of Neuralstem's Memorandum in

22 Support of Defendants' Motion to Re-Open the Case and Lift the Stay, filed in the District of

23 Maryland, Case No. 06-CV-01877-AW, on May 6, 2008.

24    20.    Attached as Exhibit 17 is a true and correct copy of StemCells' Memorandum in

25 Opposition to Defendant's Motion to Re-Open the Case and Lift the Stay, filed in the District of

26 Maryland, Case No. 06-CV-01877-AW, on May 23, 2008.

27    21.    Attached as Exhibit 18 is a true and correct copy of the Amended Complaint for

28 Declaratory Judgment of Patent Unenforceability, Invalidity, Non-Infringement, and Non-

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

Liability of Trade Libel and Unfair Competition, filed in the District of Maryland, Case No. 08-cv-1173, on May 13, 2008.

22.    Attached as Exhibit 19 is a true and correct copy of a PACER Civil Dockets for District of Maryland Case No. 04-cv-03973 StemCells, Inc. v. Reneuron and District of Maryland Case No. 05-cv-01125 StemCells, Inc. v. ReNeuron, dated June 11, 2008.

23.    Attached as Exhibit 20 is a true and correct copy of Neuralstems' Complaint for Misappropriation of Trade Secrets, Breach of Contract, Unfair Competition, and Breach of Implied Covenant of Good Faith and Fair Dealing, filed in the Central District of California, Case No. CV08-02168 R against Reneuron, Ltd., on April 7, 2008.

24.    Attached as Exhibit 21 is a true and correct copy of the PACER Docket for StemCells v. Neuralstem District of Maryland, Case No. 06-cv-01877, dated June 17, 2008.

I declare, under penalty of perjury, under the laws of the United States, that the foregoing is true and correct and that this Declaration was completed at Palo Alto, California this 19th day of June 2008.

_____*/s/ Andrew A. Kumamoto*_____
Andrew A. Kumamoto

# Exhibit 1

# SEC Filings

**10-Q**

NEURALSTEM, INC. filed this Form 10-Q on 05/15/08

---

**U.S. SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-Q**

---

(Mark one)

☒  Quarterly Report Under Section 13 or 15(d) of the Securities Exchange Act of 1934

For the Quarterly Period Ended March 31, 2008

Or

☐  Transition Report Under Section 13 or 15(d) of the Securities Exchange Act of 1934

Commission File Number 000-1357459

---

**Neuralstem, Inc.**
(Name of small business issuer in its charter)

**Delaware**
(State or other jurisdiction
of incorporation or organization)

**52-2007292**
(I.R.S. Employer
Identification No.)

**9700 Great Seneca Highway,**
**Rockville, Maryland**
(Address of principal executive offices)

**20850**
(Zip Code)

Issuer's telephone number: (301) 366-4841

Neuralstem - Investor Relations - SEC Filings

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐              Accelerated filer ☐

Non-accelerated filer ☐ (Do not check if a small reporting company)      Smaller reporting company ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act)  Yes ☐ No ☒

As of May 10, 2008 there were 32,075,875 shares of common stock, $.01 par value, issued and outstanding.

**Neuralstem, Inc.**

Table of Contents

Page

PART I -    FINANCIAL INFORMATION

Item 1.     Financial Statements

Balance Sheets as of March 31, 2008 (Unaudited) and December 31, 2007                    4

Statements of Operations (Unaudited)
Three months ended March 31, 2008 and 2007                                              7

Statements of Changes in Stockholders' Equity (Unaudited)
For the period from January 1, 2007 through March 31, 2008                               11

Statements of Cash Flows (Unaudited) Three months ended March 31, 2008 and 2007          15

Notes to Financial Statements (Unaudited)                                               12

Item 2.     Management's Discussion and Analysis of Financial Condition, Results of Operations and Plan of Operation

Item 3.     Quantitative and Qualitative Disclosures about Market Risk

Item 4T.    Controls and Procedures

PART II -   OTHER INFORMATION

Item 1.     Legal Proceedings                                                           18

Item 1A.    Risk Factors                                                                19

Item 2.     Unregistered Sales of Equity Securities and Use of Proceeds                 23

Item 3.     Defaults Upon Senior Securities                                             24

Item 4.    Submission of Matters to a Vote of Security Holders.

Item 5.    Other Information

Item 6.    Exhibits and Reports on Form 8-K

2

Case 4:08-cv-02364-CW    Document 34-2    Filed 06/19/2008    Page 6 of 52

**PART I**
**FINANCIAL INFORMATION**

**NEURALSTEM, INC.**
**BALANCE SHEETS**

| | | March 31, 2008 (Unaudited) | December 31, 2007 |
|---|---|---|---|
| **ASSETS** | | | |
| **CURRENT ASSETS** | | | |
| Cash | $ | 8,257,850 | $ 7,403,737 |
| Prepaid expenses | | 124,064 | 130,719 |
| Total current assets | | 8,381,914 | 7,534,456 |
| Property and equipment, net | | 155,182 | 136,920 |
| Other assets | | 49,272 | 43,271 |
| Intangible assets, net | | 111,016 | 111,406 |
| Total assets | $ | 8,697,384 | $ 7,826,053 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| **CURRENT LIABILITIES** | | | |
| Accounts payable and accrued expenses | $ | 494,007 | $ 1,016,699 |
| Total liabilities | | 494,007 | 1,016,699 |
| **STOCKHOLDERS' EQUITY** | | | |
| Preferred Stock, 7,000,000 shares authorized, zero issued and outstanding | | — | — |
| Common stock, $.01 par value, 75 million shares authorized, 32,075,875 and 31,410,566 shares outstanding in 2008 and 2007 | | 320,759 | 314,016 |
| Additional paid-in capital | | 55,813,067 | 52,151,245 |

| | | |
|---|---:|---:|
| Accumulated deficit | (47,930,449) | (45,655,997) |
| Total stockholders' equity | 8,203,377 | 6,809,354 |
| Total liabilities and stockholders' equity | $ 8,697,384 | $ 7,826,053 |

See accompanying notes to Financial Statements.

3

NEURALSTEM, INC.
STATEMENTS OF OPERATIONS
(Unaudited)

| | Three Months Ended March 31, | |
| | 2008 | 2007 |
|---|---|---|
| Revenues | $ - | $ 181,825 |
| Operating expenses | | |
| Research and development costs | 1,198,843 | 845,589 |
| General, selling and administrative expenses | 1,083,169 | 291,053 |
| Depreciation and amortization | 13,757 | 12,981 |
| Total operating expenses | 2,295,769 | 1,149,623 |
| Operating loss | (2,295,769) | (967,798) |
| Non-operating income (expense) | | |
| Interest income | 21,317 | 18,903 |
| Interest expense | - | (347) |
| Total Non-operating income | 21,317 | 18,556 |
| Net loss | $ (2,274,452) | $ (949,242) |
| Net loss per share, basic and diluted | $ (0.07) | $ (0.04) |
| Average number of shares of common stock outstanding | 31,762,872 | 26,585,549 |

See accompanying notes to Financial Statements.

4

**NEURALSTEM, INC.**

**STATEMENT OF STOCKHOLDERS' EQUITY**

**For the period from January 1, 2008 through March 31, 2008**

**(Unaudited)**

| | Preferred Stock | | Common Stock | | Additional Paid-In Capital | Accum. Deficit | Total |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| Balance at January 1, 2008 | - | $ - | 31,410,566 | $ 314,106 | $ 52,151,245 | $ (45,655,997) | $ 6,809,354 |
| Exercise of Warrants to purchase Common Stock ($1.50 - $2.00 per share), net of offering costs of $7,313. | | | 50,000 | 500 | 73,437 | | 73,937 |
| Issuance of common stock though private Placement ($4.06 per share). | | | 615,309 | 6,153 | 2,493,847 | | 2,500,000 |
| Share Based Payment - Employee Compensation | | | | | 1,094,538 | | 1,094,538 |
| Net loss | | | | | | (2,274,452) | (2,274,452) |
| Balance at March 31, 2008 | - | $ - | 32,075,875 | $ 320,759 | $ 55,813,067 | $ (47,930,449) | $ 8,203,377 |

See accompanying notes to financial statements

5

## NEURALSTEM, INC.
## STATEMENTS OF CASH FLOWS
### (Unaudited)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2008 | 2007 |
| Cash flows from operating activities: | | |
| Net loss | $ (2,274,452) | $ (949,242) |
| Adjustment to reconcile net loss to cash used in operating activities: | | |
| Depreciation and amortization | 13,758 | 12,981 |
| Share based compensation | 1,094,538 | 75,482 |
| Changes in assets and liabilities: | | |
| Accounts receivable | | (79,359) |
| Prepaid expenses | 6,655 | 11,673 |
| Other assets | (6,001) | 65 |
| Accounts payable and accrued expenses | (522,692) | 126,607 |
| Net cash used in operating activities | (1,688,194) | (801,793) |
| | | |
| Cash flow from investing activities: | | |
| Capital outlay for intangible assets | (2,744) | (3,950) |
| Purchase of property and equipment | (28,886) | (4,274) |
| Net cash used in investing activities | (31,630) | (8,224) |
| | | |
| Cash flows from financing activities: | | |
| Issuance of common stock | 2,573,937 | 5,643,050 |
| Payments on notes payable | – | (1,918) |
| Net cash provided by financing activities | 2,573,937 | 5,641,132 |
| | | |
| Net increase in cash | 854,113 | 4,831,115 |
| Cash, beginning of period | 7,403,737 | 1,807,041 |
| Cash, ending of period | $ 8,257,850 | $ 6,638,156 |

See Accompanying Notes to Financial Statements

Neuralstem - Investor Relations - SEC Filings.

6

**NEURALSTEM, INC.**
**NOTES TO FINANCIAL STATEMENTS**

### Note 1.  Basis of Presentation

The accompanying unaudited financial statements of Neuralstem, Inc. (the "Company") have been prepared in accordance with generally accepted accounting principles in the United States and the rules and regulations of the Securities and Exchange Commission (the "SEC"), for interim financial information. Therefore, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with Company's Annual Report on Form 10-KSB for the year ended December 31, 2007.

The interim financial statements are unaudited, but in the opinion of management all adjustments, consisting only of normal recurring accruals, considered necessary to present fairly the results of these interim periods have been included. The results of the Company's operations for any interim period are not necessarily indicative of results that may be expected for any other interim period or for the full year.

### Note 2.  Significant Accounting Policies and Recent Accounting Pronouncements

#### Use of Estimates

The preparation of financial statements in accordance with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Because of the use of estimates inherent in the financial reporting process, actual results could differ significantly from those estimates.

#### Revenue Recognition

Our revenue recognition policies are in accordance with the SEC's Staff Accounting Bulletin No. 101, *Revenue Recognition in* Financial Statements as amended by SAB 104. Our revenue is derived primarily from providing treated samples for gene expression data from stem cell experiments, from providing services under various grant programs and through the licensing of the use of our intellectual property.  Revenue is recognized when there is persuasive evidence that an arrangement exists, delivery of goods and services has occurred, the price is fixed and determinable, and collection is reasonably assured.

#### Research and Development

Research and development costs are charged to expense as they are incurred.

#### Loss per Common Share

Basic loss per common share is calculated by dividing net loss by the weighted average number of common shares outstanding during the period. Diluted loss per common share adjusts basic loss per share for the potentially dilutive effects of shares issuable under our stock option plan, using the treasury stock method. Common equivalent shares from the exercise of stock options and warrants are excluded from the computation of diluted loss per share as their effect is antidilutive.

#### Share based payments

We have granted stock-based compensation awards to employees and board members. Awards may consist of common stock, warrants, or stock options. Our stock options and warrants have up to a ten year life. The stock options or warrants vest either upon the grant date or over varying periods of time. The stock options we grant provide for option exercise prices equal to or greater than the fair market value of the common stock at the date of the grant.

During the three months ended March 31, 2008 we granted 4,200,000 options. In the similar period ended March 31, 2007 we granted no options or warrants. We accrue related compensation expenses as our options vest in accordance with the Statement of Financial Accounting Standards ("SFAS") 123(R), *Share-Based Payment*. We recognized $1,094,538 and 75,482 in share-based compensation expense during the three months ended March 31, 2008 and 2007, respectively, from the vesting of stock options or warrants.

A summary of stock option activity during the three months ended March 31, 2008 and related information is included in the table below:

7

| | Number of Options | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Life (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2008 | 3,200,659 | $ 1.19 | 7.4 | $ 8,256,977 |
| Granted | 4,200,000 | 3.73 | 9.8 | |
| Exercised | — | | | |
| Forfeited | — | | | |
| Outstanding at March 31, 2008 | 7,400,659 | $ 2.63 | 8.7 | $ 5,045,500 |
| Exercisable at March 31, 2008 | 1,536,076 | $ 1.16 | 7.3 | $ 2,537,500 |

Share-based compensation included in the statements of operations for the three months ended March 31, 2008 and 2007 was as follows:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2008 | 2007 |
| Research and development costs | $ 752,014 | $ 37,741 |
| General, selling and administrative expenses | 342,524 | 37,741 |
| Total | $ 1,094,538 | $ 75,482 |

Options to purchase common stock were issued to certain officers, stockholders and consultants.

| | Number of Warrants | Weighted-Average Exercise Price |
|---|---|---|
| Outstanding at January 1, 2008 | 11,208,515 | $ 2.44 |
| Issued | — | — |
| Exercised | 50,000 | 1.63 |
| Forfeited | — | — |
| Outstanding at March 31, 2008 | 11,158,515 | $ 2.44 |

Exercisable at March 31, 2008

|  | |
|---|---|
| 8,158,515 | $ 2.24 |

In the first quarter holders of warrants to purchase 50,000 shares of our common stock for $1.50 and $2.00 exercised them for $81,250 less offering costs of $7,313.

Recent Accounting Pronouncements

In June 2006, the FASB issued Interpretation No. 48, "*Accounting for Uncertainty in Income Taxes—an Interpretation of FASB Statement No. 109*" ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an entity's financial statements in accordance with SFAS No. 109, "*Accounting for Income Taxes,*" and prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. Additionally, FIN 48 provides guidance on subsequent derecognition of tax positions, financial statement classification, recognition of interest and penalties, accounting in interim periods, and disclosure and transition requirements. The Company adopted the provisions of FIN 48 on January 1, 2007.

8

Neuralstem - Investor Relations - SEC Filings    Page 15 of 51

The Company recognizes accrued interest related to unrecognized tax benefits in interest expense and penalties in operating expense. No amounts were accrued for the payment of interest and penalties at January 1, 2008 or March 31, 2008. The Company's adoption of FIN 48 did not have a material effect on the Company's financial condition, results of operations or cash flows.

In September 2006, the FASB issued FASB Statement No. 157, *"Fair Value Measurements"* (SFAS 157), which defines fair value, establishes a framework for measuring fair value under GAAP, and expands disclosures about fair value measurements. SFAS 157 applies to other accounting pronouncements that require or permit fair value measurements. The new guidance is effective for financial statements issued for fiscal years beginning after November 15, 2007, and for interim periods within those fiscal years.

In February 2007, the FASB issued Statement No. 159, *"The Fair Value Option for Financial Assets and Financial Liabilities — Including an amendment of FASB Statement No. 115"* (SFAS 159). SFAS 159 provides companies with an option to report selected financial assets and liabilities at fair value. SFAS 159's objectives are to reduce both complexity in accounting for financial instruments and the volatility in earnings caused by measuring related assets and liabilities differently. SFAS 159 is effective as of the beginning of an entity's first fiscal year beginning after November 15, 2007.

In June 2007, the Financial Accounting Standards Board ratified a consensus opinion reached by the Emerging Issues Task Force (EITF) on EITF Issue 07-3, *"Accounting for Nonrefundable Advance Payments for Goods or Services Received for Use in Future Research and Development Activities."* The guidance in EITF Issue 07-3 requires the Company to defer and capitalize nonrefundable advance payments made for goods or services to be used in research and development activities until the goods have been delivered or the related services have been performed. If the goods are no longer expected to be delivered nor the services expected to be performed, the Company would be required to expense the related capitalized advance payments. The consensus in EITF Issue 07-3 is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2007 and is to be applied prospectively to new contracts entered into on or after December 15, 2007. Early adoption is not permitted. Retrospective application of EITF Issue 07-3 is also not permitted. The Company intends to adopt EITF Issue 07-3 effective January 1, 2008. The impact of applying this consensus will depend on the terms of the Company's future research and development contractual arrangements entered into on or after December 15, 2007 and has not had a material impact upon the Company's operations.

## Note 3.  Stockholders' Equity

During the first quarter of 2008, the Company raised $73,937 through conversion of warrants previous issued by the company. The company issued a total of 50,000 common shares to the converting warrant holders at prices ranging from $1.50 to $2.00.

The Company also completed a private placement of 615,309 common shares at $4.06 per share increasing equity by $2,500,000 in February 2008.

During the first quarter of 2008, the Company granted 4,200,000 options on shares of common stock to the Company's Chief Scientific Officer and Chairman of the Board and to the CEO as an incentive for these officers' continued employment. The options fully vest in July 2011. The Company valued these options using the Black-Scholes option pricing model using the following assumptions: exercise price of $3.73, term between 3.16 and 5.50 years, volatility rate between 51% and 77% and discount rate between 2.89 and 3.28%. The total value of these options will be expensed over the vesting period. The Company began to record the expense related to these options in the first quarter of 2008.

## Note 4.  Subsequent Events

In May 2008, the Company filed a suit against StemCells, Inc. stating, among other things, that StemCells intentionally withheld crucial information highly material to the patentability of StemCells' "new" patent (US Pat No. 7,361,505) and that this was done with the intent to deceive the United States Patent Office in order to get the '505 patent allowed. As a result of these actions, Neuralstem is asking for a declaratory judgment that the patent is unenforceable. The suit will be filed in the United States District Court for the District of Maryland Southern Division.

In May Neuralstem filed a motion to re-open the infringement lawsuit with StemCells, Inc. and to have the Stay lifted, so that the case can be disposed of on summary judgment as soon as possible. The Company announced the recent actions of the U.S. Patent Office now entitles the company to summary judgment in the case and that the Patent Office actions have destroyed the basis for the infringement suit filed by StemCells, Inc.

In April 2008, the European Patent Office granted Neuralstem a European patent EP0915968, covering the "Isolation, Propagation and Directed Differentiation of Stem Cells from Embryonic and Adult Central Nervous System of Mammals." The European patent has been validated in several European countries including France, Germany, Ireland, Spain, Sweden, Switzerland and the United Kingdom.

9

## ADVISEMENT

Unless the context requires otherwise, "*Neuralstem*," "*the Company*," "*we*," "*us*," "*our*" and similar terms refer to Neuralstem, Inc. Our common stock, par value $.01 per share is commonly referred to in this quarterly report as our "*common shares*." The information contained herein is current as of the date of this quarterly report (March 31, 2008), unless another date is specified.

We prepare our interim financial statements in accordance with United States generally accepted accounting principles. Our financial condition and results of operations for the three-month interim period ended March 31, 2008 are not necessarily indicative of our prospective financial condition and results of operations for the pending full fiscal year ending December 31, 2008. The interim financial statements presented in this quarterly report as well as other information relating to our company contained in this quarterly report should be read in conjunction and together with any reports, statements and information filed by us with the United States Securities and Exchange Commission ("SEC").

## FORWARD LOOKING STATEMENTS

In this quarterly report we make a number of statements, referred to as "forward-looking statements," within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 (the "Exchange Act"), which are intended to convey our expectations or predictions regarding the occurrence of possible future events or the existence of trends and factors that may impact our future plans and operating results. These forward-looking statements are derived, in part, from various assumptions and analyses we have made in the context of our current business plan and information currently available to us and in light of our experience and perceptions of historical trends, current conditions and expected future developments and other factors we believe are appropriate in the circumstances. You can generally identify forward looking statements through words and phrases such as "believe," "expect," "seek," "estimate," "anticipate," "intend," "plan," "budget," "project," "may likely result," "may be," "may continue" and other similar expressions.

When reading any forward-looking statement you should remain mindful that actual results or developments may vary substantially from those expected as expressed in or implied by such statement for a number of reasons or factors, including but not limited to:

- the success of our research and development activities, the development of a viable commercial production model, and the speed with which regulatory authorization and product launches may be achieved;

- whether or not a market for our product develops and, if a market develops, the rate at which it develops;

- our ability to successfully sell our products if a market develops;

- our ability to attract and retain qualified personnel to implement our growth strategies;

- our ability to develop sales, marketing, and distribution capabilities;

- our ability to obtain reimbursement from third party payers for the products that we sell;

- the accuracy of our estimates and projections;

- our ability to fund our short-term and long-term financing needs;

- changes in our business plan and corporate strategies; and

- other risks and uncertainties discussed in greater detail in the section captioned "Risk Factors"

Each forward-looking statement should be read in context with and in understanding of the various other disclosures concerning our company and our business made elsewhere in this report as well as our public filings with the Securities and Exchange Commission. You should not place undue reliance on any forward-looking statement as a prediction of actual results or developments. We are not obligated to update or revise any forward-looking statements contained in this report or any other filing to reflect new events or circumstances unless and to the extent required by applicable law.

10

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION, RESULTS OF OPERATIONS AND PLAN OF OPERATION

### General

The following discussion of our financial condition and results of operations should be read in conjunction with (1) our unaudited interim financial statements and their explanatory notes included as part of this quarterly report, and (2) our audited annual financial statements and explanatory notes for the year ended December 31, 2007 as filed with the SEC, and as may be amended.

This quarterly report contains forward-looking statements that involve risks and uncertainties. See "Risk Factors" set forth on page 16 of this report for a more complete discussion of these factors. Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date that they are made. We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

### Overview

Neuralstem is focused on the development and commercialization of treatments based on transplanting human neural stem cells.

We have developed and maintain a portfolio of patents and patent applications that form the proprietary base for our research and development efforts in the area of neural stem cell research. We own or exclusively license four (4) issued patents and thirteen (13) patent pending applications in the field of regenerative medicine and related technologies. We believe our technology base, in combination with our know-how, and collaborative projects with major research institutions provides a competitive advantage and will facilitate the successful development and commercialization of products for use in the treatment of a wide array of neurodegenerative conditions and in regenerative repair of acute disease.

This is a young and emerging field. There can be no assurances that our intellectual property portfolio will ultimately produce viable commercialized products and processes. Even if we are able to produce a commercially viable product, there are strong competitors in this field and our product may not be able to successfully compete against them.

All of our research efforts to date are at the level of basic research or in the pre-clinical stage of development. We are focused on leveraging our key assets, including our intellectual property, our scientific team, our facilities and our capital, to accelerate the advancement of our stem cell technologies. In addition, we are pursuing strategic collaborations with members of academia. We are headquartered in Rockville, Maryland.

In addition to our core tissue based technology we have begun developing a Small-Molecule compound. We have performed preliminary *in vitro* and *in vivo* tests on the compound with regard to neurogenesis. Based on the results of these tests we have applied for a U.S. patent on the compound.

### Technology

Our technology is the ability to isolate human neural stem cells from most areas of the developing human brain and spinal cord and our technology includes the ability to grow them into physiologically relevant human neurons of all types. Our two issued core patents entitled: (i) *Isolation, Propagation, and Directed Differentiation of Stem Cell from Embryonic and Adult Central Nervous System of Mammals* ; and (ii) *In Vitro Generation of Differentiated Neurons from Cultures of Mammalian Multi-potential CNS Stem Cell* contain claims which cover the process of deriving the cells and the cells created from such process.

What differentiates our stem cell technology from others is that our patented processes do not require us to "push" the cells towards a certain fate by adding specific growth factors. Our cells actually "become" the type of cell they are fated to be. We believe this process and the resulting cells create a technology platform that allows for the efficient isolation and ability to

produce, in commercially reasonable quantities, neural stem cells from the human brain and spinal cord.

Our technology allows for cells to grow in cultured dishes, also known as *in vitro* growth, without mutations or other adverse events that would compromise their usefulness.

**Research**

We have devoted substantial resources to our research programs in order to isolate and develop a series of neural stem cell banks that we believe can serve as a basis for therapeutic products. Our efforts to date have been directed at methods to identify, isolate and culture large varieties of stem cells of the human nervous system, and to develop therapies utilizing these stem cells. This research is conducted both internally and through the use of third party laboratory consulting companies under our direct supervision.

As of March 31, 2008, we had 7 full-time employees. Of these employees, three are directly involved in research and development activities and four are engaged in business development and administration. We also use the services of numerous outside consultants in business and scientific matters. We believe that we have good relations with our employees and consultants.

11

Neuralstem - Investor Relations - SEC Filings

## Trends & Outlook

**Revenue:** Our revenue in 2007 was from grant reimbursements and licensing fees. As our focus is now on pre-clinical work in anticipation of entering clinical trials in 2008, we are no concentrated on increasing revenue. We have completed work on previously awarded grants.

Long-term, we anticipate that grant revenue as a percentage of overall revenue will decrease and our revenue will be derived primarily from licensing fees and the sale of our cell therapy products. At present, we are in our pre-clinical stage of development and as a result, we can not accurately predict when or if we will be able to produce a product for commercialization. Accordingly, we cannot accurately estimate when such a change in revenue composition will occur or if it will ever occur.

**Research and Development Expenses:** Our research and development expenses consist primarily of costs associated with basic and pre-clinical research, exclusively in the field of human neural stem cell therapies and regenerative medicine, related to our clinical cell therapy candidates. These expenses represent both pre-clinical development costs and costs associated with non-clinical support activities such as quality control and regulatory processes. The cost of our research and development personnel is the most significant category of expense. However, we also incur expenses with third parties, including license agreements, third-party contract services, sponsored research programs and consulting expenses.

We do not segregate research and development costs by project because our research is focused exclusively on human stem cell therapies as a unitary field of study. Although we have different areas of focus for our research, these areas are completely intertwined and have not yet matured to the point where they are separate and distinct projects. The intellectual property, scientists and other resources dedicated to these efforts are not separately allocated to individual projects, but rather are conducting our research on an integrated basis.

We expect that research and development expenses will continue to increase in the foreseeable future as we add personnel, expand our pre-clinical research (animal surgeries, manufacturing of cells, and in vitro characterization of cells which includes testing and cell quality control), begin clinical trial activities, increase our regulatory compliance capabilities, and ultimately begin manufacturing.

In 2006 we retained Quintiles, Inc. to assist with regulatory compliance, preparation of our first Investigative New Drug ("IND") application, and patient enrollment for our first human trial. While recruitment for the trial cannot commence until we have received an FDA approved protocol, much of the infrastructure required must be developed and in place well in advance. For instance, we can begin to identify, contact, and educate prospective patients as well as the treatment community prior to commencing these trials.

Although we feel the above increase in personnel will be sufficient for our short term needs, the cost of increased personnel and expenses as we move from pre-clinical to clinical state is difficult to predict due to the uncertainty inherent in the timing and extent of progress in our research programs, and initiation of clinical trials. In addition, the results from our basic research and pre-clinical trials, as well as the results of trials of similar therapeutics underdevelopment by others, will influence the number, size and duration of planned and unplanned trials. As our research efforts mature, we will continue to review the direction of our research based on an assessment of the value of possible commercial applications emerging from these efforts. Based on this continuing review, we expect to establish discrete research programs and evaluate the cost and potential for cash inflows from commercializing products, partnering with others in the biotechnology industry, or licensing the technologies associated with these programs to third parties.

We believe that it is not possible at this stage to provide a meaningful estimate of the total cost to complete our ongoing projects and bring any proposed products to market. The use of human stem cells as a therapy is an emerging area of medicine, and it is not known what clinical trials will be required by the FDA in order to gain marketing approval. The costs to complete such clinical trials could vary substantially depending upon the projects selected for development, the number of clinical trials required and the number of patients needed for each study. At a minimum, we estimate that a trial for an individual indication such as Ischemic Spastic Paraplegia will require at least 10 to 12 patients at an estimated cost of $100,000 to $150,000 per patient. It is possible that the completion of these studies could be delayed for a variety of reasons, including difficulties in enrolling patients, delays in manufacturing, incomplete or inconsistent data from the pre-clinical or clinical trials, and difficulties evaluating the trial results. Any delay in completion of a trial would increase the cost of that trial, which would harm our operating results. Due to these uncertainties, we cannot reasonably estimate the size, nature, nor timing of the costs to complete, or the amount or timing of the net

cash inflows from our current activities. Until we obtain further relevant pre-clinical and clinical data, we will not be able to estimate our future expenses related to these programs or when, if ever, and to what extent, we will receive cash inflows from resulting products.

*General and Administrative Expenses*: Our general and administrative expenses consist of the general costs, expenses and salaries for the operation and maintenance of our business as well as professional service fees (legal, accounting, audit) relating thereto. We anticipate that general and administrative expenses will increase as we progress from pre-clinical to clinical phase.

In May of 2008 we initiated litigation against one of our competitors, StemCells, Inc. We believe in response to such litigation, StemCells, Inc. initiated an action against us. The litigation is in its initial stages and it is hard to estimate what the actual costs stemming there from will be. We have currently budgeted an additional $50,000 per month but this amount could significantly increase. For a further description of the litigation, refer to the section of this report entitled "*Legal Proceedings*."

Notwithstanding, we anticipate that General and Administrative Expense related to our core business will increase at a slower rate than that of similar companies making such transition to do in large part to our outsourcing model.

12

## Critical Accounting Policies

Our financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). The preparation of these financial statements requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses. Note 2 of the Notes to Financial Statements describes certain significant accounting policies used in the preparation of the financial statements. Certain of these significant accounting policies are considered to be critical accounting policies, as defined below.

A critical accounting policy is defined as one that is both material to the presentation of our financial statements and requires management to make difficult, subjective or complex judgments that could have a material effect on our financial condition and results of operations. Specifically, critical accounting estimates have the following attributes: (1) we are required to make assumptions about matters that are highly uncertain at the time of the estimate; and (2) different estimates we could reasonably have used, or changes in the estimate that are reasonably likely to occur, would have a material effect on our financial condition or results of operations.

Estimates and assumptions about future events and their effects cannot be determined with certainty. We base our estimates on historical experience and on various other assumptions believed to be applicable and reasonable under the circumstances. These estimates may change as new events occur, as additional information is obtained and as our operating environment changes. These changes have historically been minor and have been included in the consolidated financial statements as soon as they became known.

Based on a critical assessment of our accounting policies and the underlying judgments and uncertainties affecting the application of those policies, management believes that our financial statements are fairly stated in accordance with GAAP, and present a meaningful presentation of our financial condition and results of operations. We believe the following:

*Use of Estimates*—These financial statements have been prepared in accordance with GAAP, accordingly, they require management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Specifically, our management has estimated the expected economic life and value of our licensed technology, our net operating loss for tax purposes and our stock, option and warrant expenses related to compensation to employees and directors, consultants and investment banks. Actual results could differ from those estimates.

*Revenue Recognition*—Our revenue, to date, has been derived primarily from providing treated samples for gene expression data from stem cell experiments and from providing services as a subcontractor under federal grant programs. Revenue is recognized when there is persuasive evidence that an arrangement exists, delivery of goods and services has occurred, the price is fixed and determinable, and collection is reasonably assured.

*Intangible and Long-Lived Assets*—We follow SFAS No. 144, "Accounting for Impairment or Disposal of Long-Lived Assets," which established a "primary asset" approach to determine the cash flow estimation period for a group of assets and liabilities that represents the unit of accounting for a long lived asset to be held and used. Long-lived assets to be held and used are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The carrying amount of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less cost to sell. During the periods ended March 31, 2008 and March 31, 2007 no impairment losses were recognized.

*Research and Development Costs*—Research and development costs consist of expenditures for the research and development of patents and technology, which are not capitalizable and charged to operations when incurred. Our research and development costs consist mainly of payroll related expenses, research supplies and costs incurred in connection with specific research grants.

Neuralstem - Investor Relations - SEC Filings

*Share Based Compensation*—Beginning in 2006, we adopted SFAS No. 123R *"Share Based Payment"* which superseded APB Opinion No. 25. SFAS No. 123R requires compensation costs related to share-based payment transactions to be recognized in the financial statements.

13

## RESULTS OF OPERATIONS

*Summary Income Statement for the Three Months Ended March 31, 2008 & 2007*

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2008 | 2007 |
| Revenues | $ - | $ 181,825 |
| Operating Expenses | 2,295,769 | 1,149,623 |
| Operating Loss | (2,295,769) | (967,798) |
| Non-operating income | 21,317 | 18,556 |
| Net Loss | $ (2,274,452) | $ (949,242) |

## RESULTS OF OPERATIONS

*Result of Operations for the Three Months ending March 31, 2008 and 2007*

Revenues for the three months ended March 31, 2008 and 2007 were $0 and $181,825 respectively.

Research and development expenses for the three months ended March 31, 2008 and 2007 were $1,198,843 and $845,589, respectively. The increase in expenses in the current period consists mainly of payroll and payroll related expenses, share based compensation, research supplies and costs incurred in connection with specific research grants.

General and administrative expenses for the three months ended March 31, 2008 and 2007 were approximately $1,083,169, and $291,053, respectively. The principal increase in expenses in 2008 versus 2007 is a result of increased stock based compensation, payroll, legal (both patent and corporate), and the establishment of an accrual for a management incentive program.

Other non-operating income for the three months ended March 31, 2008 and 2007 were approximately $21,317, and $18,556, respectively. The increase in 2008 relates to interest income derived from our higher cash deposit balance compared to prior period.

Net loss for the three months ended March 31, 2008 and 2007 was approximately $2,274,453 and $949,242, respectively.

*Recent Accounting Pronouncements*

In June 2006, the FASB issued Interpretation No. 48, *"Accounting for Uncertainty in Income Taxes—an Interpretation of FASB Statement No. 109"* ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an entity's financial statements in accordance with SFAS No. 109, *"Accounting for Income Taxes,"* and prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. Additionally, FIN

48 provides guidance on subsequent derecognition of tax positions, financial statement classification, recognition of interest and penalties, accounting in interim periods, and disclosure and transition requirements. The Company adopted the provisions of FIN 48 on January 1, 2007.

The Company recognizes accrued interest related to unrecognized tax benefits in interest expense and penalties in operating expense. No amounts were accrued for the payment of interest and penalties at January 1, 2007. The Company's adoption of FIN 48 did not have a material effect on the Company's financial condition, results of operations or cash flows.

In September 2006, the FASB issued FASB Statement No. 157, "*Fair Value Measurements*" (SFAS 157), which defines fair value, establishes a framework for measuring fair value under GAAP, and expands disclosures about fair value measurements. SFAS 157 applies to other accounting pronouncements that require or permit fair value measurements. The new guidance is effective for financial statements issued for fiscal years beginning after November 15, 2007, and for interim periods within those fiscal years. The adoption of this standard did not affect our financial statements.

In February 2007, the FASB issued Statement No. 159, "The *Fair Value Option for Financial Assets and Financial Liabilities — Including an amendment of FASB Statement No. 115*" (SFAS 159). SFAS 159 provides companies with an option to report selected financial assets and liabilities at fair value. SFAS 159's objectives are to reduce both complexities in accounting for financial instruments and the volatility in earnings caused by measuring related assets and liabilities differently. SFAS 159 is effective as of the beginning of an entity's first fiscal year beginning after November 15, 2007. The adoption of this standard did not affect our financial statements.

14

In June 2007, the Financial Accounting Standards Board ratified a consensus opinion reached by the Emerging Issues Task Force (EITF) on EITF Issue 07-3, "*Accounting for Nonrefundable Advance Payments for Goods or Services Received for Use in Future Research and Development Activities.*" The guidance in EITF Issue 07-3 requires the Company to defer and capitalize nonrefundable advance payments made for goods or services to be used in research and development activities until the goods have been delivered or the related services have been performed. If the goods are no longer expected to be delivered nor the services expected to be performed, the Company would be required to expense the related capitalized advance payments. The consensus in EITF Issue 07-3 is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2007 and is to be applied prospectively to new contracts entered into on or after December 15, 2007. Early adoption is not permitted. Retrospective application of EITF Issue 07-3 is also not permitted. The Company intends to adopt EITF Issue 07-3 effective January 1, 2008. The impact of applying this consensus will depend on the terms of the Company's future research and development contractual arrangements entered into on or after December 15, 2007 and has not had a material impact upon the Company's operations.

## Liquidity and Capital Resources

We are financing our operations primarily with the proceeds from the private placement of our securities and the exercise of investor warrants. During the three months ended March 31, 2008, we raised $2,500,000, through the private placement of our securities. In addition, we raised an additional $73,937 as a result of warrant exercises from our current investors. To a substantially lesser degree, financing of our operations is provided through grant funding, payments received under license agreements, sales of our cells (tissue), and interest earned on cash. We received no payments from our grants, cell sales and licensing agreements for the three months ended March 31, 2008. Interest earned on cash and cash equivalents equaled $21,317.

We have incurred substantial net losses each year since inception as a result of research and development and general and administrative expenses in support of our operations. We anticipate incurring substantial net losses in the future.

Cash at March 31, 2008 was $8,257,850. Cash at December 31, 2007 was approximately $7,403,737. The increase in the current period is the result of the above described factors, net of amounts spent for payment of notes and accounts payable, increased legal and accounting fees, fees paid to the placement agent, and increases in other research and development and general and administrative expenses.

Our cash is limited. We will require substantial additional funding. Our future cash requirements will depend on many factors, including the pace and scope of our research and development programs, the costs involved in filing, prosecuting, maintaining and enforcing patents and other costs associated with commercializing our potential products. We intend to seek additional funding primarily through public or private financing transactions, and, to a lesser degree, new licensing or scientific collaborations, grants from governmental or other institutions, and other related transactions. If we are unable to raise additional funds, we will be forced to either scale back our business efforts or curtail our business activities entirely. Our currently monthly cash burn rate is $400,000. We anticipate that our available cash and expected income will be sufficient to finance most of our current activities for at least the next 12 months from March 31, 2008, although certain of these activities and related personnel may need to be reduced.

Additionally, in the event we are able to file a successful Investigative New Drug Application ("IND") with the FDA, we anticipate we will enter clinical trials in the last half of 2008. In the event of such trials, we would incur additional expenses associated with such trials which are estimated to exceed $1,000,000. Assuming our current monthly cash burn rate of $400,000, the increased expense from regulatory compliance and personnel required for the pre-trial and clinical work, as well as the estimated cost of the trial, our cash on hand is sufficient to finance our current operations, pre-clinical and clinical work for at least twelve months from March 31, 2008. We cannot assure you that public or private financing or grants will be available on acceptable terms, if at all. Several factors will affect our ability to raise additional funding, including, but not limited to, the volatility of our common shares.

## QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are not required to provide the information required by this items as we are considered a smaller reporting company, as defined by Rule 229.10(f)(1).

## CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

Disclosure controls and procedures are designed to ensure that information required to be disclosed in the quarterly reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported, within the time period specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in the reports filed under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

15

Neuralstem - Investor Relations - SEC Filings

**Risks Relating to the Company's Stage of Development**

*Since the Company has a limited operating history and has significantly shifted its operations and strategies since inception, you cannot rely upon the Company's limited historical performance to make an investment decision.*

Since inception in 1996 and through March 31, 2008, the Company has raised in aggregate, approximately $56,133,826 capital and recorded accumulated losses totaling $47,930,499. On March 31, 2008, the Company had a working capital surplus of $7,884,907 and stockholder's equity of $8,203,377. Our net losses for the two most recent fiscal years have been $7,063,272 and $3,147,488 for 2007 and 2006 respectively. Our net loss for the three month period ended March 31, 2008 was $2,274,453. We had no revenues for the three months ended March 31, 2008.

16

Neuralstem - Investor Relations - SEC Filings

The Company's ability to generate revenues and achieve profitability depends upon its ability to complete the development of its stem cell products, obtain the required regulatory approvals, manufacture, and market and sell its products. In part because of the Company's past operating results, no assurances can be given that the Company will be able to accomplish all or any these goals.

Although the Company has generated some revenue to date, the Company has not generated any revenue from the commercial sale of its proposed stem cell products. Since inception, the Company has engaged in several related lines of business and has discontinued operations in certain areas. For example, in 2002, the Company lost a material contract with the Department of Defense and was forced to close its principal facility and lay off almost all of its employees in an attempt to focus the Company's strategy on its stem cell technology. This limited and changing history may not be adequate to enable you to fully assess the Company's current ability to develop and commercialize its technologies and proposed products, obtain approval from the U.S. Food and Drug Administration ("FDA"), achieve market acceptance of its proposed products and respond to competition. No assurances can be given as to exactly when, if at all, the Company will be able to fully develop, commercialize market, sell and derive material revenues from its proposed products in development.

*The Company will need to raise additional capital to continue operations, and failure to do so will impair the Company's ability to fund operations, develop its technologies and promote its products.*

The Company has relied almost entirely on external financing to fund operations. Such financing has historically come primarily from the sale of common and preferred stock and convertible debt to third parties, the exercise of investor warrants and to a lesser degree from grants, loans and revenue from license and royalty fees. The Company anticipates, based on current proposed plans and assumptions relating to its operations (including the timetable of, and costs associated with, new product development) and financings the Company has undertaken prior to the date of this quarterly report, that its current working capital will be sufficient to satisfy contemplated cash requirements for approximately nine months, assuming that the Company does not engage in an extraordinary transaction or otherwise face unexpected events or contingencies, any of which could effect cash requirements. As of March 31, 2008, the Company had cash and cash equivalents on hand of $8,257,850. Presently, the Company has a monthly cash burn rate of approximately $400,000. Accordingly, the Company will need to raise additional capital to fund anticipated operating expenses and future expansion after such period. Among other things, external financing will be required to cover the further development of the Company's technologies and products and other operating costs. The Company cannot assure you that financing whether from external sources or related parties will be available if needed or on favorable terms. If additional financing is not available when required or is not available on acceptable terms, the Company may be unable to fund operations and planned growth, develop or enhance its technologies, take advantage of business opportunities or respond to competitive market pressures. Any negative impact on the Company's operations may make capital raising more difficult and may also resulting a lower price for the Company's securities.

*The Company may have difficulty raising needed capital in the future as a result of, among other factors, the Company's limited operating history and business risks associated with the Company.*

The Company's business currently generates limited amounts of cash which will not be sufficient to meet its future capital requirements. The Company's management does not know when this will change. The Company has expended and will continue to expend substantial funds in the research, development and clinical and pre-clinical testing of the Company's stem cell technologies and products. The Company will require additional funds to conduct research and development, establish and conduct clinical and pre-clinical trials, commercial scale manufacturing arrangements and to provide for the marketing and distribution. Additional funds may not be available on acceptable terms, if at all. If adequate funds are unavailable from any available source, the Company may have to delay, reduce the scope of or eliminate one or more of its research, development or commercialization programs or product launches or marketing efforts which may materially harm the Company's business, financial condition and results of operations.

The Company's long term capital requirements are expected to depend on many factors, including:

- continued progress and cost of its research and development programs;

- progress with pre-clinical studies and clinical trials;

- time and costs involved in obtaining regulatory clearance;

- costs involved in preparing, filing, prosecuting, maintaining and enforcing patent claims;

- costs of developing sales, marketing and distribution channels and its ability to sell the Company's stem cell products;

- costs involved in establishing manufacturing capabilities for commercial quantities of its products;

- competing technological and market developments;

17

- market acceptance of its stem cell products;

- costs for recruiting and retaining employees and consultants; and

- Costs for educating and training physicians about its stem cell products.

The Company may consume available resources more rapidly than currently anticipated, resulting in the need for additional funding. The Company may seek to raise any necessary additional funds through the exercising of warrants, options, equity or debt financings, collaborative arrangements with corporate partners or other sources, which may be dilutive to existing stockholders or otherwise have a material effect on the Company's current or future business prospects. If adequate funds are not available, the Company may be required to significantly reduce or refocus its development and commercialization efforts.

*The Company relies on stem cell technologies that it may not be able to commercially develop, which will prevent the Company from generating revenues, operating profitably or providing investors any return on their investment.*

The Company has concentrated its research on its stem cell technologies, and the Company's ability to generate revenue and operate profitably will depend on it being able to develop these technologies for human applications. These are emerging technologies with, as yet, limited human applications. The Company cannot guarantee that it will be able to develop its stem cell technologies or that such development will result in products or services with any significant commercial utility. The Company anticipates that the commercial sale of such products or services, and royalty/licensing fees related to its technology, will be the Company's primary sources of revenues. If the Company is unable to develop its technologies, investors will likely lose their entire investment.

*Inability to complete pre-clinical and clinical testing and trials will impair the viability of the Company.*

The Company is in its development stage and has not yet applied for approval by the FDA to conduct clinical trials. Even if the Company successfully files an IND and receives approval from the FDA to commence trials, the outcome of pre-clinical, clinical and product testing of the Company's products is uncertain, and if the Company is unable to satisfactorily complete such testing, or if such testing yields unsatisfactory results, the Company will be unable to commercially produce its proposed products. Before obtaining regulatory approval for the commercial sale of any potential human products, the Company's products will be subjected to extensive pre-clinical and clinical testing to demonstrate their safety and efficacy in humans. No assurances can be given that the clinical trials of the Company's products, or those of licensees or collaborators, will demonstrate the safety and efficacy of such products in all, or to the extent necessary to obtain appropriate regulatory approvals, or that the testing of such products will be completed in a timely manner, if at all, or without significant increases in costs, program delays or both, all of which could harm the Company's ability to generate revenues. In addition, the Company's proposed products may not prove to be more effective for treating disease or injury than current therapies. Accordingly, the Company may have to delay or abandon efforts to research, develop or obtain regulatory approval to market its proposed products. Many companies involved in biotechnology research and development have suffered significant setbacks in advanced clinical trials, even after promising results in earlier trials. The failure to adequately demonstrate the safety and efficacy of a therapeutic product under development could delay or prevent regulatory approval of the product and could harm the Company's ability to generate revenues, operate profitably or produce any return on an investment in the Company.

*The Company's additional financing requirements could result in dilution to existing stockholders.*

At present, the Company is not able to finance its operations through the sales of its product. Accordingly, the Company will be required to secure additional financing. If the Company is able to obtain such additional financings such financing may be dilutive to current shareholders. The Company has the authority to issue additional shares of common stock and preferred stock, as well as additional classes or series of ownership interests or debt obligations which may be convertible into any one or more classes or series of ownership interests. The Company is authorized to issue 75,000,000 shares of common stock and 7,000,000 shares of preferred stock. Such securities may be issued without the approval or other consent of the

Company's stockholders.

**Risks Relating to Intellectual Property and Government Regulation**

*The Company may not be able to withstand challenges to its intellectual property rights, such as patents, should contests be initiated in court or at the U.S Patent and Trademark Office.*

The Company relies on its intellectual property, including its issued and applied for patents, as the foundation of its business. The intellectual property rights of the Company may come under challenge, and no assurances can be given that, even though issued, the Company's current and potential future patents will survive claims commencing in the court system alleging invalidity or infringement on other patents. For example, in 2005, the Company's neural stem cell technology was challenged in the U.S. Patent and Trademark Office by a competitor. Although the Company prevailed in this particular matter upon re-examination by the patent office, these cases are complex, lengthy and expensive, and could potentially be adjudicated adversely to the Company, removing the protection afforded by an issued patent. The viability of the Company's business would suffer if such patent protection were limited or eliminated. Moreover, the costs associated with defending or settling intellectual property claims would likely have a material adverse effect on the Company. In May of 2008, we initiated litigation with StemCells, Inc. relating to our intellectual property. For a further discussion, refer to the section of this report entitled "*Legal Proceedings.*"

18

*The Company may not be able to adequately protect against piracy of intellectual property in foreign jurisdictions.*

Considerable research in the area of stem cell therapies is being performed in countries outside of the United States, and a number of the Company's competitors are located in those countries. The laws protecting intellectual property in some of those countries may not provide protection for the Company's trade secrets and intellectual property adequate to prevent its competitors from misappropriating the Company's trade secrets or intellectual property. If the Company's trade secrets or intellectual property are misappropriated in those countries, the Company may be without adequate remedies to address the issue.

*The Company's products may not receive FDA approval, which would prevent the Company from commercially marketing its products and producing revenues.*

The FDA and comparable government agencies in foreign countries impose substantial regulations on the manufacture and marketing of pharmaceutical products through lengthy and detailed laboratory, pre-clinical and clinical testing procedures, sampling activities and other costly and time-consuming procedures. Satisfaction of these regulations typically takes several years or more and varies substantially based upon the type, complexity and novelty of the proposed product. The Company cannot yet accurately predict when it might first submit any Investigational New Drug, or IND, application to the FDA, or whether any such IND application would be granted on a timely basis, if at all, nor can the Company assure you that it will successfully complete any clinical trials in connection with any such IND application. Further, the Company cannot yet accurately predict when it might first submit any product license application for FDA approval or whether any such product license application would be granted on a timely basis, if at all. As a result, the Company cannot assure you that FDA approvals for any products developed by it will be granted on a timely basis, if at all. Any such delay in obtaining, or failure to obtain, such approvals could have a material adverse effect on the marketing of the Company's products and its ability to generate product revenue.

*Because the Company or its collaborators must obtain regulatory approval to market its products in the United States and other countries, the Company cannot predict whether or when it will be permitted to commercialize its products.*

Federal, state and local governments and agencies in the United States (including the FDA) and governments in other countries have significant regulations in place that govern many of the Company's activities. The Company is or may become subject to various federal, state and local laws, regulations and recommendations relating to safe working conditions, laboratory and manufacturing practices, the experimental use of animals and the use and disposal of hazardous or potentially hazardous substances used in connection with its research and development work. The preclinical testing and clinical trials of the products that the Company or its collaborators develop are subject to extensive government regulation that may prevent the Company from creating commercially viable products from its discoveries. In addition, the sale by the Company or its collaborators of any commercially viable product will be subject to government regulation from several standpoints, including manufacturing, advertising and promoting, selling and marketing, labeling, and distributing. If, and to the extent that, the Company is unable to comply with these regulations, its ability to earn revenues will be materially and negatively impacted.

**Risks Relating to Competition**

*The Company's competition includes both public and private organizations and collaborations among academic institutions and large pharmaceutical companies, most of which have significantly greater experience and financial resources than the Company does.*

The biotechnology industry is characterized by intense competition. The Company competes against numerous companies, many of which have substantially greater financial and other resources than it has. Several such enterprises have initiated cell therapy research programs and/or efforts to treat the same diseases targeted by the Company. Companies such as Geron Corporation, Genzyme Corporation, StemCells, Inc. Advanced Cell Technology, Inc. Aastrom Biosciences, Inc. and Viacell, Inc., as well as others, have substantially greater resources and experience in the Company's fields than it does, and are well situated to compete with us effectively. Of course, any of the world's largest pharmaceutical companies represent a significant actual or potential competitor with vastly greater resources than the Company's.

**Risks Relating to the Company's Reliance on Third Parties**

*The Company's outsource model depends on collaborators, non-employee consultants, research institutions, and scientific contractors to help it develop and test its proposed products. Our ability to develop such relationships could impair or delay our ability to develop products.*

The Company's strategy for the development, clinical testing and commercialization of its proposed products is based on an outsource model. This model requires that the Company enter into collaborations with corporate partners, research institutions, scientific contractors and licensors, licensees and others in order to further develop its technology and develop products. In the event the Company is not able to enter into such relationships in the future, our: ability to develop products may be seriously hindered; or we would be required to expend considerable money and research to bring such research and development functions in house. Either outcome could result in our inability to develop a commercially feasible product or in the need for substantially more working capital to complete the research in-house. Also, we are currently dependent on collaborators for a substantial portion of our research and development. Although our collaborative agreements do not impose any duties or obligations on us other than the licensing of our technology, the failure of any of these collaborations may hinder our ability to develop products in a timely fashion. By way of example, our collaboration with John Hopkins University, School of Medicine yielded findings that contributed to our patent application entitled Transplantation of Human Cells for Treatment of Neurological Disorder. Had the collaboration not have existed, our ability to apply for such patent would have been greatly hindered. We currently have 4 key collaborations. They are with:

19

Neuralstem - Investor Relations - SEC Filings

- The University of California, San Diego;

- University of Central Florida; and

- John Hopkins University.

- University of Michigan

As we are under no financial obligation to provide additional funding under any of these collaborations, our primary risk is that no results are derived from their research.

*We intend to rely upon the third-party FDA-approved manufacturers for our stem cells. Should these manufacturers fail to perform as expected, we will need to develop or procure other manufacturing sources, which would cause delays or interruptions in our product supply and result in the loss of significant sales and customers.*

We currently have no internal manufacturing capability, and will rely extensively on FDA-approved licensees, strategic partners or third party contract manufacturers or suppliers. We current have an agreement with Charles River Laboratories for the manufacturing and storage of our cells. The agreement is a paid for services agreement and does not require us to purchase a minimum amount of cells. In the event Charles River Laboratories fails to provide suitable cells, we would be forced to either manufacture the cells ourselves or seek other third party vendors. Should we be forced to manufacture our stem cells, we cannot give you any assurance that we will be able to develop an internal manufacturing capability or procure third party suppliers. In the event we must seek alternative third party suppliers, they may require us to purchase a minimum amount of cells, could be significantly more expensive than our current supplier, or could require other unfavorable terms. Any such event would materially impact our prospects and could delay our development. Moreover, we cannot give you any assurance that any contract manufacturers or suppliers we procure will be able to supply our product in a timely or cost effective manner or in accordance with applicable regulatory requirements or our specifications

**General Risks Relating to the Company's Business**

*The Company may be subject to litigation that will be costly to defend or pursue and uncertain in its outcome.*

The Company's business may bring it into conflict with its licensees, licensors, or others with whom it has contractual or other business relationships or with its competitors or others whose interests differ from the Company's. If the Company is unable to resolve those conflicts on terms that are satisfactory to all parties, the Company may become involved in litigation brought by or against it. That litigation is likely to be expensive and may require a significant amount of management's time and attention, at the expense of other aspects of the Company's business. The outcome of litigation is always uncertain, and in some cases could include judgments against us that require the Company to pay damages, enjoin it from certain activities, or otherwise affect its legal or contractual rights, which could have a significant adverse effect on its business. By way of example, in May of 2008, we filed a complaint against one of our competitors, StemCells Inc., alleging that U.S. Patent No. 7,361,505 (the "'505 patent"), allegedly exclusively licensed to StemCells, Inc., is invalid, not infringed, and unenforceable. On the same day, StemCells, Inc. filed a complaint alleging that we had infringed, contributed to the infringement of, and or induced the infringement of two patents owned by or exclusively licensed to StemCells relating to stem cell culture compositions. At present, the litigation is in its initial stages and any likely outcome is difficult to predict. It is not known when nor on what basis this matter will be concluded.

*The Company may not be able to obtain third-party patient reimbursement or favorable product pricing, which would reduce its ability to operate profitably.*

The Company's ability to successfully commercialize certain of its proposed products in the human therapeutic field may depend to a significant degree on patient reimbursement of the costs of such products and related treatments at acceptable levels from government authorities, private health insurers and other organizations, such as health maintenance organizations.

The Company cannot assure you that reimbursement in the United States or foreign countries will be available for any products it may develop or, if available, will not be decreased in the future, or that reimbursement amounts will not reduce the demand for, or the price of, its products with a consequent harm to the Company's business. The Company cannot predict what additional regulation or legislation relating to the health care industry or third-party coverage and reimbursement may be enacted in the future or what effect such regulation or legislation may have on the Company's business. If additional regulations are overly onerous or expensive or if health care related legislation makes its business more expensive or burdensome than originally anticipated, the Company may be forced to significantly downsize its business plans or completely abandon its business model.

20

*The Company's products may be expensive to manufacture, and they may not be profitable if the Company is unable to control the costs to manufacture them.*

The Company's products may be significantly more expensive to manufacture than most other drugs currently on the market today due to a fewer number of potential manufactures, greater level of needed expertise, and other general market conditions affecting manufacturers of stem cell based products. The Company would hope to substantially reduce manufacturing costs through process improvements, development of new science, increases in manufacturing scale and outsourcing to experienced manufacturers. If the Company is not able to make these, or other improvements, and depending on the pricing of the product, its profit margins may be significantly less than that of most drugs on the market today. In addition, the Company may not be able to charge a high enough price for any cell therapy product it develops, even if they are safe and effective, to make a profit. If the Company is unable to realize significant profits from its potential product candidates, this business would be materially harmed.

*In order to secure market share and generate revenues, the Company's proposed products must be accepted by the health care community, which can be very slow to adopt or are unreceptive to new technologies and products.*

The Company's proposed products and those developed by its collaborative partners, if approved for marketing, may not achieve market acceptance since hospitals, physicians, patients or the medical community in general may decide not to accept and utilize these products. The products that the Company is attempting to develop represents substantial departures from established treatment methods and will compete with a number of more conventional drugs and therapies manufactured and marketed by major pharmaceutical companies. The degree of market acceptance of any of the Company's developed products will depend on a number of factors, including:

- the Company's establishment and demonstration to the medical community of the clinical efficacy and safety of its proposed products;

- the Company's ability to create products that are superior to alternatives currently on the market;

- the Company's ability to establish in the medical community the potential advantage of its treatments over alternative treatment methods; and

- Reimbursement policies of government and third-party payors.

If the health care community does not accept the Company's products for any of the foregoing reasons, or for any other reason, the Company's business would be materially harmed.

*We depend on two key employees for our continued operations and future success. A loss of either employee could significantly hinder our ability to move forward with our business plan.*

The loss of either of our key executive officers, Richard Garr and Karl Johe, would be significantly detrimental to us.

- We currently *do not* maintain "key person" life insurance on the life of Mr. Garr. As a result, the Company will not receive any compensation upon the death or incapacity of this key individuals;

- We currently *do* maintain "key person" line insurance on the life of Mr. Johe. As a result, the Company will receive approximately $1,000,000 in the event of his death or incapacity.

In addition, the Company's anticipated growth and expansion into areas and activities requiring additional expertise, such as clinical testing, regulatory compliance, manufacturing and marketing, will require the addition of new management personnel and the development of additional expertise by existing management personnel. There is intense competition for qualified personnel in the areas of the Company's present and planned activities, and there can be no assurance that the Company will be able to continue to attract and retain the

qualified personnel necessary for the development of its business. The failure to attract and retain such personnel or to develop such expertise would adversely affect the Company's business.

21

*The Company has entered into long-term contracts with key personnel and stockholders, with significant anti-termination provisions, which could make future changes in management difficult or expensive.*

Messrs. Garr and Johe have entered into seven (7) year employment agreements with the Company which expire on November 1, 2012 and which include termination provisions stating that if either employee is terminated for any reason other than a voluntary resignation, then all compensation due to such employee under the terms of the respective agreement shall become due and payable immediately. These provisions will make the replacement of either of these employees very costly to the Company, and could cause difficulty in effecting a change in control of the Company. Termination prior to full term on the contracts would cost the Company as much as $1,800,000 per contract, and immediate vesting of all outstanding options.

*The Company has no product liability insurance, which may leave it vulnerable to future claims that the Company will be unable to satisfy.*

The testing, manufacturing, marketing and sale of human therapeutic products entails an inherent risk of product liability claims, and the Company cannot assure you that substantial product liability claims will not be asserted against it. The Company has no product liability insurance. In the event the Company is forced to expend significant funds on defending product liability actions, and in the event those funds come from operating capital, the Company will be required to reduce its business activities, which could lead to significant losses.

*The Company cannot assure you that adequate insurance coverage will be available in the future on acceptable terms, if at all, or that, if available, the Company will be able to maintain any such insurance at sufficient levels of coverage or that any such insurance will provide adequate protection against potential liabilities.*

The Company has limited director and officer insurance and commercial insurance policies. Any significant claim would have a material adverse effect on its business, financial condition and results of operations. Insurance availability, coverage terms and pricing continue to vary with market conditions. The Company endeavors to obtain appropriate insurance coverage for insurable risks that it identifies, however, the Company may fail to correctly anticipate or quantify insurable risks, may not be able to obtain appropriate insurance coverage and insurers may not respond as the Company intends to cover insurable events that may occur. The Company has observed rapidly changing conditions in the insurance markets relating to nearly all areas of traditional corporate insurance. Such conditions may result in higher premium costs, higher policy deductibles, and lower coverage limits. For some risks, the Company may not have or maintain insurance coverage because of cost or availability.

**Risks Relating to the Company's Common Stock**

*Our common shares are sporadically or "thinly" traded, so you may be unable to sell at or near ask prices or at all if you need to sell your shares to raise money or otherwise desire to liquidate your shares*

Our common shares have historically been sporadically or "thinly" traded, meaning that the number of persons interested in purchasing our common shares at or near prices at any given time may be relatively small or non-existent. This situation is attributable to a number of factors, including the fact that we are a small company which is relatively unknown to stock analysts, stock brokers, institutional investors and others in the investment community that generate or influence sales volume, and that even if we came to the attention of such persons, they tend to be risk-averse and would be reluctant to follow an unproven development stage company such as ours or purchase or recommend the purchase of our shares until such time as we became more seasoned and viable. As a consequence, there may be periods of several days or more when trading activity in our shares is minimal or non-existent, as compared to a seasoned issuer which has a large and steady volume of trading activity that will generally support continuous sales without a material reduction in share price. We cannot give you any assurance that a broader or more active public trading market for our common shares will develop or be sustained, or that current trading levels will be sustained. Due to these conditions, we can give you no assurance that you will be able to sell your shares at or near ask prices or at all if you need money or otherwise desire to liquidate your shares.

*The market price for our common shares is particularly volatile given our status as a relatively unknown company with a small and thinly-traded public float, limited operating*

*history and lack of revenues or profits to date could lead to wide fluctuations in our share price. The price at which you purchase our common shares may not be indicative of the price that will prevail in the trading market. You may be unable to sell your common shares at or above your purchase price, which may result in substantial losses to you. The volatility in our common share price may subject us to securities litigation.*

The market for our common shares is characterized by significant price volatility when compared to seasoned issuers, and we expect that our share price will continue to be more volatile than a seasoned issuer. The volatility in our share price is attributable to a number of factors. First, as noted above, our common shares are sporadically or thinly traded. As a consequence of this lack of liquidity, the trading of relatively small quantities of shares by our shareholders may disproportionately influence the price of those shares in either direction. The price for our shares could, for example, decline precipitously in the event that a large number of our common shares are sold on the market without commensurate demand, as compared to a seasoned issuer which could better absorb those sales without a material reduction in share price. Secondly, we are a speculative or "risky" investment due to our limited operating history and lack of significant revenues to date, and uncertainty of future market acceptance for our products if successfully developed. As a consequence of this enhanced risk, more risk-adverse investors may, under the fear of losing all or most of their investment in the event of negative news or lack of progress, be more inclined to sell their shares on the market more quickly and at greater discounts than would be the case with the stock of a seasoned issuer. Additionally, in the past, plaintiffs have often initiated securities class action litigation against a company following periods of volatility in the market price of its securities. We may in the future be the target of similar litigation. Securities litigation could result in substantial costs and liabilities and could divert management's attention and resources.

22

The following factors may add to the volatility in the price of our common shares: actual or anticipated variations in our quarterly or annual operating results; government regulations, announcements of significant acquisitions, strategic partnerships or joint ventures; our capital commitments; and additions or departures of our key personnel. Many of these factors are beyond our control and may decrease the market price of our common shares, regardless of our operating performance. We cannot make any predictions or projections as to what the prevailing market price for our common shares will be at any time, including as to whether our common shares will sustain their current market prices, or as to what effect that the sale of shares or the availability of common shares for sale at any time will have on the prevailing market price.

**The Company faces risks related to compliance with corporate governance laws and financial reporting standards.**

The Sarbanes-Oxley Act of 2002, as well as related new rules and regulations implemented by the Securities and Exchange Commission and the Public Company Accounting Oversight Board, require changes in the corporate governance practices and financial reporting standards for public companies. These new laws, rules and regulations, including compliance with Section 404 of the Sarbanes-Oxley Act of 2002 relating to internal control over financial reporting ("Section 404"), will materially increase the Company's legal and financial compliance costs and made some activities more time-consuming and more burdensome. Starting in 2007, Section 404 of the Sarbanes-Oxley Act of 2002 will require that the Company's management assess the Company's internal control over financial reporting annually and include a report on its assessment in its filings with the SEC.

**The Company does not intend to pay cash dividends on its common stock in the foreseeable future.**

Any payment of cash dividends will depend upon the Company's financial condition, results of operations, capital requirements and other factors and will be at the discretion of the Board of Directors. The Company does not anticipate paying cash dividends on its common stock in the foreseeable future. Furthermore, the Company may incur additional indebtedness that may severely restrict or prohibit the payment of dividends.

***Our issuance of additional common shares or preferred shares, or options or warrants to purchase those shares, could dilute your proportionate ownership and voting rights and negatively impact the value of your investment in our common shares as the result of preferential voting rights or veto powers, dividend rights, disproportionate rights to appoint directors to our board, conversion rights, redemption rights and liquidation provisions granted to the preferred shareholders, including the grant of rights that could discourage or prevent the distribution of dividends to you, or prevent the sale of our assets or a potential takeover of our company.***

We are entitled under our certificate of incorporation to issue up to 75,000,000 common and 7,000,000 "blank check" preferred shares. As of March 31, 2008, we have issued and outstanding 32,075,875 common shares, 18,509,174 common shares reserved for issuance upon the exercise of current outstanding options and warrants, 949,341 common shares reserved for issuances of additional grants under our 2005 incentive stock plan, and 1,950,000 shares reserved for issuance of grants under our 2007 stock plan. Accordingly, we will be entitled to issue up to 21,515,610 additional common shares and 7,000,000 additional preferred shares. Our board may generally issue those common and preferred shares, or options or warrants to purchase those shares, without further approval by our shareholders based upon such factors as our board of directors may deem relevant at that time. Any preferred shares we may issue shall have such rights, preferences, privileges and restrictions as may be designated from time-to-time by our board, including preferential dividend rights, voting rights, conversion rights, redemption rights and liquidation provisions. It is likely that we will be required to issue a large amount of additional securities to raise capital to further our development and marketing plans. It is also likely that we will be required to issue a large amount of additional securities to directors, officers, employees and consultants as compensatory grants in connection with their services, both in the form of stand-alone grants or under our various stock plans. We cannot give you any assurance that we will not issue additional common or preferred shares, or options or warrants to purchase those shares, under circumstances we may deem appropriate at the time.

**UNREGISTERED SALES OF EQUITY SECURITIES**
**AND USE OF PROCEEDS**

We incorporate by reference the information pertaining to unregistered sales of equity securities as disclosed in our annual report file on Form 10-KSB for the period ended December

31, 2007.

- On January 21, 2008, we issued the following:

*Karl Johe, Chairman and Chief Science Officer* - options to purchase 2.1 million common shares at a price of $3.66 per share. The options vest over 3.5 years with the vesting period commencing on January 1, 2008 with 700,000 options vesting on each of February 28, 2009, April 30, 2010, and June 30, 2011. The options expire on January 1, 2018. Additionally, the options will become immediately exercisable upon an event which would result in an acceleration of Mr. Johe's stock options granted under his employment agreement.

23

*Richard Garr, Chief Executive Officer and General Council* - options to purchase 2.1 million common shares at a price of $3.66 per share. The options vest over 3.5 years with the vesting period commencing on January 1, 2008 with 700,000 options vesting on each of February 28, 2009, April 30, 2010, and June 30, 2011 . The options expire on January 1, 2018. Additionally, the options will become immediately exercisable upon an event which would result in an acceleration of Mr. Johe's stock options granted under his employment agreement.

• On February 19, 2008, we entered into an agreement with CJ CheilJedang Corporation (KSE: CJ CheilJedang) for the sale of $2.5 million of common shares at $4.063 per share. Pursuant to the transaction, we issued an aggregate of 615,309 common shares to CJ CheilJedang. Please refer to our Current Report filed on form 8-K on February 25, 2008 for a further description of the transaction.

### DEFAULTS UPON SENIOR SECURITIES

None

### SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None

### DEFAULT UPON SENIOR SECURITIES

None

### SUBMISSIONOF MATTERS TO A VOTE OF SECURITY HOLDERS

None

### EXHIBITS.

The following exhibits are hereby filed as part of this Quarterly Report on Form 10-Q or incorporated by reference.

| Exhibit Number: | Description |
| --- | --- |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a) and Rule 15d-14(a) of the Securities Exchange Act, as amended |
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a) and Rule 15d-14(a) of the Securities Exchange Act, as amended |
| 32.1 | Certification of the Chief Executive Officer Pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | Certification of the Chief Financial Officer Pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

24

## SIGNATURES

In accordance with the requirements of the Securities Exchange Act of 1934, the Registrant has caused this report to be signed by the undersigned hereunto duly authorized.

**NEURALSTEM, INC.**

Date: May 15, 2008

/s/ I. Richard Garr
Chief Executive Officer

/s/ John Conron
Chief Financial Officer
(Principal Accounting Officer)

25

**EXHIBIT 31.1**

**SECTION 302**

**CERTIFICATION OF THE PRINCIPAL EXECUTIVE OFFICER**

I, I Richard Garr, certify that:

(1) I have reviewed this quarterly report on Form 10-Q of Neuralstem, Inc;

(2) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3) Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4) The registrant's other certifying officer(s) and I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its unconsolidated investments, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5) The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 15, 2008

By: /s/ I. Richard Garr
    I. Richard Garr, Chief Executive Officer

**EXHIBIT 31.2**

**SECTION 302**

**CERTIFICATION OF THE PRINCIPAL FINANCIAL OFFICER**

I, John Conron, certify that:

(1) I have reviewed this quarterly report on Form 10-Q of Neuralstem, Inc;

(2) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3) Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4) The registrant's other certifying officer(s) and I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its unconsolidated investments, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5) The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 15, 2008

By: /s/ John Conron

John Conron, Chief Financial Officer

(Principal Financial Officer)

**EXHIBIT 32.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350 AND EXCHANGE ACT RULES 13a-14(b) AND 15d-14(b)**
**(Section 906 of the Sarbanes-Oxley Act of 2002)**

In connection with the Quarterly Report of Neuralstem, Inc. (the "Company") on Form 10-Q for the period ending March 31, 2008, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, I. Richard Garr, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that, to the best of my knowledge and belief:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of the operation of the Company.

/s/ I. Richard Garr
Chief Executive Officer
Neuralstem, Inc

This certification accompanies the Report pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by the Sarbanes-Oxley Act of 2002, be deemed filed by the Company for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

**EXHIBIT 32.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO
18 U.S.C. SECTION 1350 AND EXCHANGE ACT RULES 13a-14(b) AND 15d-14(b)
(Section 906 of the Sarbanes-Oxley Act of 2002)**

In connection with the Quarterly Report of Neuralstem, Inc. (the "Company") on Form 10-Q for the period ending March 31, 2008, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, John Conron, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge and belief:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of the operation of the Company.

/s/ John Conron
Chief Financial Officer
(Principal Financial Officer)
Neuralstem, Inc.

This certification accompanies the Report pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by the Sarbanes-Oxley Act of 2002, be deemed filed by the Company for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

<< Previous Page | Next Page >>

# Exhibit 2

contact | jobs | site map |



The discovery and development of stem cell therapeutics

News & Events > Press Releases > April 23, 2008

Press Releases

Events

Email Alerts

Press Release Archive

## StemCells, Inc. Granted Key U.S. Patent Covering Composition of Neural Stem Cells Derived From Any Tissue Source, Including Embryonic

**PALO ALTO, Calif. (April 23, 2008)** – StemCells, Inc. (NASDAQ: STEM) announced today that the U.S. Patent and Trademark Office has issued U.S. Patent Number 7,361,505 with broad claims covering human neural stem cells derived from any tissue source, including embryonic, fetal, juvenile, or adult tissue. The '505 patent is exclusively licensed to StemCells.

"The issuance of this patent rounds out and strengthens our neural stem cell portfolio, which we believe is unparalleled in its breadth, depth and completeness," said Martin McGlynn, President and CEO of StemCells, Inc. "We are confident that any third party wishing to commercialize neural stem cells as potential therapeutics or to use them as drug screening tools will have to seek a license from us irrespective of how they derive the cells. We have already granted licenses to several companies and are currently considering licensing others."

StemCells, Inc., including its wholly-owned subsidiary, StemCells California, Inc., owns or has exclusive rights to more than 50 issued or allowed U.S. patents and more than 150 granted or allowed non-U.S. patents. Most of these have application to the selection, expansion or use of neural stem cells, and include claims which cover compositions of matter, methods of identifying, isolating and enriching neural stem and progenitor cell populations, and methods of using these cells for therapeutic applications as well as for drug discovery and screening. The Company has patent protection for the manufacture and use of its HuCNS-SC ® human neural stem cells through to the year 2024, even without relying on patent term extensions. Some of the Company's other composition of matter patents, such as U.S. Patent Number 7,153,686 claim certain populations of enriched HuCNS-SC cells discovered by StemCells scientists. The Company has granted licenses to a number of companies in the neural stem cell field for limited purposes, including the U.S.-based BioWhittaker, Inc. (now part of the Swiss-based Lonza Group), UK-based ReNeuron Group plc, and Canadian-based Stem Cell Therapeutics Corp. and StemCell Technologies.

### About StemCells, Inc.
StemCells, Inc. is a clinical-stage biotechnology company focused on the discovery, development and commercialization of cell-based therapeutics to treat diseases of the central nervous system and liver. The Company's product development programs seek to repair or repopulate CNS and liver tissue that has been damaged or lost as a result of disease or injury. StemCells has pioneered the discovery and development of HuCNS-SC ® cells, its highly purified, expandable population of human neural stem cells. StemCells has

completed enrollment and dosing of a six patient Phase I clinical trial of its proprietary HuCNS-SC product candidate as a treatment for neuronal ceroid lipofuscinosis (NCL) and expects the trial to be completed in early 2009. NCL, which is often referred to as Batten disease, is a rare and fatal neurodegenerative disease that affects infants and young children. Further information about the Company is available on its web site at: www.stemcellsinc.com.

*Apart from statements of historical fact, the text of this press release constitutes forward-looking statements regarding, among other things, the future business operations of StemCells, Inc. (the "Company") and its ability to conduct clinical trials as well as its research and product development efforts. The forward-looking statements speak only as of the date of this news release. StemCells does not undertake to update any of these forward-looking statements to reflect events or circumstances that occur after the date hereof. Such statements reflect management's current views and are based on certain assumptions that may or may not ultimately prove valid. The Company's actual results may vary materially from those contemplated in the forward-looking statements due to risks and uncertainties to which the Company is subject, including uncertainties regarding the Company's ability to obtain the increased capital resources needed to continue its current operations and to conduct the research, preclinical development and clinical trials necessary for regulatory approvals and continued patent prosecution efforts; uncertainty regarding the validity and enforceability of the Company's existing patents, which may be questioned or contested through requests for reexamination and other legal proceedings; and other factors that are described under the heading "Risk Factors" in Item 1A of the Company's Annual Report on Form 10-K.*

#########################

CONTACT: StemCells, Inc.
Rodney Young
Chief Financial Officer
650-475-3100, Ext. 105
irpr@stemcellsinc.com

SOURCE: StemCells, Inc.

© 2000-2008 StemCells, Incorporated, World Rights Reserved. Tel: (650) 475-3100        Terms of Use | Privacy Policy | Forward Looking Statement

# Exhibit 3

Case 4:08-cv-02364-CW     Document 34-4     Filed 06/19/2008     Page 2 of 3

# Press Release

## Neuralstem Sues StemCells, Inc. Over New Patent

ROCKVILLE, Md., May 7 /PRNewswire-FirstCall/ -- Stem cell company Neuralstem, Inc. (Amex: CUR) is filing suit today against StemCells, Inc. stating, among other things, that StemCells intentionally withheld crucial information highly material to the patentability of StemCells' "new" patent (US Pat No. 7,361,505) and that this was done with the intent to deceive the United States Patent Office in order to get the '505 patent allowed. As a result of these actions, Neuralstem is asking for a declaratory judgment that the patent is unenforceable. The suit will be filed in the United States District Court for the District of Maryland Southern Division.

(Logo: http://www.newscom.com/cgi-bin/prnh/20061221/DCTH007LOGO )

"While we believe that it is clear that we are not infringing this patent, and we have not yet been directly accused by StemCells, Inc. of infringing this patent, the threatening statements in their press release of April 23rd leave the misleading impression that we would require a license from them as a result of the issuance of this patent. Nothing could be further from the truth," said Neuralstem President & CEO Richard Garr. "And, in addition to finding that the patent is unenforceable against us, or anyone else for that matter, as a result of their actions, we are asking that the Court also declare that we are not infringing the patent and that the patent is also invalid."

"We are confident that their intentional withholding of highly material information and their intent to deceive the Patent Office, will result in this patent being unenforceable," concluded Garr.

About Neuralstem

Neuralstem's patented technology enables, for the first time, the ability to produce neural stem cells of the human brain and spinal cord in commercial quantities, and the ability to control the differentiation of these cells into mature, physiologically relevant human neurons and glia.

Major Central Nervous System diseases targeted by the Company with research programs currently underway include: Ischemic Paraplegia, Traumatic Spinal Cord Injury and ALS. The company's cells have extended the life of rats with ALS (Lou Gehrig's disease) as reported the journal TRANSPLANTATION, in collaboration with Johns Hopkins University researchers, and also reversed paralysis in rats with Ischemic Spastic Paraplegia, as reported in NEUROSCIENCE on June 29, 2007, in collaboration with researchers at University of California San Diego.

The company has also developed immortalized human neural stem cells for in-vitro use in drug development for the academic and pharmaceutical markets. For further information, please visit http://www.neuralstem.com.

Cautionary Statement Regarding Forward Looking Information

This news release may contain forward-looking statements made pursuant to the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. Investors are cautioned that such forward-looking statements in this press release regarding potential applications of Neuralstem's technologies constitute forward-looking statements that involve risks and uncertainties, including, without limitation, risks inherent in the development and commercialization of potential products, uncertainty of clinical trial results or regulatory approvals or clearances, need for future capital, dependence upon collaborators and maintenance of our intellectual property rights. Actual results may differ materially from the results anticipated in these forward- looking statements. Additional information on potential factors that could affect our results and other risks and uncertainties are detailed from time to time in Neuralstem's periodic reports, including the quarterly report on Form 10-KSB for the year ended December 31, 2007.

SOURCE  Neuralstem, Inc.

-0-    05/07/2008

    /CONTACT:  Company Contact: Richard Garr, President, Neuralstem, Inc.,
+1-301-366-4960; Media: Deanne Eagle, Planet Communications, +1-917-837-5866;
Investor Relations: Ira Weingarten, +1-805-897-1880, or Steve Chizzik,
+1-908-688-9111, both of Equity Communications, all for Neuralstem, Inc./
    /Photo:  NewsCom: http://www.newscom.com/cgi-bin/prnh/20061221/DCTH007LOGO
        AP Archive:  http://photoarchive.ap.org
        PRN Photo Desk, photodesk@prnewswire.com /
    /Web site:  http://www.neuralstem.com /
(CUR)

CO:  Neuralstem, Inc.; StemCells, Inc.
ST:  Maryland
IN:  BIO HEA MTC
SU:  FLW

JD-FK
-- NEW036 --
0544 05/07/2008 08:00 EDT http://www.prnewswire.com

# Exhibit 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| NEURALSTEM, INC.,<br>9700 Great Seneca Highway,<br>Rockville, Maryland, 20850,<br>Montgomery County,<br><br>Plaintiff,<br><br>v.<br><br>STEMCELLS, INC.; STEMCELLS<br>CALIFORNIA, INC.,<br>3155 Porter Drive, Palo Alto,<br>California 94304;<br>and<br>NEUROSPHERES HOLDING LTD.,<br>83 Heritage Medical Research Center,<br>3330 Hospital Drive N.W.,<br>Calgary, Alberta, T2N 4N1, Canada,<br><br>Defendants. | : : : : : : : : : : : : : : : : : : : : : | Civ. No. _____<br><br>Jury Trial Demanded |

## COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT
## UNENFORCEABILITY, INVALIDITY, AND NON-INFRINGEMENT

Plaintiff, Neuralstem, Inc. ("Neuralstem"), by its attorneys, alleges as follows for its

Complaint for Declaratory Judgment against Defendants StemCells, Inc.; StemCells California,

Inc. (collectively, "StemCells"); and Neurospheres Holding, Ltd. ("Neurospheres") (collectively,

"Defendants"):

## I.    JURISDICTION, VENUE AND PARTIES

1.    This action arises under the Declaratory Judgment Act, 28 U.S.C §§ 2201 and

2202 and the patent laws of the United States, 35 U.S.C. § 1 *et seq*.  Venue for this case is proper

in this District and before this Court under 28 U.S.C. § 1391(b) and 1391(c).

2.      Plaintiff Neuralstem is a corporation organized under the laws of the State of Maryland with its principal place of business at 9700 Great Seneca Highway, Rockville, Maryland 20850.  Founded in 1996, Neuralstem is a publicly-traded biotherapeutics company whose mission is to use stem cell research and its patented human neural stem cell technology to treat diseases of the central nervous system including Ischemic Paraplegia, Traumatic Spinal Cord Injury, ALS, Stroke, and Parkinson's Disease.  Neuralstem's technology was pioneered and developed by its Scientific Founder and Chairman, Dr. Karl Johe.  Neuralstem's technology enables, for the first time, the ability to produce neural stem cells of the human brain and spinal cord in significant quantities, and the ability to control the differentiation of these cells into mature, physiologically relevant human neurons and glia.  Neuralstem sells no commercial products embodying this technology as it is engaged in the process of gathering data for submission to the Food and Drug Administration.

3.      Upon information and belief, Defendant StemCells, Inc. is a Delaware corporation, with its principal place of business located at 3155 Porter Drive, Palo Alto, California 94304.  StemCells is in the business of stem cell based treatments of diseases and conditions characterized by damage to or degeneration of the central nervous system ("CNS"), liver, pancreas and other tissue and stem cell based diagnostic and screening tools.

4.      Upon information and belief, Defendant StemCells California, Inc. is a wholly owned subsidiary of StemCells, Inc., with its principal place of business located at 3155 Porter Drive, Palo Alto, California 94304.

5.      Jurisdiction over StemCells is proper because StemCells has availed itself of the jurisdiction of this Court by filing lawsuits alleging patent infringement in the United States

District Court for the District of Maryland, including *StemCells, Inc. v. Neuralstem, Inc.*, Case No. 06-1877, which is currently pending.

6.     Upon information and belief, Defendant Neurospheres is a Canadian entity with its principal place of business at 83 Heritage Medical Research Center, 3330 Hospital Drive N.W., Calgary, Alberta, T2N 4N1, Canada.  Upon information and belief, Neurospheres is an intellectual property holding company that licenses all of its patents to its exclusive/non-exclusive licensee StemCells, Inc.  Upon information and belief, StemCells, Inc. has the right to sublicense the Neurospheres patents and has claimed all substantial rights in all Neurospheres patents, including the right to enforce them.

7.     This court has jurisdiction over Neurospheres based on its active and ongoing relationship with its exclusive licensee, StemCells, and StemCells' extensive contacts in this judicial district including, but not limited to, StemCells' filing of at least three different lawsuits alleging patent infringement in the United States District Court for the District of Maryland for patents that are owned by Neurospheres.

## FACTUAL ALLEGATIONS

8.     On April 22, 2008, the United States Patent and Trademark Office issued United States Patent No. 7,361,505 (the "'505 patent") for "Multipotent Neural Stem Cell Compositions" to Neurospheres.  (*See* Exhibit A.)

9.     The day after issuance, StemCells, Neurospheres' exclusive licensee for the '505 patent, issued a press release regarding the '505 patent and touting its "broad claims covering human neural stem cells derived from any tissue source, including embryonic, fetal, juvenile, or adult tissue."  (Exhibit B, StemCells April 23, 2008 Press Release.)  In that press release, StemCells' President and CEO, Martin McGlynn stated: "We are confident that ***any third party wishing to commercialize neural stem cells as potential therapeutics or use them as drug***

*screening tools will have to seek a license* from us irrespective of how they derive the cells. *Id.* (emphasis added). According to StemCells it has granted many licenses to patents directed to neural stem cells, including licenses to Cambrex; ReNeuron, R&D Systems; and Stem Cell Therapeutics. (*See* Exhibit C, Amended Complaint in Case No. AW 06 CV 1877, at ¶ 10.)

10.     In addition, to issuing threatening statements to the market, StemCells has a history of aggressively enforcing its exclusively licensed patents. In 2001 StemCells filed suit against Sciencell Research Laboratories ("Sciencell") in the United States District Court for the District of Massachusetts alleging infringement of nine U.S. Patents. Civil Action No. 01-CV-11942 (REK). In 2004 and 2005, StemCells sued ReNeuron twice in the United States District Court for the District of Maryland. *See* Civil Action Nos. 04-CV-03973 and 05-CV-1125.

11.     In 2006, StemCells filed suit against Plaintiff NeuralStem in the United States District Court for the District of Maryland alleging infringement of five U.S. Patents. Civil Action No. AW-06-CV-1877. Judge Alexander Williams, Jr. has stayed that case pending the completion of the reexaminations related to the patents-in-suit in that case. (*See* Exhibit D, Case No. AW 06 CV 1877, Docket No. 70.)

12.     Based on its press release stating that no one can work in this field without a license from StemCells and its history of suing companies that refuse to take a license, including Neuralstem, a justiciable controversy exists between Neuralstem and Defendants regarding the '505 patent.

### Neuralstem's Injury

13.     Neuralstem has suffered injury due to StemCells' public threats of infringement and enforcement. Through its overarching threats of litigation against all neural stem cell researchers, StemCells has knowingly and willfully engaged in a course of conduct designed to

improperly obtain monopoly power in the neural stem cell market and the market for innovation in the field of neural stem cell technology in the United States.

14.    StemCells' threats of infringement are designed to prevent Neuralstem from obtaining research funding and/or adversely affect Neuralstem's financial position.  On the day of StemCells' April 23, 2008 press release, Neuralstem's stock price dropped 10%.

15.    To remedy the damage StemCells has caused and continues to cause, Neuralstem seeks declaratory judgments of non-infringement and invalidity and/or unenforceability of the '505 patent.

### History Before the Patent Office and Inequitable Conduct

16.    On June 7, 1995, Neurospheres filed application serial no. 08/480, 172 (the '505 patent Application") with the PTO for "Multipotent Neural Stem Cell Compositions."  The '505 patent application was assigned to Examiner Robert Hayes.  After nearly thirteen years in prosecution and extensive appellate review, Neurospheres obtained a Notice of Allowance on January 24, 2007.  On February 5, 2007, Neurospheres paid the issue fee.

17.    On July 24, 2006, StemCells filed a lawsuit in this Judicial District asserting infringement of U.S. Patent Nos. 6,294,346 ("'346 patent"); 7,101,709 ("'709 patent"); 6,497,872 ("'872 patent"); and 5,851,832 ("'832 patent").  The '346, '709, '872, and '832 patents are from the same family as the '505 patent and claim similar subject matter related to neural stem cells.

18.    On December 7, 2006 and April 5, 2007, Neuralstem filed reexamination requests for the '346 patent (Reexamination Control No. 90/008,367); '709 patent (Reexamination Control No. 90/008,366); '872 patent (Reexamination Control No. 90/008,581); and the '832 patent (Reexamination Control No. 90/008,580).  The reexamination requests cited at least eleven prior art references that had not been previously cited in the StemCells patent family.

19.    The PTO determined the reexaminations raised multiple new issues of patentability.  The reexaminations were assigned to Examiners Bennett Celsa, Padmashri Ponnaluri, Sharon Turner, and Deborah Jones who operate in a special group at the PTO. Notably, the three Examiners handling the reexaminations were not the same as the Examiner handling the '505 patent application.

20.    As a result of the reexaminations, StemCells and Neuralstem jointly agreed to stay the previous lawsuit between these parties.

21.    While the reexaminations and the '505 patent application were assigned to different Examiners, the attorneys prosecuting both the '505 patent and the concurrent reexaminations for the '346, '709, '872, and '832 patents were the same.  Moreover, the attorneys representing StemCells in *StemCells v. Neuralstem* (Civil Action No. AW-06-CV-1877) are also from the same law firm as those prosecuting patents on behalf of StemCells before the PTO.  Upon information and belief, the lead prosecuting attorney maintains his law firm's relationship with both StemCells and Neurospheres.  The lead prosecuting attorney participated in telephone conversations with opposing counsel regarding the *StemCells v. Neuralstem* litigation.

22.    Accordingly, the attorneys prosecuting the '505 patent were fully aware of the pending litigation with Neuralstem, the reexaminations filed by Neuralstem, and the prior art cited in those reexaminations.  The attorneys prosecuting the '505 patent were aware their firm was handling the concurrent reexaminations.

23.    The '346, '709, '872, and '832 patents are in the same family as the '505 patent and claim similar subject matter related to neural stem cells.  Accordingly, the attorneys prosecuting the '505 patent were aware that they had a duty to disclose the existence of the

Neuralstem litigation and the reexaminations of the '346, '709, '872, and '832 patents to the PTO during the prosecution of the '505 patent.

24.    Under the Manual of Patent Examining Procedure ("MPEP") 2001.06, Patentees have the duty to disclose "all material information they are *aware* of regardless of the source of or how they become aware of the information."  MPEP 2001.06 (emphasis in original).  This also includes when "the subject matter for which a patent is being sought is or has been involved in litigation, the existence of such litigation and any other material information arising therefrom ***must*** be brought to the attention of the [PTO]."  MPEP 2001.06(c) (emphasis added).

25.    The inventors and their attorneys failed to disclose the pending litigation with Neuralstem to the PTO during prosecution of the '505 patent.

26.    On December 7, 2006, Neuralstem filed reexamination requests for the '346 patent (Reexamination Control No. 90/008,367) and the '709 patent (Reexamination Control No. 90/008,366).  The PTO granted these requests on February 16, 2007.

27.    The inventors and their attorneys failed to disclose Reexamination Control Nos. 90/008,367 and 90/008,366 to Examiner Hayes during prosecution of the '505 patent.

28.    On April 5, 2007, Neuralstem filed reexamination requests for the '872 patent (Reexamination Control No. 90/008,581) and the '832 patent (Reexamination Control No. 90/008,580).  The PTO granted these requests on May 10, 2007.

29.    The inventors and their attorneys failed to disclose Reexamination Control Nos. 90/008,580 and 90/008,581 to Examiner Hayes during prosecution of the '505 patent.

30.    On September 7 and 8, 2007, the PTO Examiners handling the reexaminations issued four Office Actions rejecting the claims in the '346, '709, '872 and '832 patents as unpatentable.

31.     The inventors and their attorneys did not disclose the September 7 and 8, 2007 Office Actions to Examiner Hayes during prosecution of the '505 patent.

32.     The inventors and their attorneys amended the patent claims of the '346, '709, '872 and '832 patents in their Responses to overcome the rejections in the September 7 and 8, 2007 Office Actions.

33.     The inventors and their attorneys did not disclose their Responses to the September 7 and 8, 2007 Office Actions to Examiner Hayes during prosecution of the '505 patent.

34.     The inventors and their attorneys did not disclose the existence of any of the four concurrently pending reexamination proceedings to Examiner Hayes during prosecution of the '505 patent.

35.     Though Defendants submitted an Information Disclosure Statement ("IDS") to Examiner Hayes revealing the prior art cited in the four reexaminations on May 16, 2007, they did so after the patent issue fee was paid.    (Exhibit E, May 16, 2007 '505 patent IDS Submission.)

36.     The IDS is a filing with the PTO in which patent applicants bring to the attention of the Examiner any background art that bears on the patentability of the application.  Patentees have a duty to disclose to the PTO any information known to the individual to be material to the patentability of a claimed invention.  *See* MPEP § 609.

37.     Per the PTO regulations, the Defendants' untimely IDS submission would not be considered by the examiner:

> 37 CFR 1.97
>
> (a) In order for an applicant for a patent or for a reissue of a patent to have an information disclosure statement in compliance with § 1.98 considered by the Office during the pendency of the application, the information

disclosure statement must satisfy one of paragraphs (b), (c), or (d) of this section.

*****

(d) An information disclosure statement shall be considered by the Office if filed by the applicant after the period specified in paragraph (c) of this section, provided that the information disclosure statement is filed on or before payment of the issue fee and is accompanied by:

(1) The statement specified in paragraph (e) of this section; and

(2) The fee set forth in § 1.17(p).

Nevertheless, Defendants specifically requested "that the Examiner consider completely the cited information, along with any other information, in reaching a determination concerning the patentability of the present claims, and sign the enclosed form PTO-1449 to evidence that the cited information has been fully considered by the Patent and Trademark Office during the examination of this application." *Id.*

38.    In addition to being untimely, Defendants' IDS submission to Examiner Hayes also was incomplete and misleading because it failed to mention the pending reexaminations, the fact that four other PTO Examiners, Examiners Bennett Celsa, Padmashri Ponnaluri, Deborah Jones, and Sharon Turner had determined the prior art cited in those reexaminations raised "substantial new questions of patentability," and that those prior art references ultimately forced Defendants to substantially amend the claims in all four patents during the course of the reexamination proceedings.

39.    On January 9, 2008, Examiner Hayes sent a communication to Defendants' attorneys stating that the May 16, 2007 IDS was non-compliant because it was submitted after the patent issue fee was paid, and therefore the IDS was not considered. (Exhibit F, '505 patent Examiner Response to IDS.)   Though Defendants could have responded to the PTO communication and prevented the '505 patent from issuing so that their IDS submission and

information about the reexamination proceedings and the litigation could be considered, Defendants failed to do so.

40.    Although they had numerous opportunities to comply with their duty of candor before the PTO, Defendants repeatedly did not apprise the PTO of information highly material to the patentability of '505 patent, including the pending litigation and concurrent reexamination proceedings.

41.    Defendants repeated failures to disclose material information and the submission of an after-the-fact and incomplete IDS show their conduct was not a mistake, but rather, suggests an intent to deceive the PTO by concealing highly material information.

42.    Defendants were aware of the adverse effect the prior art references cited in the non-compliant IDS had on the claims of the '346, '709, '872 and '832 patents during reexamination, and thus knew or should have known that those references were highly material to the '505 patent.  As a result of the conduct described above, the '505 patent is unenforceable.

43.    Moreover, the inventors' and attorneys' duty of candor extends throughout a patent's entire prosecution history.  Under the doctrine of infectious unenforceability all of Defendants' patents in the same patent family, including the '346, '709, '872 and '832 patents, are also infected and unenforceable due to inequitable conduct in the '505 patent application.

## COUNT I

(Declaratory Judgment of Unenforceability)

44.    Neuralstem incorporates all preceding Paragraphs of its Complaint as if fully set forth herein.

45.    Due to the failure to apprise the Patent Office of prior art and information highly material to the patentability of '505 patent, the '505 patent is unenforceable.

46.    A judicial declaration of unenforceability is necessary and appropriate to resolve this controversy.

## COUNT II

(Declaratory Judgment of Non-Infringement)

47.    Neuralstem incorporates all preceding Paragraphs of its Complaint as if fully set forth herein.

48.    Neuralstem's activities do not infringe, do not induce infringement, and do not contributorily infringe any valid, enforceable claims, if any, of the '505 patent.

49.    Neuralstem does not infringe the '505 patent because Neuralstem's activities do not constitute patent infringement under 35 U.S.C. § 271(e)(1).

50.    A judicial declaration of non-infringement is necessary and appropriate to resolve this controversy.

## COUNT III

(Declaratory Judgment of Invalidity)

51.    Neuralstem incorporates all preceding Paragraphs of its Complaint as if fully set forth herein.

52.    Upon information and belief, each claim of the '505 patent is invalid for failure to comply with one of more of the conditions for patentability specified in Part II of Title 35 of the United States Code, including at least Sections 101, 102, 103, and 112.

53.    A judicial declaration of invalidity is necessary and appropriate to resolve this controversy.

## RELIEF REQUESTED

WHEREFORE, Neuralstem requests that the Court enter a judgment in Neuralstem's

favor and against StemCells and provide Neuralstem the following relief:

A.      Order, adjudge, and decree that Neuralstem is not infringing the '505 patent, directly or indirectly;

B.      Order, adjudge, and decree that the '505 patent is unenforceable;

C.      Order, adjudge, and decree that the '505 patent is invalid;

D.      Order, adjudge, and decree that this is an exceptional case under 35 U.S.C. § 285 and award Neuralstem its reasonable attorneys' fees; and

E.      Award such other and further relief as the Court may deem just.

## JURY DEMAND

Neuralstem demands trial by jury.

Respectfully submitted,

BELL, BOYD & LLOYD LLP

/s/ _____

Michael T. Murphy
D. Md. Bar # 11357
Mmurphy@bellboyd.com
Jeffrey J. Howell
D. Md Bar #16229
Jhowell@bellboyd.com
BELL, BOYD & LLOYD LLP
1615 L Street, N.W.
Suite 1200
Washington, DC 20036
(202) 466-6300 (tel)
(202) 463-0678 (fax)

Of Counsel:

Alan L. Barry (*pro hac vice* pending)
abarry@bellboyd.com
Michael J. Abernathy (*pro hac vice* pending)
mabernathy@bellboyd.com

Sanjay K. Murthy (*pro hac vice* pending)
smurthy@bellboyd.com
Brian J. Arnold (*pro hac vice* pending)
barnold@bellboyd.com
Christian G. Stahl (*pro hac vice* pending)
cstahl@bellboyd.com
BELL, BOYD & LLOYD LLP
70 West Madison
Suite 3100
Chicago, IL 60602
(312) 372-1121
(312) 827-8000

Attorneys for Plaintiff

# Exhibit 5

1   MCDERMOTT WILL & EMERY LLP
    Terrence P. McMahon (71910)
2   tmcmahon@mwe.com
    William G. Gaede III (136184)
3   wgaede@mwe.com
    Andrew A. Kumamoto (178541)
4   akumamoto@mwe.com
    3150 Porter Drive
5   Palo Alto, CA  94304-1212
    Telephone:    (650) 813-5000
6   Facsimile:    (650) 813-5100

7   Attorneys for *StemCells, Inc. and*
    *StemCells California, Inc.*

8

9                   IN THE UNITED STATES DISTRICT COURT

10            IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13   STEMCELLS, INC., a Delaware corporation,      Case No. _____
     and STEMCELLS CALIFORNIA, INC., a
14   California corporation,                        **COMPLAINT FOR PATENT
                                                    INFRINGEMENT**
                              Plaintiffs,
15                                                  **DEMAND FOR JURY TRIAL**

16   v

17   NEURALSTEM, INC., a Maryland
     corporation, KARL K. JOHE, an individual,
18   and I. RICHARD GARR, an individual

                               Defendants.
19

20          Plaintiffs StemCells, Inc. and StemCells California, Inc. (collectively, "StemCells") allege

21   against Defendants Neuralstem, Inc. ("Neuralstem"), Karl Johe, and Richard Garr (collectively

22   "Defendants") as follows:

23                                    **JURISDICTION**

24          1.      This action arises under the Patent Laws of the United States, 35 U.S.C. §§ 1 *et*

25   *seq.*  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

26

27

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

**VENUE**

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c), and 28 U.S.C. § 1400(b) because defendants acts of patent infringement are occurring within this judicial district, and defendants are subject to personal jurisdiction in this judicial district.

**THE PARTIES**

3.      Plaintiff StemCells, Inc. is a Delaware corporation, with its principal place of business located at 3155 Porter Drive, Palo Alto, California 94304.

4.      Plaintiff StemCells California, Inc. is a California corporation wholly owned by StemCells, Inc., with its principal place of business located at 3155 Porter Drive, Palo Alto, California 94304.  Collectively, the two parties shall be referred to as "StemCells."

5.      StemCells is in the business of stem cell based treatments of diseases and conditions characterized by damage to or degeneration of the central nervous system ("CNS"), liver, pancreas and other tissue.

6.      On information and belief, Neuralstem is a publicly traded corporation incorporated under the laws of the State of Delaware with headquarters at 9700 Great Seneca Highway, Rockville, Maryland 20850.

7.      On information and belief, defendants Karl Johe and Richard Garr reside in Maryland.  Defendant Johe has also acted through a shell corporation known as High Med Technologies, Inc.

8.      Defendants do not have a license with StemCells to commercialize any products such as neural stem cells.

**COUNT I**

(Infringement of StemCells' United States Patent No. 7,115,418)

9.      StemCells is the assignee or exclusive licensee of U.S. Patent No. 7, 115,418 (the "'418 patent").  A true and correct copy of the '418 patent is attached hereto as Exhibit 1 and incorporated herein.

10.      On information and belief, defendants have been and still are infringing, contributing to the infringement of, and/or inducing the infringement of '418 patent in this

1    judicial district and elsewhere and will continue to do so unless enjoined by this Court.  Such

2    activity is outside of the scope of 35 U.S.C. § 271(e)(1).

3         11.    Defendants' infringement of the '418 patent has been and continues to be willful,

4    entitling StemCells to enhanced damages.

5         12.    Defendants' infringement of the '418 patent has caused reparable and irreparable

6    harm and damage to StemCells, which will continue unless enjoined by this Court.

7                                    **COUNT II**

8                (Infringement of StemCells' United States Patent No. 7,361,505)

9         13.    StemCells is the assignee or exclusive licensee of U.S. Patent No. 7,361,505 (the

10   "'505 patent").  A true and correct copy of the '505 patent is attached hereto as Exhibit 2 and

11   incorporated herein.

12        14.    On information and belief, defendants have been and still are infringing,

13   contributing to the infringement of, and/or inducing the infringement of '505 patent in this

14   judicial district and elsewhere and will continue to do so unless enjoined by this Court.  Such

15   activity is outside of the scope of 35 U.S.C. § 271(e)(1).

16        15.    Defendants' infringement of the '505 patent has been and continues to be willful,

17   entitling StemCells to enhanced damages.

18        16.    Defendants' infringement of the '505 patent has caused reparable and irreparable

19   harm and damage to StemCells, which will continue unless enjoined by this Court.

20                               **PRAYER FOR RELIEF**

21        **WHEREFORE**, StemCells prays for judgment and relief as follows:

22        A.    A finding by the Court that Defendants have infringed, contributed to the

23   infringement and/or induced the infringement of the '505 patent and the '418 patent;

24        B.    A finding by the Court that Defendants' infringement of the '505 patent and the

25   '418 is willful, and an award of enhanced damages of up to three times the amount found or

26   assessed under 35 U.S.C. § 284;

27        C.    A temporary, preliminary and permanent injunction against Defendants' continued

28   infringement, inducing of infringement, and contributing to infringement of the '505 patent and

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

COMPLAINT FOR PATENT INFRINGEMENT
*StemCells v. Neuralstem*

1    the '418 patent, including any such infringement by the defendants' parents, subsidiaries,

2    affiliates, divisions, officers, agents, servants, employees, directors, partners, representatives,

3    shareholders and all parties in active concert and/or participation with it;

4         D.    An award of damages in favor of StemCells and against Defendants sufficient to

5    compensate StemCells for Defendants' infringement of the '505 patent and the '418 patent, and

6    an assessment of prejudgment and post-judgment interest;

7         E.    A finding by the Court that this case is exceptional under 35 U.S.C. § 285;

8         F.    An award to StemCells of its reasonable expenses, including attorneys' fees, and

9    costs of this action; and

10         G.    Such other and further relief as the Court finds just and proper.

11    DATED this 7th day of May 2008 at Palo Alto, Calfornia.

12

13    Respectfully submitted,

MCDERMOTT WILL & EMERY LLP

14

15    By:                             
William G. Gaede

16

17    Attorneys for *StemCells, Inc. and*
*StemCells California, Inc.*

18

19

20

21

22

23

24

25

26

27

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1

## DEMAND FOR JURY TRIAL

2

3    Plaintiffs respectfully request a jury trial on all issues triable thereby.

4                                        MCDERMOTT WILL & EMERY LLP

5    By: _____
                                              William G. Gaede, III

6

7    *Attorneys for StemCells, Inc. and*
     *StemCells California, Inc.*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

# Exhibit 6

MCDERMOTT WILL & EMERY LLP
Terrence P. McMahon (71910)
tmcmahon@mwe.com
William G. Gaede III (136184)
wgaede@mwe.com
Andrew A. Kumamoto (178541)
akumamoto@mwe.com
3150 Porter Drive
Palo Alto, CA  94304-1212
Telephone:    (650) 813-5000
Facsimile:    (650) 813-5100

Attorneys for *StemCells, Inc. and
StemCells California, Inc.*

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| STEMCELLS, INC., a Delaware corporation, and STEMCELLS CALIFORNIA, INC., a California corporation,<br><br>Plaintiffs,<br><br>v<br><br>NEURALSTEM, INC., a Maryland corporation, KARL K. JOHE, an individual, and I. RICHARD GARR, an individual,<br><br>Defendants. | Case No.    C-08-02364 CW<br><br>**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT, TRADE LIBEL AND VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Honorable Claudia Wilken |

Plaintiffs StemCells, Inc. and StemCells California, Inc. (collectively, "StemCells") allege against Defendants Neuralstem, Inc. ("Neuralstem"), Karl Johe, and Richard Garr (collectively "Defendants") as follows:

## JURISDICTION

1.    The First and Second Claims For Relief arise under the Patent Laws of the United States, 35 U.S.C. §§ 1 *et seq.*  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

- 1 -

1  2. The Third and Fourth Claims for Relief arise under California statutory and

2 common law.  This Court has jurisdiction over these claims under the doctrine of supplemental

3 jurisdiction, 28 U.S.C. § 1367, because the federal and state claims have common operative facts,

4 and judicial economy, convenience, and fairness to the parties will result if this Court assumes

5 and exercises jurisdiction over the State law claims.

6        **PERSONAL JURISDICTION AND VENUE**

7  3. Defendants are subject to personal jurisdiction in California and Venue is proper in

8 this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c).

9           **THE PARTIES**

10  4. Plaintiff StemCells, Inc. is a Delaware corporation, with its principal place of

11 business located at 3155 Porter Drive, Palo Alto, California 94304.

12  5. Plaintiff StemCells California, Inc. is a California corporation wholly owned by

13 StemCells, Inc., with its principal place of business located at 3155 Porter Drive, Palo Alto,

14 California 94304.

15  6. StemCells, *inter alia*, is in the business of stem cell based treatments of diseases

16 and conditions characterized by damage to or degeneration of the central nervous system

17 ("CNS"), liver, pancreas and other tissue.

18  7. On information and belief, Neuralstem is a publicly traded corporation

19 incorporated under the laws of the State of Delaware with headquarters at 9700 Great Seneca

20 Highway, Rockville, Maryland 20850.

21  8. On information and belief, Defendants Karl Johe and Richard Garr reside in

22 Maryland.  Defendant Johe has also acted through a shell corporation known as High Med

23 Technologies, Inc.  On information and belief, Defendant Garr is an attorney.

24  9. Defendants do not have a license with StemCells to practice any invention under

25 StemCells patents, including the two patents alleged herein.

26

27

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

MPK 141630-3.081361.0011      - 2 -      **FIRST AMENDED COMPLAINT
FOR PATENT INFRINGEMENT
CASE NO. C-08-02364 CW**

**FIRST CLAIM FOR RELIEF**
(Infringement of StemCells' United States Patent No. 7,115,418)
(Against All Defendants)

10.     StemCells is the assignee or exclusive licensee of U.S. Patent No. 7,115,418 (the "'418 patent").  A true and correct copy of the '418 patent is attached hereto as Exhibit 1 and incorporated herein.

11.     On information and belief, Defendants have been and still are infringing, contributing to the infringement of, and/or inducing the infringement of '418 patent in this judicial district and elsewhere and will continue to do so unless enjoined by this Court.  Such activity is outside of the scope of 35 U.S.C. § 271(e)(1).

12.     Defendants' infringement of the '418 patent has been and continues to be willful, entitling StemCells to enhanced damages.

13.     Defendants' infringement of the '418 patent has caused reparable and irreparable harm and damage to StemCells, which will continue unless enjoined by this Court.

**SECOND CLAIM FOR RELIEF**
(Infringement of StemCells' United States Patent No. 7,361,505)
(Against All Defendants)

14.     StemCells incorporates paragraphs 1 through 13 of this Complaint as if set forth in full herein.

15.     StemCells is the assignee or exclusive licensee of U.S. Patent No. 7,361,505 (the "'505 patent").  A true and correct copy of the '505 patent is attached hereto as Exhibit 2 and incorporated herein.

16.     On information and belief, Defendants have been and still are infringing, contributing to the infringement of, and/or inducing the infringement of '505 patent in this judicial district and elsewhere and will continue to do so unless enjoined by this Court.  Such activity is outside of the scope of 35 U.S.C. § 271(e)(1).

17.     Defendants' infringement of the '505 patent has been and continues to be willful, entitling StemCells to enhanced damages.

18.     Defendants' infringement of the '505 patent has caused reparable and irreparable harm and damage to StemCells, which will continue unless enjoined by this Court.

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

FIRST AMENDED COMPLAINT
for PATENT INFRINGEMENT
CASE NO. C-08-02364 CW

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

**THIRD CLAIM FOR RELIEF**
(Trade Libel)
(Against Defendant Neuralstem)

19.     StemCells incorporates paragraphs 1 through 18 of this Complaint as if set forth in full herein.

20.     Defendant Neuralstem has embarked upon an intentional course of action to devalue and injure the intellectual property of StemCells and to impugn the business honesty of StemCells and engage in unfair competition under California Business and Professional Code Section 17200.   In particular, Neuralstem made and continues to make wrongful and false statements about actions the U.S. Patent and Trademark Office ("Patent Office") had taken with respect to StemCells' patents and StemCells' actions before the Patent Office.   Such statements constitute wrongful conduct as herein more specifically set forth.

21.     From December 2006 to October 2007, Neuralstem filed petitions before the Patent Office for reexamination of StemCells' U.S. Patent Nos. 5,851,832, 7,101,709, 6,497,872, and 6,294,346.   In February, May, and November of 2007, the Patent Office granted reexamination of the patents on the grounds that "a substantial new question of patentability" existed.   As set forth in the Manual of Patent Examination Procedure ("MPEP") at Section 2242 a "substantial new question of patentability" occurs when "a prior art patent or printed publication raises a substantial question of patentability where there is a substantial likelihood that a reasonable examiner would consider the prior art patent or printed publication important in deciding whether or not a claim is patentable."   As specifically stated in the MPEP a "'substantial new question of patentability' as to a patent claim could be present even if the examiner would not necessarily reject[] the claim as either fully anticipated, or obvious in view of, the prior art patents or printed publications."

22.     On May 22, 2007, Neuralstem's President and CEO, I. Richard Garr, gave a presentation at a conference sponsored by the Wall Street Analyst Forum for public corporations to address analysts, portfolio managers and professional investors.   During the presentation, Mr. Garr told the audience:

Well, also you refer us to the infringement law suite [sic] was filed last August by StemCells, Inc. and obviously we are not infringing their patents. But it actually hasn't gone anywhere. *At this point, the patent office has ruled that all of the patents they accused us of infringing are invalid. In fact, they have little bit, it's preliminary because they get to fight it out, but the preliminary ruling was that all the claims in all the patents, they are not valid.* So, I think for a couple of years nothing will happen until and unless they make it out of the patent office even in those patents, intact. Yeah.

(Emphasis added.)

23.    On May 22, 2007, the PTO had not invalidated any claims of the '872, '832, '709 and '346 patents.

24.    The transcript of Mr. Garr's presentation has been posted on several websites on the Internet. Neuralstem has posted a link to one of the websites on its company webpage for News and Press Releases.

25.    On information and belief, Neuralstem made the above-noted statement with knowledge that a decision on Neuralstem's request for reexamination was not a decision on the validity of the subject patents. *See In re Etter*, 756 F.2d 852, 857 n.5 (Fed. Cir. 1985) ("The inquiry occasioned by a request for reexamination is solely whether a reexamination order should issue and is not directed toward resolution of validity.")

26.    In April 2008 the Patent Office issued notices of an intent to issue reexamination certificates on the '872 and '832 patents. Defendant Neuralstem has conceded in public filings that the PTO is likely to also issue notices of an intent to issue reexamination certificates for the '346 and '709 patents.

27.    At the time when the Neuralstem May 2007 statements were made about the StemCells patents, StemCells was in separate negotiations to license its patented technologies to two companies, BrainCells Inc. (BCI) and NeuroGeneration, both located in California. BCI had signed a term sheet with StemCells, and NeuroGeneration was about to sign a license agreement with StemCells. Shortly after Neuralstem's May 2007 statements, both companies terminated the license negotiations.

28.    Neuralstem has continued to engage in wrongful conduct to injure StemCells' intellectual property. In a press release issued on March 28, 2008, Neuralstem publicly stated that

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

FIRST AMENDED COMPLAINT
FOR PATENT INFRINGEMENT
CASE NO. C-08-02364 CW

a patent infringement suit that StemCells had brought against Neuralstem in 2006 in the District of Maryland had been "dismissed." In fact, as was well known to Neuralstem, the lawsuit had been stayed pending reexamination of the four patents. A true copy of Neuralstem's March 28 press release is attached hereto as Exhibit 3 and is incorporated herein. Indeed, Neuralstem recently acknowledged that the reexamination proceedings for the '872 patent and the '832 patent have resulted in the Patent Office issuing notices of intent to issue reexamination certificates, and that the Patent Office "is likely to also issue notices of an intent to issue reexamination certifications for the '346 and the '709 patents." Neuralstem further requested that the Maryland court lift the stay of that litigation because the reexamination proceedings were "almost complete."

29.     On April 22, 2008, the Patent Office issued the '505 Patent. Earlier, the Patent Office issued a Notice of Allowance on January 24, 2007, and StemCells paid the issuance fee on February 5, 2007. On April 23, 2008, StemCells issued a press release announcing issuance of the '505 Patent. A true copy of the April 23, 2008 press release is attached hereto as Exhibit 4 and is incorporated by reference. On May 7, 2008, Neuralstem issued a press release in which it announced the filing of a lawsuit against StemCells seeking, *inter alia*, a declaration of inequitable conduct on the '505 Patent. A true copy of the May 7, 2008, press release is attached hereto as Exhibit 5 and is incorporated by reference. Mr. Garr is quoted in the May 7 press release as saying that:

> While . . . we have not yet been directly accused by StemCells, Inc. of infringing this patent, *the threatening statements in their press release of April 23rd leave the misleading impression that we would require a license from them as a result of the issuance of this patent.* Nothing could be further from the truth," said Neuralstem President & CEO Richard Garr. "And, in addition to finding that the patent is unenforceable against us, or anyone else for that matter, as a result of their actions, we are asking that the Court also declare that we are not infringing the patent and that the patent is also invalid."
>
> "We are confident *that their intentional withholding of highly material information and their intent to deceive the Patent Office*, will result in this patent being unenforceable," concluded Garr.

(Emphasis added.)

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

30.     The false statements that StemCells made threatening statements and intentionally withheld material information from the Patent Office continued Neuralstem's practice of impugning the business honesty of StemCells and disparaging and damaging StemCells' intellectual property.

31.     On information and belief, Neuralstem has intentionally spread these knowingly false information to others, and has encouraged and enabled said individuals to spread the false information on the Internet.

32.     In engaging in such activities, Defendant Neuralstem has engaged in trade libel of StemCells' intellectual property, including the '505 patent before this Court.  StemCells has suffered pecuniary loss from such statements.  Moreover, such conduct has been made in such a manner as to imply business dishonesty, all to StemCells' detriment and injury.

## FOURTH CLAIM FOR RELIEF
(Unfair Competition)
(Violation of California Business & Professions Code § 17200, et seq.)
(Against Defendant Neuralstem)

33.     StemCells incorporates paragraphs 1 through 32 of this Complaint as if set forth in full herein.

34.     Defendant Neuralstem has engaged in numerous unlawful and unfair practices, and promotions, in violation of Section 17200, *et seq*., of the California Business and Professions Code, including by, among other things, disseminating false statements into California and elsewhere about actions of the Patent Office and actions of StemCells before the Patent Office.

35.     As a result of Neuralstem's acts and practices, members of the public are likely to be deceived about the validity and enforceability of StemCells' intellectual property.

36.     StemCells is informed and believes, and on that basis alleges, that Neuralstem has acted as described herein with the intent to cause damaging effects in California, particularly to StemCells located therein, and elsewhere.

37.     Neuralstem has engaged and will continue to engage in the wrongful acts alleged herein, and thereby continue to violate Section 17240, *et seq*., of the California Business and Professions Code.  Injunctive relief pursuant to California Business & Professions Code sections

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

FIRST AMENDED COMPLAINT
FOR PATENT INFRINGEMENT
CASE NO. C-08-02364 CW

17203 and 17535 is necessary to prevent and restrain further violations by Neuralstem. Until such an injunction is issued StemCells, and members of the public, will continue to suffer irreparable harm for which there is no adequate remedy at law. StemCells is also entitled to an order of restitution and disgorgement of profits earned by Neuralstem by its wrongful conduct.

### PRAYER FOR RELIEF

**WHEREFORE**, StemCells prays for judgment and relief as follows:

A.    A finding by the Court that Defendants have infringed, contributed to the infringement and/or induced the infringement of the '505 patent and the '418 patent;

B.    A finding by the Court that Defendants' infringement of the '505 patent and the '418 is willful, and an award of enhanced damages of up to three times the amount found or assessed under 35 U.S.C. § 284;

C.    A temporary, preliminary and permanent injunction against Defendants' continued infringement, inducing of infringement, and contributing to infringement of the '505 patent and the '418 patent, including any such infringement by the Defendants' parents, subsidiaries, affiliates, divisions, officers, agents, servants, employees, directors, partners, representatives, shareholders and all parties in active concert and/or participation with any Defendant;

D.    An award of damages in favor of StemCells and against Defendants sufficient to compensate StemCells for Defendants' infringement of the '505 patent and the '418 patent, and an assessment of prejudgment and post-judgment interest;

E.    A finding by the Court that this case is exceptional under 35 U.S.C. § 285;

F.    A temporary, preliminary and permanent injunction against Neuralstem's continued acts of trade libel and unfair competition with respect to StemCells' intellectual property, including by Neuralstem's parents, subsidiaries, affiliates, divisions, officers, agents, servants, employees, directors, partners, representatives, shareholders and all parties in active concert and/or participation with it;

G.    For disgorgement of profits Neuralstem earned as a result of its false, unlawful, unfair and fraudulent business practices and advertisements;

H.    For compensatory damages in an amount to be proven at trial;

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1  I.      For punitive damages in an amount to be proven at trial;

2  J.      An award to StemCells of its reasonable expenses, including attorneys' fees, and

3  costs of this action; and

4  K.      Such other and further relief as the Court finds just and proper.

5  DATED this 9th day of May 2008 at Palo Alto, California.

6                                         Respectfully submitted,

7                                         MCDERMOTT WILL & EMERY LLP

8

9  By:      _____/s/ William G. Gaede, III_____
                                           William G. Gaede, III

10

11  Attorneys for *StemCells, Inc. and StemCells California, Inc.*

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

MPK 141630-3.081361.0011            - 9 -

FIRST AMENDED COMPLAINT
FOR PATENT INFRINGEMENT
CASE NO. C-08-02364 CW

**DEMAND FOR JURY TRIAL**

Plaintiffs respectfully request a jury trial on all issues triable thereby.

MCDERMOTT WILL & EMERY LLP

By:  _____/s/ William G. Gaede, III_____
William G. Gaede, III

*Attorneys for StemCells, Inc. and*
*StemCells California, Inc.*

- 1 -

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

# Exhibit 7

Neuroscience 147 (2007) 546–560

# FUNCTIONAL RECOVERY IN RATS WITH ISCHEMIC PARAPLEGIA AFTER SPINAL GRAFTING OF HUMAN SPINAL STEM CELLS

D. CIZKOVA,[a,b] O. KAKINOHANA,[b] K. KUCHAROVA,[a,b] S. MARSALA,[c] K. JOHE,[d] T. HAZEL,[d] M. P. HEFFERAN[b] AND M. MARSALA[b,*]

[a]Institute of Neurobiology, Centrum of Excellence, Slovak Academy of Science, Kosice, Soltesovej 4, Slovakia

[b]Anesthesiology Research Laboratory-0695, University of California, San Diego, 9500 Gilman Drive, La Jolla, CA 92093, USA

[c]Department of Pathology, University of California, San Diego, La Jolla, CA 92093, USA

[d]Neuralstem, Inc., Rockville, MD 20850, USA

**Abstract**—Transient spinal cord ischemia in humans can lead to the development of permanent paraplegia with prominent spasticity and rigidity. Histopathological analyses of spinal cords in animals with ischemic spastic paraplegia show a selective loss of small inhibitory interneurons in previously ischemic segments but with a continuing presence of ventral $\alpha$-motoneurons and descending cortico-spinal and rubro-spinal projections. The aim of the present study was to examine the effect of human spinal stem cells (hSSCs) implanted spinally in rats with fully developed ischemic paraplegia on the recovery of motor function and corresponding changes in motor evoked potentials. In addition the optimal time frame for cell grafting after ischemia and the optimal dosing of grafted cells were also studied.

Spinal cord ischemia was induced for 10 min using aortic occlusion and systemic hypotension. In the functional recovery study, hSSCs (10,000–30,000 cells/0.5 $\mu$l/injection) were grafted into spinal central gray matter of L2–L5 segments at 21 days after ischemia. Animals were immunosuppressed with Prograf (1 mg/kg or 3 mg/kg) for the duration of the study. After cell grafting the recovery of motor function was assessed periodically using the Basso, Beattie and Bresnahan (BBB) scoring system and correlated with the recovery of motor evoked potentials. At predetermined times after grafting (2–12 weeks), animals were perfusion-fixed and the survival, and maturation of implanted cells were analyzed using antibodies recognizing human-specific antigens: nuclear protein (hNUMA), neural cell adhesion molecule (hMOC), neuron-specific enolase (hNSE) and synaptophysin (hSYN) as well as the non-human specific antibodies TUJ1, GFAP, GABA, GAD65 and GLYT2.

After cell grafting a time-dependent improvement in motor function and suppression of spasticity and rigidity was seen and this improvement correlated with the recovery of motor evoked potentials. Immunohistochemical analysis of grafted lumbar segments at 8 and 12 weeks after grafting revealed intense hNSE immunoreactivity, an extensive axo-dendritic outgrowth as well as rostrocaudal and dorsoventral migration of implanted hNUMA-positive cells. An intense hSYN immunoreactivity was identified within the grafts and in the vicinity of persisting $\alpha$-motoneurons. On average, 64% of hSYN terminals were GAD65 immunoreactive which corresponded to GABA immunoreactivity identified in 40–45% of hNUMA-positive grafted cells. The most robust survival of grafted cells was seen when cells were grafted 21 days after ischemia. As defined by cell survival and laminar distribution, the optimal dose of injected cells was 10,000–30,000 cells per injection. These data indicate that spinal grafting of hSSCs can represent an effective therapy for patients with spinal ischemic paraplegia. © 2007 IBRO. Published by Elsevier Ltd. All rights reserved.

Key words: spinal cord ischemia, paraplegia, cell replacement, human neural stem cells, spasticity, rigidity.

Ischemic spinal cord injury represents a serious complication associated with transient cross-clamping of the descending thoracic or thoracoabdominal aorta (Tarlov, 1967; Svensson et al., 1986). Depending on the duration of the ischemic interval, corresponding neurological dysfunction resulting from spinal ischemic injury may be expressed as paraparesis or fully developed spastic paraplegia with or without a component of rigidity. After longer ischemic intervals flaccidity is seen (Dimitrijevic and Nathan, 1967).

The mechanism leading to ischemia-induced neuronal degeneration is only partially understood and may involve excessive release/activity of excitatory amino acids, prostaglandins and/or oxygen free radicals (Marsala et al., 1994; Saganova and Marsala, 1994; Facchinetti et al., 1998; Lombardi et al., 1998; Akins and Atkinson, 2002; Stys, 2005). In addition to a well-documented sensitivity of the brain and spinal cord neurons to transient ischemia, recent evidence demonstrates a similar AMPA-receptor-mediated degeneration of oligodendrocytes and astrocytes. The loss of these glial cells, even in the absence of a significant neuronal degeneration, can lead to an altered local segmental conductivity and a corresponding loss of function (for review see Stys, 2005).

Histopathological analysis of spinal cords taken from animals with rigidity and spasticity shows a selective loss of small inhibitory neurons, but with persisting $\alpha$-motoneurons in previously ischemic spinal segments. Similar spinal neuronal pathology has been described in patients after spinal ischemic injury (Tarlov, 1967; Taira and Marsala, 1996; Marsala et al., 2004). In contrast, in animals with flaccid paraplegia, pan-necrotic neurodegenerative changes are seen affecting both small inhibitory and excitatory interneurons as well as ventral $\alpha$-motoneurons (Zivin and DeGirolami, 1980). Corresponding with the time frame of neuronal degeneration after spinal ischemia, similarly as

*Corresponding author. Tel: +1-858-822-3805; fax: +1-858-822-3249.
E-mail address: mmarsala@ucsd.edu (M. Marsala).
Abbreviations: BBB, Basso, Beattie and Bresnahan; hMOC, mouse anti-neural cell adhesion molecule; hNSE, mouse anti-human-specific enolase; hSSC, human spinal stem cell; hSYN, mouse anti-synaptophysin; MEP, motor evoked potential; NGS, normal goat serum; NSE, neuron specific enolase; SYN, synaptophysin; TX, Triton X-100.

0306-4522/07/$30.00+0.00 © 2007 IBRO. Published by Elsevier Ltd. All rights reserved.
doi:10.1016/j.neuroscience.2007.02.065

D. Cizkova et al. / Neuroscience 147 (2007) 546–560

547

in focal or global brain ischemia, an injury-dependent activation of local microglia and infiltration of macrophages occur. Depending on the extent of injury, the peak of inflammatory changes is typically seen between 2 and 3 days after spinal ischemia in the rabbit model and then shows a gradual loss of inflammatory elements over the following 2–3 weeks (Giulian and Robertson, 1990).

In the past two to three decades a considerable effort has been made assessing the therapeutic potential of spinal grafting of a variety of cell lines, acutely lesioned spinal cord fetal tissue, as well as direct spinal gene delivery, in ameliorating neurological dysfunction using several models of spinal injury including mechanical traumatic injury (Reier et al., 1992a,b; Mori et al., 1997; Liu et al., 1999; McDonald et al., 1999; Chow et al., 2000), chemically lesioned spinal cord (Onifer et al., 1997) or genetically manipulated animals which display progressive α-motoneuronal degeneration (e.g. ALS transgenic mice or rat) (Nagai et al., 2001; Vastag, 2001; Acsadi et al., 2002). In general these studies show long term survival and preservation of neuronal phenotype in grafts generated from fetal tissue or neuronally committed precursors (Anderson et al., 1995; Onifer et al., 1997). In some of these studies, depending on the spinal injury model, a variable degree of neurological recovery was also demonstrated and characterized by improved ambulatory functions (McDonald et al., 1999).

In contrast, *in vitro*–expanded neural precursors grafted into previously mechanically or chemically injured spinal cord showed only limited neuronal differentiation and maturation (Onifer et al., 1997). While the mechanism of this preferential non-neuronal differentiation is not completely defined it is hypothesized that a local release of proinflammatory cytokines (such as TNFα, TGFβ) at the site of previous injury is likely involved.

As previously discussed spinal ischemia-induced spastic paraplegia is associated with a selective loss of small inhibitory interneurons but with a continuing presence of ventral α-motoneurons and descending supraspinal input including corticospinal and rubrospinal tracts (Taira and Marsala, 1996). In previous studies using a rat spinal ischemia model, we have demonstrated that spinal grafting of postmitotic human hNT neurons or committed rat spinal neuronal precursors is associated with significant recovery of motor function and suppression of otherwise exacerbated peripheral myogenic responses after electrical stimulation of the motor cortex. This neurological recovery was associated with a robust maturation of grafted neurons and development of a GABAergic phenotype in a subpopulation of grafted neurons (Marsala et al., 2004).

In the present study, using immunosuppressed rats with ischemia-induced spasticity and rigidity, we characterized the effect of spinal grafting of human spinal stem cells (hSSCs) when grafted into previously ischemic spinal cord segments. The effect of such treatment was characterized by: i) correlative analysis between the degree of recovery of ambulatory function (Basso, Beattie and Bresnahan (BBB) score) and motor evoked potentials (MEPs), ii) stereological quantification of grafted cells and, iii) neurotransmitter phenotype of grafted neuronally differ-

entiated neurons. In addition, the optimal time period for cell grafting after the ischemic episode and the most favorable dose of grafted cells was studied.

## EXPERIMENTAL PROCEDURES

These studies were carried out under protocols approved by the Institutional Animal Care and Use Committee of the University of California, San Diego (La Jolla, CA, USA) and were in compliance with Association for Assessment of Laboratory Animal Care guidelines for animal use. All studies were performed in such a manner as to minimize group size and animal suffering.

### Derivation of the spinal hSSCs

Human SSCs were prepared from the cervical–upper thoracic region of spinal cord tissue obtained from a single 8-week human fetus after an elective abortion. The fetal tissue was donated by the mother in a manner fully compliant with the guidelines of NIH and FDA and approved by an outside independent review board. The spinal cord tissue was removed of meninges and dorsal root ganglia and dissociated into a single cell suspension by mechanical trituration in serum-free, modified N2 media. The modified N2 media was composed of: 100 mg/l human plasma apo-transferrin, 25 mg/l recombinant human insulin, 1.56 g/l glucose, 20 nM progesterone, 100 μM putrescine, and 30 nM sodium selenite in DMEM/F12. For growth of the hSSCs, 10 ng/ml bFGF as the sole mitogen was added to the modified N2 media (growth media). The initial culture was serially expanded as a monolayer culture in precoated flasks (T-175) or plates (150 mm, Nunc) (Johe et al., 1996). Briefly, the precoated vessels were prepared by incubating them for 1 h at room temperature with 100 μg/ml poly-D-lysine in 10 mM Hepes buffer at 0.165 ml/cm². The vessels were washed three times with water and allowed to completely dry aseptically in the hood. They were then further incubated with 100 μg/ml fibronectin/PBS for 5 min or alternatively 25 μg/ml fibronectin/PBS for 1 h. The fibronectin solution was aspirated and the vessels were used immediately without drying.

Approximately $6.1 \times 10^6$ total cells were obtained upon the initial dissociation of the spinal cord tissue. All of the cells were plated onto one 150 mm plate in 20 ml of the growth media. The growth medium was changed every other day and in the alternate days, 10 ng/ml of bFGF was directly added to the culture. The first passage was conducted 16 days after plating. At this point, the culture was composed mostly of post-mitotic neurons and mitotic hSSCs. The mitotic cells were harvested by brief treatment with trypsin (0.05%+0.53 mM EDTA). Trypsin was stopped by addition of soybean trypsin inhibitor to 0.05% final concentration. The cell suspension was triturated with a pipette to obtain a single cell suspension and centrifuged at 1400 r.p.m. for 5 min. The cell pellet was resuspended in growth media and the cells were replated in new pre-coated plates at $1.2 \times 10^6$ cells in 20 ml of growth media per 150 mm plate. The cells were harvested at approximately 75% confluence, which occurred in 5–6 days. This process was repeated for 20 passages. At various passages, the cells were frozen in the growth medium plus 10% DMSO at $5 \times 10^6$–$10 \times 10^6$ cells/ml using a programmable freezer. The frozen cells were stored in liquid nitrogen. Upon thawing, the overall viability and recovery was typically 80–95%. The resulting cell line, which was produced by epigenetic means only, using bFGF as the sole mitogen, was named "566RSC." A cell bank of passage 16 cells was prepared and used for this study.

### Induction of spinal ischemic paraplegia

Transient spinal cord ischemia (10 min) was induced as previously described (Taira and Marsala, 1996). Briefly, in halothane (1.5%) -anesthetized S.D. rats, a 2F Fogarty catheter (Am.V. Muller, CV

1035; Baxter, Inc., Irvine, CA, USA) was passed through the left femoral artery to the descending thoracic aorta to the level of the left subclavian artery. Distal arterial pressure (i.e. below the level of aortic occlusion) was monitored by cannulation of the tail artery (PE-50). Spinal cord ischemia was induced by inflation of the intra-aortic balloon catheter (0.05 ml of saline) and concurrent systemic hypotension (40 mm Hg) induced by blood withdrawal (10.5–11 cc into a heated (37 °C) external reservoir) via a 20-gauge polytetrafluoroethylene catheter in the left carotid artery. The efficacy of the occlusion was demonstrated by an immediate and sustained drop in distal blood pressure. After 10-min ischemia, the balloon was deflated, and the blood was reinfused. When the arterial blood pressure was stabilized (20–30 min after reflow), the arterial lines were removed and wounds were closed.

After ischemia, the recovery of motor function was assessed in 2-day intervals using a modified 21-point open field locomotor scale (Basso et al., 1996). Only animals with BBB score of 0–4 at 21 days after ischemia were selected for the transplantation study.

## Experimental groups

There were three separate components in the study. The specific goals of these studies were to establish: i) the optimal post-injury time frame for spinal hSSCs grafting as defined by cell survival; ii) the optimal density of grafted cells as defined by the effect of cell grafts on spinal cord morphology; and, iii) the therapeutic-behavioral effect after cell grafting in animals with fully developed ischemic paraplegia as defined by the recovery of motor function and suppression of electrophysiologically-defined signs of spasticity and rigidity (see Table 1 for experimental groups).

In the first study (Study I: Groups A1–A4) animals were grafted with hSSCs at 3 days (Group A1; $n=4$), 7 days (Group A2; $n=5$) or 21 days (Group A3; $n=12$) after ischemic injury (see Table 1). In a separate control group (Group A4; $n=7$) medium was injected only. Animals in this study survived between 7 days and 8 weeks.

In the second study (Study II: Groups B1–B4) a variable density of cells (5000, 10,000, 30,000 or 50,000 in 0.5 $\mu$l of vehicle; $n=4$ for each cell density) was injected spinally in animals at 21 days after ischemia. The survival, total cell density (see Stereological Quantification) and differentiation profile of grafted cells were then analyzed between 2 and 7 weeks after grafting.

In the third functional long-term recovery study (Study III: Groups C1 and C2) the effect of spinal hSSCs on the recovery of motor function and corresponding changes in MEPs was studied

in animals with defined spastic paraplegia. In the first group (Group C1; $n=13$) animals were grafted with the hSSCs. In the second control group (Group C2; $n=6$) animals were spinally injected with medium only. In both groups, the recovery of motor function (see Evaluation of Neurological Function) and MEPs (see Recording of MEPs) were assessed/recorded in 7-day intervals for up to 12 weeks. At 3 months all animals were perfusion fixed for immunohistopathological analysis of the spinal cords (see Perfusion Fixation and Tissue Processing).

Animals in all experimental groups received daily immunosuppressive treatment with FK-506 (Prograf; Astellas Pharma US, Inc., Deerfield, IL, USA; 1 mg/kg (Studies I and II) or 3 mg/kg (Study III); i.p.) during the entire survival period, with the treatment initiated 3 days before spinal transplantation.

## Preparation of hSSCs for implantation

One day prior to each surgery day, one cryopreserved vial of the previously prepared passage 16 cell bank was thawed, washed, concentrated in a hibernation buffer, and shipped from the cell preparation site (Neuralstem, Inc., Rockville, MD, USA) to the surgery site (UCSD, San Diego, CA, USA) at 2–8 °C by overnight delivery. Upon receipt the following day, the cell concentration was adjusted to a final concentration of 5000, 10,000, 30,000, or 50,000 in 0.5 $\mu$l of buffer and used directly for implantation without further manipulation. Before and after implantation the viability of cells was tested using fluorescein diacetate/propidium iodide. On average a 70–85% viability rate was recorded. At the same time, some of the cells were plated on a previously prepared rat astrocyte monolayer for in vitro differentiation (see following paragraph).

## Culture of hSSCs on rat astrocyte monolayer for in vitro differentiation

Some of the cells were differentiated in vitro on rat astrocyte monolayer. Astrocytes were isolated from lumbar spinal cords of P2 rat pups using Papain Dissociation System (Worthington Biochem. Corporation, NJ, USA). After isolation astrocytes were cultured with DMEM–10% FBS on Nunclon six-well plates. To purify astrocytes, mechanical shaking was used on day 7 after isolation. Astrocytes were then fed with fresh DMEM-10% FBS every 3 days until confluent. For co-cultivation astrocytes were passaged into Laboratory-Tek 4-chamber slides and cultivated for additional 5–7 days. The hSSCs, resuspended in DMEM–10% FBS into a final

**Table 1.** Experimental groups

| Group | Post-injury time, cells and medium injected | Cell density/no. of injections | Assessment of motor function (BBB score) | MEPs | Post-graft survival | Histology/stereological quantification |
|---|---|---|---|---|---|---|
| **Study I** | | | | | | |
| A1 ($n=4$) | 3 d | 30,000/10 | − | − | 7–14 d | +/− |
| A2 ($n=5$) | 7 d | 30,000/10 | − | − | 7–14 d | +/− |
| A3 ($n=12$) | 21 d | 30,000/10 | + | − | 1–8 wk | +/− |
| A4 ($n=7$) | 21 d | Medium/10 | + | − | 8 wk | +/− |
| **Study II** | | | | | | |
| B1 ($n=4$) | 21 d | 5,000/10 | − | − | 2–7 wk | +/− |
| B2 ($n=4$) | 21 d | 10,000/10 | − | − | 2–7 wk | +/+ |
| B3 ($n=4$) | 21 d | 30,000/10 | − | − | 2–7 wk | +/+ |
| B4 ($n=4$) | 21 d | 50,000/10 | − | − | 2–7 wk | +/− |
| **Study III** | | | | | | |
| C1 ($n=13$) | 21 d | 10,000/25–30 | + | − | 3 mo | +/− |
| C2 ($n=6$) | 21 d | Medium/25–30 | + | + | 3 mo | +/− |

concentration of $3–5\times10^6$ neurons/ml, were then added into the astrocyte culture and cultivated for 2–6 weeks. For immunofluorescence staining cells were fixed with 4% paraformaldehyde/0.1% glutaraldehyde for 10 min at 24 °C, in 0.1 M TRIS solution for 30 min and stained with antibodies raised against neuron specific enolase (hNSE, human specific 1:200; Novocastra Laboratories, Newcastle upon Tyne, UK), and GABA (1:15,000; Sigma, St. Louis, MO, USA). Standard immunofluorescence technique was then used as described (see Perfusion Fixation and Tissue Processing).

### Spinal cord implantation of hSSCs

Animals were anesthetized with 1.5–2% halothane (in room air), placed into a spinal unit apparatus (Stoelting, Wood Dale, IL, USA) and a partial Th12–L1 laminectomy was performed using a dental drill (exposing the dorsal surface of L2–L5 segments). Using a glass capillary (tip diameter 80–100 $\mu$m) connected to a pressure-controlled microinjector (Stoelting), rats were injected with 0.5 $\mu$l of the hSSCs in hibernation buffer. The duration of each injection was 60 s followed by 30-s pause before capillary withdrawal. The center of the injection was targeted into central gray matter (laminae V–VII) (distance from the dorsal surface of the spinal cord at L3 level: 1 mm) (Kakinohana et al., 2004). The rostrocaudal distance between individual injections ranged between 200 $\mu$m (25–30 injections) and 500 $\mu$m (10 injections). The distance between the right and the left injection entry point ranged between 1.6–1.8 mm.

In study I, animals received a total of 10 bilateral injections (10 injections on the left and 10 injections on the right side) of 30,000 cells/injection. In study II, animals received a total of 10 bilateral injections of 5000, 10,000, 30,000 or 50,000 cells/injection. In study III, animals received a total of 25–30 injections (10,000 cells per injection) (see Table 1). After implantation, the incision was cleaned with 3% $H_2O_2$ and penicillin/streptomycin mixture and closed in two layers.

### Evaluation of neurological function

The recovery of motor function was evaluated in 7-day intervals using a 21-point open field locomotor scale developed by BBB (Basso et al., 1996). BBB scores categorize combinations of rat hindlimb movements, trunk position and stability, stepping, coordination, paw placement, toe clearance, and tail position, representing sequential recovery stages that rats attain after spinal injury/ischemia. The assessment of the neurological function was performed by an observer unaware of the treatment protocol. Neurological function was evaluated in Groups A3, A4, C1, and C2.

### Recording of MEPs

To record MEPs, animals were anesthetized (90 mg/kg) and maintained with ketamine (100 mg/kg/h, i.m.). Selection of ketamine anesthesia was based on previous studies reported from other laboratories which demonstrate a minimal suppressive effect on MEPs and Hoffmann reflex (Thompson et al., 1992; Chiba et al., 1998; Ho and Waite, 2002). Depth of anesthesia was verified periodically by the absence of corneal reflexes, whisker tremor and the pinna reflex.

MEPs were elicited by transcranial electrical stimulation (20 V, 200 $\mu$s; ISOSTIM™ A320, WPI, Sarasota, FL, USA) of the motor cortex using percutaneous stainless steel stimulating electrodes. Responses were recorded from the gastrocnemius muscle using platinum (22G) electrodes (distance between recording electrodes=1 cm) connected to a preamplifier (HS4 fiber optic Bioamp Headstage, WPI) and amplified using DB4 fiber optic amplifier (WPI). Sampling rate was 80 kHz and filter bandwidth was set at 100–10,000 Hz. MEPs were recorded in 7-day intervals

and stored on a PC for analysis. MEPs were recorded and analyzed in Groups C1 and C2.

### Perfusion fixation and tissue processing

At the end of the survival periods, rats were anesthetized with pentobarbital (40 mg/kg; i.p.) and transcardially perfused with heparinized saline (100 ml) followed by 4% paraformaldehyde in 0.1 M phosphate buffer (PB; 500 ml). The spinal cords were dissected and postfixed in the same fixative overnight at 4 °C. After postfixation tissue was cryoprotected in a graded sucrose solutions (10, 20 and 30%). Frozen coronal, parasagittal or horizontal spinal cord sections (10–30 $\mu$m) were then cut. For immunohistochemistry, free floating sections (30 $\mu$m) were placed in PBS (0.1 M; pH=7.4) containing 5% normal goat or donkey serum (NGS, DS), 0.2% Triton X-100 (TX), for 2 h at room temperature to block non-specific protein activity. This was followed by overnight incubation at 4 °C with primary human specific antibodies: mouse anti-nuclear protein/h-nuc (hNUMA; 1:100; Chemicon Inc., Temecula, CA, USA); mouse anti-neural cell adhesion molecule (hMOC; 1:200; DAKO, Carpenteria, CA, USA); mouse anti-neuron-specific enolase (hNSE; 1:200; Novocastra Laboratory); mouse anti-synaptophysin (hSYN; 1:1000; Chemicon Inc.). These antibodies were combined in multiple labeling experiments with polyclonal antibodies, rabbit anti-GFAP (1:500; Chemicon Int.), rabbit anti-GABA (1:15,000, Chemicon Inc.), or rabbit anti-synaptophysin (SYN) (1:200; Novocastra Laboratory), rabbit anti-GAD65 (1:2500; Chemicon); guinea-pig anti-GLYT2 (1:2500; Chemicon); goat anti-CHAT (1:100; Chemicon). Mouse anti-ED1 monoclonal antibody (1:1000; Chemicon Inc.) was used for identification of activated macrophages/microglia.

After incubation with primary antibodies, sections were washed 3× in PBS and incubated with fluorescent-conjugated secondary goat anti-rabbit, goat anti-mouse, or donkey anti-goat antibodies (Alexa 488, 594, 680; 4 $\mu$l/ml; Molecular Probes, Eugene, OR, USA). All blocking and antibody preparations were made in 0.1 M PBS/0.2% TX/5% NGS or 5% DS. For multiple labeling experiments, primary antibodies from different species were applied simultaneously, followed by application of secondary antibodies conjugated to different fluorescent markers. For general nuclear staining DAPI (3 $\mu$l/ml) was added to the final secondary antibody solutions. After staining, sections were mounted on slides, dried at room temperature and covered with Prolong anti-fade kit (Molecular Probes).

### Stereological quantification of grafted hSSCs by confocal microscopy

The total number of NUMA-positive human cells was estimated using stereological, unbiased, and systematic sampling (West et al., 1991). Every tenth previously-stained section (30-$\mu$m thick) was used for stereological quantification after applying fractionator sampling scheme. The optical images (1-$\mu$m spacing) were obtained using a Leica DMLB microscope (Leica Microsystems, Wetzlar, Germany) with a 100× oil-immersion objective (numerical aperture 1.3). The optical images were captured using digital camera (Olympus, Tokyo, Japan) and ImagePro software (Media Cybernetics, Bethesda, MD, USA) supplied with a StagePro (Media Cybernetics) controlled motorized Z stage. The total number of grafted NUMA-positive cells was then calculated by applying the fractionator formula $N=Q\times(1/hsf)\times(1/asf)\times(1/ssf)$, where $N$ is a total number of positive nuclei, $Q$ is sum of cells counted, $hsf$ is the height sampling fraction, $asf$ is area sampling fraction and $ssf$ is slice sampling fraction. Stereological quantification was performed in Study II (Groups B2 and B3) in animals which received 10,000 or 30,000 cells/injection ($n=3$ for each cell dosing group).

In colocalization analysis, images were captured with an Olympus confocal microscope (Fluoview 1000). In general, optical sections spaced by 0.2–0.5 $\mu$m were taken. Digital images of

blue, green, red and far red fluorescence were captured for each optical section. The intensity values for each color were kept within the linear range of the camera. Lenses included 40× and 60× oil immersion (numerical aperture 1.3).

#### Volume reconstruction of grafted spinal cord segments

To systematically analyze the position of the grafts with respect to their rostro-caudal as well as laminar distribution, a volume reconstruction of the individual grafting sites and spinal cords was performed. For this analysis, previously cut serial sections (average 150 sections/animal) were imaged with a 20× objective and images were then aligned using Ellipse software (Ellipse-2.0.6.1, Sk) (Kakinohana et al., 2004) and volume reconstructed using 3-D Constructor (Media Cybernetics).

#### Statistical analysis

For the statistical analysis of neurologic outcome non-parametric tests were used. The overall treatment and time-dependent main effect was analyzed using the Kruskal-Wallis test. Intergroup differences at specific time points after grafting were analyzed using Mann-Whitney $U$ test (an unpaired two-group test). A $P$-value of <0.05 was considered significant.

### RESULTS

#### Characterization of *in vitro* differentiated hSSCs

The hSSCs co-cultured on the rat astrocyte monolayers showed a pattern of a progressive neuronal maturation. This was expressed as extensive axodendritic branching and the development of neuron-like morphology. Staining of cultured cells with human specific NSE antibody confirmed an advanced degree of neuronal maturation in NSE positive neurons (Fig. 1A). Double labeling with NSE and GABA antibody showed development of clear GABA immunoreactivity in a subpopulation of NSE positive neurons (Fig. 1B, C). Quantitative analysis performed in four sister cultures at 4 weeks after astrocyte/hSSCs co-culture showed that on average, 45±6% of NSE-positive neurons were GABA immunoreactive.

*Study I (variable postinjury time and cell grafting).* In animals grafted at 3 or 7 days after ischemia only occasional or no surviving cells were seen at 7–14 days after cell grafting as defined by the presence or absence of NUMA-positive cells. While the individual injections tracts were identified, these areas were heavily infiltrated with ED1 immunoreactive elements or GFAP-positive reactive astrocytes (data not shown).

In contrast animals grafted at 21 days (Group A3) after ischemia showed a consistent presence of transplanted cells. The majority of individual grafts were located in the central gray matter distributed between dorsal and ventral horn. Phenotypic examination of grafted cells was identical as seen in study B and is described in detail in the following section (Study II).

Evaluation of the recovery of motor function in Group A3 and A4 showed that there was a progressive recovery of ambulatory functions in animals grafted with hSSCs. Three of nine animals displayed a significant improvement at 2 weeks after grafting (BBB score 7–8) and showed near normal ambulatory function at 6 weeks (BBB score 18–20). Three other animals, while not able to stand, showed a clear relief of otherwise increased muscle tone and improvement in the mobility of all three joints in the lower extremities (Fig. 3A). Statistical analysis at 6–8 weeks after grafting revealed a significantly better motor score in animals grafted with hSSCs if compared with animals injected with medium only (Fig. 3A).

*Study II (cell dosing study).* Staining of spinal cord sections taken from animals grafted at 21 days after ischemia with 5000–50,000 cells per injection site showed a consistent presence of grafted cells. Fig. 2A, B, C show the presence of bilateral NUMA and hMOC-positive grafts in an animal that received 30,000 cells per injection. A comparable graft-specific expression of hNSE was also seen (Fig. 2D). The laminar distribution of the individual grafts was between the surface of the dorsal spinal cord (lamina I) and extended in the majority of animals to lamina VIII.

Analysis of sagittal sections revealed a number of NUMA- and MOC-positive grafted cells which migrated for distances greater than 500 μm from the borders of the grafts and could easily be identified as solitary cells localized between the individual grafting sites (Fig. 2E, F, G; white arrows; white asterisks, two grafts). The majority of solitary cells which migrated outside of the grafts showed differentiation into astrocytes as evidenced by colocalization of NUMA staining with GFAP immunoreactivity (Fig. 2H–K).

Systematic 3-D analysis of serial transverse spinal cord sections stained with the hMOC antibody confirmed a consistent presence of MOC-positive grafts across three individual injection sites (Fig. 2L, M, N).



**Fig. 1.** (A–C) hSSCs co-cultured on a rat astrocyte monolayer for 6 weeks and stained with human-specific NSE antibody (A) and GABA antibody (B). Extensive axodendritic sprouting and GABA immunoreactivity in terminally differentiated neurons was noted.

D. Cizkova et al. / Neuroscience 147 (2007) 546–560    551

### Stereological quantification of grafted hSSCs and 3D volume reconstruction

Stereological estimation of grafted cells was performed in three animals injected with 10,000 cells/injection and in three animals injected with 30,000 cells/injection. NUMA-stained sections were used for stereological analysis.

In animals that received 10,000 cells/injection an average $257,800\pm37,867$ of grafted cells was counted in five bilateral grafts. Since, approximately 100,000 cells were injected ($5\times10,000$ counted in 5 injections=$50,000\times2$/both spinal cord sides) we estimate about 1.5 to 2 doublings of the cell number after grafting. A similar increase in the number of NUMA-positive cells in animals injected with 30,000 cells was seen where the average was $794,000\pm45,697$ in five bilateral grafts.

Neuroanatomical examination of the spinal cords revealed that in 4 of 12 animals injected with $\geq30,000$ cells/injection there was an oversized graft extending to the surface of the dorsal horn. In these animals individual grafts were found extending to the surface of the dorsal horn and corresponded to the positions of the injection needle tract. As a result of graft outgrowth the topographical organization of the spinal cord was partially lost and the laminar borders of the dorsal horn were difficult to recognize. Such changes were not identified in animals which received $\leq10,000$ cells/injection. Based on these data 10,000 cells/injection was chosen for the recovery study using an adult Sprague–Dawley rat of 350 g of body weight.

*Study III (functional recovery study). Effect of spinal grafting of hSSCs on motor function and MEPs.* In animals grafted with hSSCs two types of responses were noted. In the first group of animals (i.e. responders) a progressive improvement in motor behavior was seen, expressed as an increase in voluntary movement in all three joints of the lower extremities (Fig. 3B). This improved behavioral function correlated with an improvement in MEPs response (i.e. suppression of otherwise increased MEPs amplitudes; Fig. 3C, D). In the second group of grafted animals no significant recovery was observed (non-responders) and all animals continue to show extensor type of paraplegia and increased muscle tone (Fig. 3B). These animals also showed a continued increase in MEPs amplitude (Fig. 3C).

In the control group, where animals were injected with vehicle only, no significant recovery of motor function or change in MEPs amplitudes was noted for the entire 3-month survival period (Fig. 3B, C).

### Immunohistological analysis of grafted cells

Examination of spinal cord sections at 12 weeks after grafting showed a consistent presence of hSSCs cells in all grafted animals. The majority of grafts were localized in the gray matter in L2–L5 segments and were distributed between the dorsal horn and the intermediate zone (lamina VII).

Double labeling with human-specific NSE antibody combined with DCX antibody revealed clear expression of both proteins within the grafts. While the intensity of staining varied between individual neurons, the majority of neurons appeared to express both proteins (Fig. 4A–F; arrows). In contrast, numerous DCX-positive fibers were identified extending from the border of the graft but were NSE-negative (Fig. 4D–F; yellow arrows). Similarly, confocal analysis of double-labeled sections with TUJ1 and NUMA antibodies revealed colocalization of both antigens within the grafted cells (Fig. 4G). Staining with a non-human specific GFAP antibody revealed numerous host-derived GFAP-positive astrocytes in the vicinity of NUMA and DCX immunoreactive grafted neurons (Fig. 4H–J).

### Development of GABA-ergic phenotype in grafted neurons

Systematic analysis of NUMA-positive cells double stained with GABA antibody revealed that on average 40–45% of grafted cells developed a GABAergic phenotype ($n=4$). GABA immunoreactivity was clearly identified within the grafts and in individual NUMA-positive neurons (Fig. 5A–F).

### Development of hSYN immunoreactivity

Staining of transverse spinal cord sections with hSYN antibody revealed a dense hSYN immunoreactivity within the grafts (Fig. 6A, B, red arrows). In addition, numerous hSYN-positive terminals were identified adjacent to $\alpha$-motoneuronal membranes (Fig. 6C, D, red). The distances between the border of the individual grafts and the hSYN-positive terminals in the ventral horn ranged between 300 and 800 $\mu m$. Confocal analysis of sections double stained with hSYN and a SYN antibody that recognizes both the human and the rat SYN (Fig. 6D, F, G, blue color) demonstrated that only a subpopulation of SYN-positive terminals was also labeled with the hSYN antibody (Fig. 6C–G; yellow arrows).

### Development of GAD65 and GLYT2 phenotype in hSYN immunoreactive terminals

Confocal analysis of spinal cord sections triple labeled with GAD65, hSYN and CHAT antibody showed that numerous hSYN terminals in the ventral horn or in the vicinity of $\alpha$-motoneuronal membranes were also GAD65 immunoreactive (Fig. 7A–D). Quantitative analysis showed that $64\pm15\%$ of hSYN terminals were GAD65 immunoreactive. Single optical sections showed colocalization of both hSYN and GAD65 immunoreactivity (Fig. 7B–D). In contrast to GAD65 immunoreactive terminals, less then 2% of hSYN positive structures showed colocalization with GLYT2 immunoreactivity (Fig. 7E–H; yellow arrow).

### DISCUSSION

In the present study, by using a well-characterized rat model of spinal ischemic paraplegia, we demonstrate that spinal grafting of viable hSSCs expanded for 16 passages leads to a progressive recovery of motor function over 2–3 months after grafting. Such an improvement in ambulatory

552                                    D. Cizkova et al. / Neuroscience 147 (2007) 546–560



**Fig. 2.** (A, B) Transverse lumbar spinal cord sections taken at 7 weeks after grafting from an animal injected with 30,000 cells/injection. Staining with human specific nuclear antibody (NUMA) confirmed the presence of grafted cells distributed between the superficial DH layers and lamina VIII. (C, D) Staining with human specific MOC and NSE antibody revealed intense immunoreactivity within the individual grafts. (E–G) Sagittal lumbar spinal cord sections stained with NUMA and MOC antibody. The core of the individual injection sites could clearly be recognized (E–G:

D. Cizkova et al. / Neuroscience 147 (2007) 546–560                                                    553



Fig. 3. (A–D) Recovery of motor function and MEPs in animals grafted with hSSCs. (A) Statistical analysis of the BBB score between groups A3 and A4 (Study I) revealed a significant improvement at 6 and 8 weeks (P<0.05). (B) In Study III 7 of 13 animals grafted with hSSCs showed an improvement in the movement of all three joints of the lower extremities and relief of muscle spasticity and rigidity. Six animals showed no improvement. Correlative assessment with the degree of BBB recovery and the degree of MEPs normalization showed a significant correlation (C). (D) MEPs recording in an individual animal at baseline, after ischemia and at 2 months after hSSCs grafting. Increased MEPs amplitudes were found after ischemia, followed by a partial normalization at 2 months after grafting.

functions correlates with improvement of MEPs recorded during the same time frame. Histological analysis of grafted cells shows long term survival, robust neuronal differentiation, and development of GABAergic phenotype in a subpopulation of grafted neurons. Similarly, in our previous study we demonstrated a comparable treatment effect and long term cell survival after spinal grafting of postmitotic human hNT neurons or committed rat spinal neuronal precursors (Marsala et al., 2004).

**Region specific loss of inhibitory interneurons after spinal ischemia in rats and in humans**

As outlined above, the likely mechanism of spinal ischemic paraplegia (i.e. spastic/rigid paraplegia) is primar-

ily based on the loss of segmental inhibitory GABA- and glycinergic interneurons in ischemic-injured segments with a resulting increase in $\alpha$-motoneuronal excitability in persisting $\alpha$-motoneuronal pools. In addition, using this rat aortic occlusion model we have also demonstrated a continuing presence and functionality of spinopetal projections (corticospinal and rubrospinal tract) as well as VGLUT1-positive Ia afferents in previously ischemic spinal cord segments (Marsala et al., 2005; Kakinohana et al., 2006). Similarly, comparable qualitative and quantitative histopathological and functional deficits have been described in several other animal models of spinal ischemic injury as well as in humans (Dimitrijevic and Nathan, 1967; Tarlov, 1967; Zivin and DeGirolami,

asterisks). Numerous NUMA- and MOC-positive cells which migrated for distances greater then 500 $\mu$m from the borders of the grafts can also be identified (white arrows). (H–K) Confocal analysis of NUMA and GFAP antibody-stained sections showed that a sub-population of NUMA-positive cells differentiated into astrocytes (I, J, K). These cells were typically localized at the periphery of the individual grafts. (L–N) Systematic 3-D analysis of serial transverse spinal cord sections stained with the hMOC antibody confirmed a consistent presence of MOC-positive grafts across three individual injections sites (DH, dorsal horn; VH, ventral horn).

D. Cizkova et al. / Neuroscience 147 (2007) 546–560



Fig. 4. (A–J) Transverse spinal cord sections taken at 3 months after grafting and double stained with human specific NSE antibody (A, red) and DCX antibody (B, green). Intense NSE and DCX staining was seen within the graft. In a number of grafted terminally differentiated neurons the colocalization of both proteins was identified (A–C, yellow arrows). Numerous processes were found extending from the graft which were DCX immunoreactive but NSE negative (D–F; yellow arrows). Double staining with NUMA and TUJ1 antibody revealed that virtually all NUMA immunoreactive cells were also TUJ1-positive (G). (H–J) Projected confocal images taken from sections triple stained with DCX, NUMA and non-human specific GFAP antibody. Numerous host-derived GFAP-positive astrocytes which were NUMA-negative were identified within the graft. DCX- and NUMA-labeled neurons with extensive axo-dendritic sprouting can also be seen (H–J, yellow arrow).

1980; Taira and Marsala, 1996). These findings indicate that the rat model is predictive of the dysfunction resulting from spinal ischemia in human patients who undergo thoraco-abdominal aortic aneurysm repair.

Consistent with the proposed mechanism of ischemia-induced spasticity and rigidity, we have shown that spinal delivery of baclofen (GABA B receptor agonist) or nipecotic acid (GABA uptake inhibitor) as well as dorsal L2–L5 rhizotomy, is effective in suppressing behavioral and electrophysiological indices of rigidity and spasticity (Marsala et al., 2005; Kakinohana et al., 2006). Human patients also display clinical relief from spasticity and rigidity with admin-

istration of baclofen or other GABA-mimetic drugs (Penn, 1988). Thus, given the similar pathophysiology of the spinal ischemic injury in the rat model and human patients, a donor cell population having the potential to develop an inhibitory phenotype (e.g. GABA- or glycinergic) may have viable therapeutic potential when transplanted into human patients to replace the lost segmental inhibitory neurons in the injured spinal segments.

In this respect it should be emphasized that spinal ischemic paraplegia represents a unique and well-defined pathological state in which region-specific grafting of neuronal precursors is aimed at restoring local inhibitory cir-



Fig. 5. (A–F) Transverse spinal cord section taken after 7 weeks of survival and stained with NUMA and GABA antibody. A subpopulation of NUMA-positive cells showed colocalization with GABA immunoreactivity (D–F: yellow arrows).

cuits and/or provide increased release of inhibitory neurotransmitters such as GABA and/or glycine. This is in contrast to spinal trauma which typically results in a loss of descending motor tracts as well as ascending sensory systems, and depending on the severity and segmental level of the injury, leads to variable degrees of motor/sensory dysfunctions (Vanicky et al., 2001; Young, 2002).

### Cell survival and neuronal differentiation of spinally grafted hSSCs

In the present study the majority of grafted cells developed a neuronal phenotype as validated by staining with human-neuron-specific antibodies such as NSE or MOC, or colocalization of staining with hNUMA and TUJ1. The capability of these cells to differentiate into neurons when grafted into a previously ischemic (injured) spinal cord during their Nestin-positive "stage" appears to be unique. Previous studies using in vitro expanded neural precursors have reported only limited neuronal differentiation and maturation when grafted into a previously mechanically or chemically injured spinal cord (Onifer et al., 1997). Contrary to the conclusion of the previous studies, it is unlikely that the host spinal tissue is specifically inhibitory to neuronal differentiation of multipotent neural stem cells. Also, similar neurogenic potential of these cells has been observed when transplanted spinally in SOD1 G93A mice (Yan et al., 2006). Rather, the simplest explanation is that the neurogenic potential of this stem cell line has been better maintained than the previously studied cell population. In that regard, it may be of significance that this cell line, unlike others reported, was initiated and maintained as an adher-

ent culture as opposed to a neurosphere culture (Johe et al., 1996).

### Variable stages of neuronal maturation in hSSCs-derived neurons

As the current results demonstrate, a mixed population of grafted neurons expressing hNSE, DCX (doublecortin) or both markers was seen 3 months after grafting. In addition a number of DCX-immunoreactive fibers were identified extending from the grafts but which were NSE negative. Previous data show that DCX is only expressed during early stages of spinal cord development and is absent in the adult rat spinal cord (Gleeson et al., 1999; Couillard-Despres et al., 2005). In contrast, the expression of NSE coincides with the morphological and functional maturation of brain neurons (Marangos et al., 1980). These data indicate that with respect to the developmental stage of grafted neurons, different subpopulations of grafted cells are still present 3 months after grafting. Considering the developmental stage of cells when they were grafted (i.e. nestin-positive) this maturation profile is not unexpected and suggests that a much longer post-grafting period is required to achieve full maturity in all grafted cells. This hypothesis is in line with our previously published data showing a more advanced stage of hNT neuron maturation at 3 months after grafting when they were grafted as fully postmitotic neurons (Marsala et al., 2004). In addition, it should be emphasized, that the maturation profile of grafted neurons can be significantly influenced by the animal species of the recipient. For example in contrast to the current rat data, grafting of the same cells into the spinal

D. Cizkova et al. / Neuroscience 147 (2007) 546–560



Fig. 6. (A–C) Fluorescent microscopy images (A, B) and projected confocal images (C, D) of transverse spinal cord sections taken at 3 months after grafting and stained with human specific SYN antibody (red), CHAT antibody (green) and SYN antibody which cross-reacts with both human and rat SYN (blue). Intense hSYN immunoreactivity was found within the two bilateral grafts (A; red arrows). Numerous hSYN immunoreactive terminals were localized in the base of the dorsal horn and extending into ventral α-motoneuron pools (B, C; red). (E–G) Single optical images (0.3 μm thick) demonstrating colocalization of hSYN and SYN immunoreactivity in the vicinity of persisting CHAT+ α-motoneuron (yellow arrows).

cord of an uninjured minipig led to only modest NSE ex-
pression at 6–7 weeks after grafting but with robust DCX
expression (Motlik and Marsala, unpublished observa-
tions). These observations are in line with a recently pub-
lished report demonstrating that the time frame of neuronal
differentiation of human embryonic stem cells implanted in
the brain ventricles of embryonic mice is consistent with
the maturation profile of the recipient (Muotri et al., 2005).

Also in contrast with other reported donor cells, cell
survival appeared to be quantitative. While a detailed time-
course study is needed to quantitatively document the fate
of individual cells, in general the current results indicated a
1.5- to 2-fold increase in the number of cells after injection.
This increase in cell number is readily accounted for by the

fact that the cells were mostly undifferentiated at the time
of implantation. Based on their in vitro behavior, it is ex-
pected that the undifferentiated neural stem cells gradually
differentiate into neurons and glia during their last cell
division over the first 3 days after transplantation. The
doubling time of the undifferentiated hSSCs in vitro is
approximately 39 h in the presence of optimal bFGF con-
centrations. Most likely, the glial progenitors continue to
proliferate slowly over the next 2 weeks. Labeling of mitotic
cells in vivo by BrdU (bromodeoxyuridine) injection or by
staining with the endogenous proliferation marker, ki67
at 2 months postimplantation showed only occasional
NUMA-positive human cells (data not shown). Thus, the
donor cells, although they initially increase in cell number,

D. Cizkova et al. / Neuroscience 147 (2007) 546–560



**Fig. 7.** (A–D) Single confocal optical images taken from section at 3 months after grafting and stained with hSYN (red), CHAT (green) and GAD65 (blue) antibodies. The majority of hSYN terminals showed colocalization with GAD65 (B–D, yellow arrows). (E–H) Single confocal optical images taken from sections at 3 months after grafting and stained with hSYN (red), CHAT (green) and GLYT2 (blue) antibodies. Only occasional colocalization of hSYN and GLYT2 antibody was noted (F–H, yellow arrow).

are not tumorigenic and do not appear to show uncontrolled cell growth. An extensive tumorigenicity study is under progress to further demonstrate this point.

**Mechanism of cell graft-mediated therapeutic effect**

As demonstrated in the present study, numerous hSSCs-derived neurons expressed NSE, suggesting an advanced stage of maturation. Staining with a human-specific SYN antibody revealed a relatively dense population of hSYN-positive terminals particularly in the ventral horn in the vicinity of persisting $\alpha$-motoneurons. More than 60% of these terminals were GAD65 immunoreactive which was consistent with robust GABA expression in grafted cells. While electron microscopic

D. Cizkova et al. / Neuroscience 147 (2007) 546–560

analysis will be required to provide definitive evidence of synapse formation, previous studies have reported the development of putative synapses between human brain-derived neuronal precursors and mice host neurons (NOD-scid/shi mice) at 16 weeks post-grafting when grafted into traumatically injured spinal cord (Cummings et al., 2005).

Based on these data we believe that the mechanism involved in the observed therapeutic effect during the first 2–3 months after grafting is likely mediated by: i) diffusion of tonically-released GABA from grafted GABA-positive neurons and an improvement in local tonic inhibitory tone; ii) development of GABA- and/or glycinergic inhibitory synapses on persisting $\alpha$-motoneurons or disinhibited Ia afferents.

In addition, recent evidence suggests that ischemia may lead to AMPA receptor-mediated degeneration of astrocytes and oligodendrocytes (see Stys, 2005 for review). The loss of these glial elements can lead to the loss of local conductivity and a resulting loss of neurological function. We speculate that the release of neurotrophic factors from grafted cells can a) promote local remyelinization due to their stimulatory effect on the host oligodendrocyte precursors, b) increase astrocyte proliferation, as well as c) stimulate long tract and segmental fiber sprouting. Such an effect can also contribute to the observed improvement in neurological function. Consistent with this hypothesis, GDNF and BDNF expression in spinally grafted hSSCs in SOD1 G93A mice was recently reported (Yan et al., 2006). An alternative or additional protective mechanism associated with the local release of trophic factors from the graft may be related to the suppression of progressive neuronal/glial apoptosis as well as axonal sparing in persisting host neurons residing in the vicinity of grafted cells.

## Functional recovery after grafting

With respect to the degree of behavioral recovery observed in the present study we have seen three principal groups after grafting. First, animals which displayed the most robust recovery and the ability to walk (BBB >16), second, animals which showed improvement in the active mobility of all three joints in the lower extremities but were not able to stand (BBB ~8), and the third group in which animals displayed little or no recovery (i.e. non-responders). The most robust recovery was seen in animals grafted with 30,000 cells/injection (total of 10 bilateral injections). However in some animals grafted with this density a graft outgrowth in the superficial regions of the dorsal horn was found and therefore 10,000 cells/injection was used in the second recovery study. While the degree of functional recovery was not so robust in this group, 7 of 13 animals showed significant improvement in the voluntary movement of the lower extremities and this improvement positively correlated with the degree of recovery of MEPs. Based on these behavioral data we speculate that the optimal cell delivery regimen in the adult rat in this particular model will likely include multiple (10–20) bilateral injections with the density of cells per injection being in the vicinity of 15,000 cells/injection.

The reason for the differences in responsiveness to the grafting in both recovery studies and among individual animals is not clear but we speculate that subtle differences playing a role can be graft positions with respect to the disinhibited primary afferents and/or $\alpha$-motoneurons as well as the magnitude of GABA release, GABA-ergic and glycinergic synapse formation and/or neurotrophic activity mediated by the graft.

Furthermore it should be noted that the maximum survival time was only 3 months in the present study and that numerous DCX immunoreactive neurons were still seen at this time point. Based on these data we speculate that a long term (6–12 months) post-grafting survival period and physical rehabilitation would likely be associated with a higher degree of functional recovery. Nonetheless, in contrast to the grafted groups, no significant recovery was seen in any animals injected with medium only.

## Endogenous neuronal proliferation after global cerebral ischemia vs. spinal cord

In previous experimental studies significant neuronal proliferation was noted in the hippocampal CA1 region and dentate gyrus after injurious intervals of ischemia. In these studies it was shown that there is up to 40%-60% of neuronal repopulation at 26–90 days after global cerebral ischemia and that such neuronal repopulation correlates with recovery of memory function (Liu et al., 1998; Bendel et al., 2005). In contrast, the spinal ischemia model used in the present study exhibits a continued presence of spastic paraplegia up to 14 months after ischemic injury and this continued deficit correlates with no detectable increase in the population of small interneurons in previously ischemic spinal cord segments (Kakinohana et al., 2006). While enhancement/modulation of intrinsic neuronal proliferative capacity would be preferable, these data indicate that in the case of spinal ischemic injury the only currently available therapeutic approach to achieve sufficient neuronal re-population in previously neuron-depleted segments will likely be region specific grafting of neuronal precursors. In addition to spinal ischemic injury which primarily affects the interneuronal population in the spinal lumbar region, selective neuronal loss resulting from a localized trauma in the same regions can also represent a potential candidate for cell replacement therapy.

## CONCLUSION

In the present study by using a well-defined rat model of ischemic spastic paraplegia we demonstrated that spinal, region-specific grafting of human neural stem cells leads to a progressive recovery of motor function and correlative improvement in MEPs over 2–3 months after grafting. The improvement in motor function was associated with long term survival of grafted neurons, neuronal differentiation and development of GABAergic phenotype in a sub-population of grafted cells. These data indicate that the use of hSSCs may be an effective therapy for patients suffering from spinal ischemia-induced paraplegia.

D. Cizkova et al. / Neuroscience 147 (2007) 546–560    559

*Acknowledgments*—This research was supported by NIH grant NS 40386 (M.M.), Neuralstem Inc., MD and Centrum of Excellence APVV 51-002105 grant (D.C.).

## REFERENCES

Acsadi G, Anguelov RA, Yang H, Toth G, Thomas R, Jani A, Wang Y, Ianakova E, Mohammad S, Lewis RA, Shy ME (2002) Increased survival and function of SOD1 mice after glial cell-derived neurotrophic factor gene therapy. Hum Gene Ther 13:1047–1059.

Akins PT, Atkinson RP (2002) Glutamate AMPA receptor antagonist treatment for ischaemic stroke. Curr Med Res Opin 18(Suppl 2): s9–s13.

Anderson DK, Howland DR, Reier PJ (1995) Fetal neural grafts and repair of the injured spinal cord. Brain Pathol 5:451–457.

Basso DM, Beattie MS, Bresnahan JC, Anderson DK, Faden AI, Gruner JA, Holford TR, Hsu CY, Noble LJ, Nockels R, Perot PL, Salzman SK, Young W (1996) MASCIS evaluation of open field locomotor scores: effects of experience and teamwork on reliability. Multicenter Animal Spinal Cord Injury Study. J Neurotrauma 13:343–359.

Bendel O, Bueters T, von Euler M, Ove Ogren S, Sandin J, von Euler G (2005) Reappearance of hippocampal CA1 neurons after ischemia is associated with recovery of learning and memory. J Cereb Blood Flow Metab 25:1586–1595.

Chiba A, Nakanishi H, Hiruma S, Satou T, Hashimoto S, Chichibu S (1998) Magnetically induced motor evoked potentials and H-reflex during Nembutal and ketamine anesthesia administration in rats. Res Commun Mol Pathol Pharmacol 101:43–57.

Chow SY, Moul J, Tobias CA, Himes BT, Liu Y, Obrocka M, Hodge L, Tessler A, Fischer I (2000) Characterization and intraspinal grafting of EGF/bFGF-dependent neurospheres derived from embryonic rat spinal cord. Brain Res 874:87–106.

Couillard-Despres S, Winner B, Schaubeck S, Aigner R, Vroemen M, Weidner N, Bogdahn U, Winkler J, Kuhn HG, Aigner L (2005) Doublecortin expression levels in adult brain reflect neurogenesis. Eur J Neurosci 21:1–14.

Cummings BJ, Uchida N, Tamaki SJ, Salazar DL, Hooshmand M, Summers R, Gage FH, Anderson AJ (2005) Human neural stem cells differentiate and promote locomotor recovery in spinal cord-injured mice. Proc Natl Acad Sci U S A 102:14069–14074.

Dimitrijevic MR, Nathan PW (1967) Studies of spasticity in man. I. Some features of spasticity. Brain 90:1–30.

Facchinetti F, Dawson VL, Dawson TM (1998) Free radicals as mediators of neuronal injury. Cell Mol Neurobiol 18:667–682.

Giulian D, Robertson C (1990) Inhibition of mononuclear phagocytes reduces ischemic injury in the spinal cord. Ann Neurol 27:33–42.

Gleeson JG, Lin PT, Flanagan LA, Walsh CA (1999) Doublecortin is a microtubule-associated protein and is expressed widely by migrating neurons. Neuron 23:257–271.

Ho SM, Waite PM (2002) Effects of different anesthetics on the paired-pulse depression of the H reflex in adult rat. Exp Neurol 177: 494–502.

Johe KK, Hazel TG, Muller T, Dugich-Djordjevic MM, McKay RD (1996) Single factors direct the differentiation of stem cells from the fetal and adult central nervous system. Genes Dev 10:3129–3140.

Kakinohana O, Cizkova D, Tomori Z, Hedlund E, Marsala S, Isacson O, Marsala M (2004) Region-specific cell grafting into cervical and lumbar spinal cord in rat: a qualitative and quantitative stereological study. Exp Neurol 190:122–132.

Kakinohana O, Hefferan MP, Nakamura S, Kakinohana M, Galik J, Tomori Z, Marsala J, Yaksh TL, Marsala M (2006) Development of GABA-sensitive spasticity and rigidity in rats after transient spinal cord ischemia: A qualitative and quantitative electrophysiological and histopathological study. Neuroscience 141:1569–1583.

Liu J, Solway K, Messing RO, Sharp FR (1998) Increased neurogenesis in the dentate gyrus after transient global ischemia in gerbils. J Neurosci 18:7768–7778.

Liu Y, Kim D, Himes BT, Chow SY, Schallert T, Murray M, Tessler A, Fischer I (1999) Transplants of fibroblasts genetically modified to express BDNF promote regeneration of adult rat rubrospinal axons and recovery of forelimb function. J Neurosci 19:4370–4387.

Lombardi V, Valko L, Stolc S, Valko M, Ondrejickova O, Horakova L, Placek J, Troncone A (1998) Free radicals in rabbit spinal cord. ischemia: electron spin resonance spectroscopy and correlation with SOD activity. Cell Mol Neurobiol 18:399–412.

Marangos PJ, Schmechel DE, Parma AM, Goodwin FK (1980) Developmental profile of neuron-specific (NSE) and non-neuronal (NNE) enolase. Brain Res 190:185–193.

Marsala M, Hefferan MP, Kakinohana O, Nakamura S, Marsala J, Tomori Z (2005) Measurement of peripheral muscle resistance in rats with chronic ischemia-induced paraplegia or morphine-induced rigidity using a semi-automated computer-controlled muscle resistance meter. J Neurotrauma 22:1348–1361.

Marsala M, Kakinohana O, Yaksh TL, Tomori Z, Marsala S, Cizkova D (2004) Spinal implantation of hNT neurons and neuronal precursors: graft survival and functional effects in rats with ischemic spastic paraplegia. Eur J Neurosci 20:2401–2414.

Marsala M, Sorkin LS, Yaksh TL (1994) Transient spinal ischemia in rat: characterization of spinal cord blood flow, extracellular amino acid release, and concurrent histopathological damage. J Cereb Blood Flow Metab 14:604–614.

McDonald JW, Liu XZ, Qu Y, Liu S, Mickey SK, Turetsky D, Gottlieb DI, Choi DW (1999) Transplanted embryonic stem cells survive, differentiate and promote recovery in injured rat spinal cord. Nat Med 5:1410–1412.

Mori F, Himes BT, Kowada M, Murray M, Tessler A (1997) Fetal spinal cord transplants rescue some axotomized rubrospinal neurons from retrograde cell death in adult rats. Exp Neurol 143:45–60.

Muotri AR, Nakashima K, Toni N, Sandler VM, Gage FH (2005) Development of functional human embryonic stem cell-derived neurons in mouse brain. Proc Natl Acad Sci U S A 102:18644–18648.

Nagai M, Aoki M, Miyoshi I, Kato M, Pasinelli P, Kasai N, Brown RH, Jr, Itoyama Y (2001) Rats expressing human cytosolic copper-zinc superoxide dismutase transgenes with amyotrophic lateral sclerosis: associated mutations develop motor neuron disease. J Neurosci 21:9246–9254.

Onifer SM, Cannon AB, Whittemore SR (1997) Altered differentiation of CNS neural progenitor cells after transplantation into the injured adult rat spinal cord. Cell Transplant 6:327–338.

Penn RD (1988) Intrathecal baclofen for severe spasticity. Ann N Y Acad Sci 531:157–166.

Reier PJ, Anderson DK, Thompson FJ, Stokes BT (1992a) Neural tissue transplantation and CNS trauma: anatomical and functional repair of the injured spinal cord. J Neurotrauma 9(Suppl 1): S223–S248.

Reier PJ, Stokes BT, Thompson FJ, Anderson DK (1992b) Fetal cell grafts into resection and contusion/compression injuries of the rat and cat spinal cord. Exp Neurol 115:177–188.

Saganova K, Marsala M (1994) Intrathecal administration of dizocilpine maleate (MK-801) attenuates ischemic damage in the rabbit spinal cord. Exp Neurol 130:337–343.

Stys PK (2005) General mechanisms of axonal damage and its prevention. J Neurol Sci 233:3–13.

Svensson LG, Von Ritter CM, Groeneveld HT, Rickards ES, Hunter SJ, Robinson MF, Hinder RA (1986) Cross-clamping of the thoracic aorta. Influence of aortic shunts, laminectomy, papaverine, calcium channel blocker, allopurinol, and superoxide dismutase on spinal cord blood flow and paraplegia in baboons. Ann Surg 204:38–47.

Taira Y, Marsala M (1996) Effect of proximal arterial perfusion pressure on function, spinal cord blood flow, and histopathologic changes after increasing intervals of aortic occlusion in the rat. Stroke 27:1850–1858.

D. Cizkova et al. / Neuroscience 147 (2007) 546–560

Tarlov IM (1967) Rigidity in man due to spinal interneuron loss. Arch Neurol 16:536–543.

Thompson FJ, Reier PJ, Lucas CC, Parmer R (1992) Altered patterns of reflex excitability subsequent to contusion injury of the rat spinal cord. J Neurophysiol 68:1473–1486.

Vanicky I, Urdzikova L, Saganova K, Cizkova D, Galik J (2001) A simple and reproducible model of spinal cord injury induced by epidural balloon inflation in the rat. J Neurotrauma 18: 1399–1407.

Vastag B (2001) Stem cells step closer to the clinic: paralysis partially reversed in rats with ALS-like disease. JAMA 285: 1691–1693.

West MJ, Slomianka L, Gundersen HJ (1991) Unbiased stereological estimation of the total number of neurons in the subdivisions of the rat hippocampus using the optical fractionator. Anat Rec 231:482–497.

Yan J, Xu L, Welsh AM, Chen D, Hazel T, Johe K, Koliatsos VE (2006) Combined immunosuppressive agents or CD4 antibodies prolong survival of human neural stem cell grafts and improve disease outcomes in amyotrophic lateral sclerosis transgenic mice. Stem Cells 24:1976–1985.

Young W (2002) Spinal cord contusion models. Prog Brain Res 137:231–255.

Zivin JA, DeGirolami U (1980) Spinal cord infarction: a highly reproducible stroke model. Stroke 11:200–202.

(Accepted 20 February 2007)
(Available online 23 May 2007)

# Exhibit 8

1
2
3
4
5
6
7          IN THE UNITED STATES DISTRICT COURT
8
9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                                          No. C 08-02364 CW
   STEMCELLS, INC., et al.,
11                                          CASE MANAGEMENT
              Plaintiffs,                   SCHEDULING ORDER FOR
12                                          REASSIGNED CIVIL
       v.                                   CASE
13
   NEURALSTEM, INC., et al.,
14
              Defendants.
15  _____/

16
       This action having been reassigned to the undersigned judge,

17     IT IS HEREBY ORDERED that a Case Management Conference will be
18
   held on **August 26, 2008, at 2:00 p.m.** in Courtroom 2, 4th Floor, 1301
19
   Clay Street, Oakland, CA  94612.  Pursuant to Civil L.R. 16-9(a), a
20
   joint Case Management Statement will be due seven (7) days prior to
21
   the conference.
22
       Plaintiff is directed to serve a copy of this Order at once on
23
   all parties to this action in accordance with the provisions of Rule
24
   5 of the Federal Rules of Civil Procedure.  Following service, the
25
   party causing the service shall file a certificate of service with the
26
   Clerk of Court.
27
       This case has been designated for the Court's Electronic Case
28

1  Filing (ECF) Program.  Pursuant to General Order 45, each attorney of

2  record is obligated to become an ECF user and be assigned a user ID

3  and password for access to the system.  All documents required to be

4  filed with the Clerk shall be filed electronically on the ECF website,

5  except as provided otherwise in section VII of General Order 45 or

6  authorized otherwise by the court.

7      IT IS SO ORDERED.

8

9  Dated:  May 12, 2008

10                                    _____
                                     CLAUDIA WILKEN
11                                    UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25
    (Rev. 10/10/07)
26

27

28

1

2

<u>NOTICE</u>

3

4      **Case Management Conferences and Pretrial Conferences** are
conducted on **Tuesdays** at 2:00 p.m.  **Criminal Law and Motion** calendar

5   is conducted on **Wednesdays** at 2:00 p.m. for defendants in custody and
2:30 p.m. for defendants not in custody.  **Civil Law and Motion**

6   calendar is conducted on **Thursdays** at 2:00 p.m.  Order of call is
determined by the Court.  Counsel need not reserve a hearing date for

7   civil motions; however, counsel are advised to check the legal
newspapers or the Court's website at www.cand.uscourts.gov for

8   unavailable dates.

9      . Motions for Summary Judgment:  All issues shall be contained
within one motion of 25 pages or less, made on 35 days notice.  (<u>See</u>

10  Civil L.R. 7-2).  Separate statements of undisputed facts in support
of or in opposition to motions for summary judgment will not be

11  considered by the Court. (<u>See</u> Civil Local Rule 56-2(a)).  The motion
and opposition should include a statement of facts supported by

12  citations to the declarations filed with respect to the motion.
Evidentiary and procedural objections shall be contained within the

13  motion, opposition or reply; separate motions to strike will not be
considered by the Court. Any cross-motion shall be contained within

14  the opposition to any motion for summary judgment, shall contain 25
pages or less, and shall be filed 21 days before the hearing.  The

15  reply to a motion may contain up to 15 pages, shall include the
opposition to any cross-motion, and shall be filed 14 days before the

16  hearing.  (<u>See</u> Civil Local Rule 7-3).  The Court may, *sua sponte* or
pursuant to a motion under Civil L.R. 6-3, reschedule the hearing so

17  as to give a moving party time to file a reply to any cross-motion.

18     All discovery motions are referred to a Magistrate Judge to be
heard and considered at the convenience of his/her calendar.  All such

19  matters shall be noticed by the moving party for hearing on the
assigned Magistrate Judge's regular law and motion calendar, or

20  pursuant to that Judge's procedures.

21     Pursuant to General Order 45,§ VI.G, "In all cases subject to
ECF, in addition to filing papers electronically, the parties are

22  required to lodge for chambers **no later than noon on the business day
following the day that the papers are filed electronically**, one paper

23  copy of each document that is filed electronically."

24

25  (rev. 10/10/07)

26

27

28

**STANDING ORDER FOR ALL JUDGES OF THE NORTHERN DISTRICT OF CALIFORNIA**

**CONTENTS OF JOINT CASE MANAGEMENT STATEMENT**

Commencing March 1, 2007, all judges of the Northern District of California require the identical information in Joint Case Management Statements filed pursuant to Civil Local Rule 16-9. The parties must include the following information in their statement which, except in unusually complex cases, should not exceed ten pages:

1.     Jurisdiction and Service:  The basis for the court's subject matter jurisdiction over plaintiff's claims and defendant's counterclaims, whether any issues exist regarding personal jurisdiction or venue, whether any parties remain to be served, and, if any parties remain to be served, a proposed deadline for service.

2.     Facts: A brief chronology of the facts and a statement of the principal factual issues in dispute.

3.     Legal Issues: A brief statement, without extended legal argument, of the disputed points of law, including reference to specific statutes and decisions.

4.     Motions: All prior and pending motions, their current status, and any anticipated motions.

5.     Amendment of Pleadings: The extent to which parties, claims, or defenses are expected to be added or dismissed and a proposed deadline for amending the pleadings.

6.     Evidence Preservation: Steps taken to preserve evidence relevant to the issues reasonably evident in this action, including interdiction of any document-destruction program and any ongoing erasures of e-mails, voice mails, and other electronically-recorded material.

7.     Disclosures: Whether there has been full and timely compliance with the initial disclosure requirements of Fed. R. Civ. P. 26 and a description of the disclosures made.

8.     Discovery: Discovery taken to date, if any, the scope of anticipated discovery, any proposed limitations or modifications of the discovery rules, and a proposed discovery plan pursuant to Fed. R. Civ. P. 26(f).

9.     Class Actions: If a class action, a proposal for how and when the class will be certified.

10.     Related Cases: Any related cases or proceedings pending before another judge of this court, or before another court or administrative body.

11.     Relief: All relief sought through complaint or counterclaim, including the amount of any damages sought and a description of the bases on which damages are calculated.  In addition, any party from whom damages are sought must describe the bases on which it contends damages should be calculated if liability is established.

12.     Settlement and ADR: Prospects for settlement, ADR efforts to date, and a specific ADR plan for the case, including compliance with ADR L.R. 3-5 and a description of key discovery or motions necessary to position the parties to negotiate a resolution.

13.     Consent to Magistrate Judge For All Purposes: Whether all parties will consent to have a magistrate judge conduct all further proceedings including trial and entry of judgment.

1

14.    Other References: Whether the case is suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

2

3

15.    Narrowing of Issues: Issues that can be narrowed by agreement or by motion, suggestions to expedite the presentation of evidence at trial (e.g., through summaries or stipulated facts), and any request to bifurcate issues, claims, or defenses.

4

5

16.    Expedited Schedule: Whether this is the type of case that can be handled on an expedited basis with streamlined procedures.

6

17.    Scheduling: Proposed dates for designation of experts, discovery cutoff, hearing of dispositive motions, pretrial conference and trial.

7

8

18.    Trial: Whether the case will be tried to a jury or to the court and the expected length of the trial.

9

19.    Disclosure of Non-party Interested Entities or Persons: Whether each party has filed the "Certification of Interested Entities or Persons" required by Civil Local Rule 3-16.  **In addition**, each party must restate in the case management statement the contents of its certification by identifying any persons, firms, partnerships, corporations (including parent corporations) or other entities known by the party to have either:  (i) a financial interest in the subject matter in controversy or in a party to the proceeding; or (ii) any other kind of interest that could be substantially affected by the outcome of the proceeding.

10

11

12

20.    Such other matters as may facilitate the just, speedy and inexpensive disposition of this matter.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 9

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

Neuralstem, Inc.

    Plaintiff,

    vs.

                                  Civil Action No. 08-CV-01173-AW

StemCells, Inc.; StemCells California, Inc. and
Neurospheres Holding Ltd.

    Defendants.

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXTEND TIME TO ANSWER OR OTHERWISE RESPOND TO AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 6(b), Defendants StemCells, Inc. and StemCells California, Inc. (collectively, "StemCells") respectfully request that this Court extend the time to answer or otherwise respond to Plaintiff's Amended Complaint in the interest of judicial economy.

On May 22, 2008, StemCells was served with the Amended Complaint, and a response is due on June 5, 2008. *See* Fed. R. Civ. P. 6; Fed. R. Civ. P. 15. As of June 2, 2008, StemCells' Co-Defendant, Neurospheres Holding Ltd. ("Neurospheres"), a Canadian company, was not served and instead has waived service pursuant to Rule 4(d). A copy of the waiver is attached as Exhibit 1 to the Declaration of Jeremy I. Medovoy. Neurospheres' answer or response is not due for 90 days (September 1, 2008) pursuant to Rule 4(d)(3). An extension of time would allow StemCells and Neurospheres to respond at the same time and in the same manner, thereby preserving Court and party resources.

In granting the extension, Plaintiff will suffer no prejudice. Motions to extend time to conserve Court and party resources are within the sound discretion of the Court.

*See, e.g., Lombard Secs. v. Thomas F. White & Co.*, 903 F. Supp. 895, 900 (D. Md. 1995) (stating that "federal district courts are vested with the inherent power to control and protect the administration of court proceedings."). The instant dispute is subject to a similar litigation pending in the Northern District of California, which does not involve Neurospheres, and which will proceed during the requested extension.

On May 7, 2008, StemCells sued Neuralstem, Dr. Garr and Dr. Johe in the Northern District of California for infringement of U.S. Patent Nos. 7,115,418 ("the '418 patent") and 7,361,505 ("the '505 patent."). *StemCells, Inc. et al. v. Neuralstem, Inc., et al*, Case No. 5:08-CV-2364, Northern District of California (Judge Claudia Wilken). A copy of the complaint is attached as Exhibit 2 to the Declaration of Jeremy I. Medovoy. That same day, Neuralstem filed this lawsuit against StemCells and Neurospheres for a declaratory judgment of non-infringement, invalidity and unenforceability of the '505 patent. On May 9, 2007, StemCells filed an Amended Complaint in the Northern District of California adding California state law causes of action. A copy of this complaint is attached as Exhibit 3 to the Declaration of Jeremy I. Medovoy. On May 22, 2007, Neuralstem served an Amended Complaint in the Maryland action on StemCells to seek declaratory determinations of non-infringement of the '418 patent and the California state law causes of action. StemCells' Answer or response to the Maryland Amended Complaint is due June 5, 2008.

As of June 2, 2008, Neurospheres has not yet been served with either the Maryland Complaint or Amended Complaint. On June 2, 2008, Neurospheres waived service pursuant to Rule 4(d)(3). *See* Exhibit 1 to Declaration of Jeremy I. Medovoy.

On May 30, 2008, Neuralstem, Dr. Garr and Dr. Johe filed a motion to dismiss or

transfer the Northern District of California Action. A hearing on that motion is set for July 10, 2008.[1]

To insure orderly motions practice and to guard against unnecessarily expending Court and party resources, StemCells requests the instant extension of time to September 1, 2008, so that a single answer or response can be filed. The issue of transfer will likely be addressed by the Northern District of California in the first instance and will simplify any motions practice before this Court. Neuralstem will not be prejudiced as the dispute will be proceeding during the requested extension.

Therefore, StemCells requests that the time to answer or otherwise respond to the Amended Complaint be extended to September 1, 2008, the date on which Neurospheres' response is due.

Respectfully Submitted,

*/s/ Jeremy I. Medovoy*
Jeremy I. Medovoy (Bar No. 16893)
MCDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, DC 20005-3096
Telephone: (202) 756-8000
Facsimile: (202) 756-8087
jmedovoy@mwe.com

*Counsel for Defendants StemCells, Inc. and StemCells California, Inc.*

---

[1]    Judge Claudia Wilken has also scheduled a Case Management Conference for August 26, 2008 in the Northern District of California action.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 2, 2008, I electronically filed the foregoing with the Clerk of Court through the CM/ECF system which will send electronic notice of the filing to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Jeremy I. Medovoy*

# Exhibit 10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

Neuralstem, Inc.

     Plaintiff,

     vs.

StemCells, Inc.; StemCells California, Inc. and
Neurospheres Holding Ltd.

     Defendants.

Civil Action No. 08-CV-01173-AW

---

## NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS

TO THE CLERK OF THIS COURT AND ALL PARTIES OF RECORD:

Please see the attached letter from counsel for Neurospheres Holding Ltd. to counsel for

Neuralstem, Inc., waiving service of a summons in the above-captioned action.

Respectfully Submitted,

_/s/ Jeremy I. Medovoy_
Jeremy I. Medovoy (Bar No. 16893)
McDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, DC 20005-3096
Telephone: (202) 756-8000
Facsimile: (202) 756-8087
jmedovoy@mwe.com

_Counsel for Defendant Neurospheres
Holding Ltd._

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 2, 2008, I electronically filed the foregoing with the Clerk of Court through the CM/ELF system which will send electronic notice of the filing to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Jeremy I. Medovoy*

# McDermott
# Will&Emery

Boston Brussels Chicago Düsseldorf Houston London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

John R. Fuisz
Attorney at Law
jfuisz@mwe.com
202.756.8029

June 2, 2008

VIA EMAIL

Sanjay M. Murphy
BELL, BOYD & LLOYD, LLP
70 West Madison
Suite 3100
Chicago, IL 60602

Re:    Neuralstem, Inc. v. StemCells, Inc., StemCells California, Inc. and Neurospheres
       Holding Ltd., Southern District of Maryland, Case No. 08-CV-1173

Dear Sanjay:

        We are writing with respect to the above captioned matter on behalf of Neurospheres
Holding Ltd.

        Neurospheres acknowledges Neuralstem Inc.'s request that it waive service of a summons
in the action, *Neuralstem, Inc. v. StemCells, Inc., StemCells California, Inc. and Neurospheres,
Inc.,* which is case number 08-CV-1173 in the United States District Court for the Southern
District of Maryland.

        Neurospheres agrees to save the cost of service of a summons and an additional copy of
the complaint and amended complaint in this lawsuit by not requiring that Neurospheres be
served with judicial process in the manner provided by Rule 4. Neurospheres will retain all
defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for
objections based on a defect in the summons or in the service of the summons. Neurospheres
understands that a judgment may be entered against it of an answer or motion under Rule 12 is
not served upon you within 90 days after that date as the request was made outside of the United
States.

Sincerely,

John R. Fuisz
On behalf of Neurospheres Holdings, Ltd.

WDC99 1574689-1.081361.0011

U.S. practice conducted through McDermott Will & Emery LLP.

600 Thirteenth Street, N.W. Washington D.C. 20005-3096 Telephone: 202.756.8000 Facsimile: 202.756.8087 www.mwe.com

# Exhibit 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| NEURALSTEM, INC., | : | |
| Plaintiff, | : | |
| | : | Civil Action No. AW 08 CV 1173 |
| v. | : | |
| | : | Jury Trial Demanded |
| STEMCELLS, INC.; STEMCELLS | : | |
| CALIFORNIA, INC., AND | : | Judge Alexander Williams, Jr. |
| NEUROSPHERES HOLDING LTD., | : | |
| Defendants. | : | |

**RESPONSE TO STEMCELLS, INC. AND STEMCELLS CALIFORNIA, INC.'S
MOTION TO EXTEND TIME TO ANSWER OR OTHERWISE RESPOND TO
AMENDED COMPLAINT AND MOTION TO STRIKE NEUROSPHERES
HOLDING, LTD.'S REQUEST TO WAIVE SERVICE OF A SUMMONS**

Plaintiff, Neuralstem, Inc. ("Neuralstem"), respectfully submits this Response to StemCells, Inc. and StemCells California, Inc. (collectively "StemCells") Motion to Extend Time to Answer or Otherwise Respond to Amended Complaint and Motion to Strike Neurospheres Holding, Ltd. ("Neurospheres") Request To Waive Service Of A Summons dated June 2, 2008. (*See* Dkt. No. 16.)

## I.    INTRODUCTION

In its Motion to Extend Time to Answer or Otherwise Respond to Amended Complaint, StemCells attempts to convince this court that it is in the interest of judicial economy to allow it an additional *three months* (*i.e.,* until September 1, 2008) to Answer Neuralstem's Amended Complaint. This argument is flawed for several reasons. First, StemCells bases the September 1, 2008 date on the false assertion that co-defendant Neurospheres "waived" service of process. As explained below, Neurospheres acted unilaterally. It is well settled that a plaintiff is not required to seek a waver of service. A plaintiff may 1) choose to seek a waiver or 2) proceed with traditional service. Neuralstem never requested that Neurospheres "waive" service and, therefore, the Notice of Wavier filed on June 2, 2008 should be stricken.

Second, StemCells claims that by September 1, 2008, the court in the retaliatory action pending in the Northern District of California will address the issue of transfer and simplify the motion practice before this court.[1] Once again, StemCells is wrong. Judge Claudia Wilken has a well-settled practice of deferring matters to the court where the first complaint was initiated. The record is clear that Neuralstem filed this suit first. Therefore, waiting for the court in California to decide Neuralstem's Motion to Dismiss, Transfer or Stay that action will not simplify motion

---

[1]    *See StemCells, Inc. v. Neuralstem, Inc.,* Civil Action No. 08-cv-02364 (CW), hereinafter the "StemCells California Action".

practice here—it will just prolong it.

Finally, StemCells never explains why it needs an additional three months to answer when it has already filed a retaliatory action in another forum which mirrors the Amended Complaint in this case. Presumably, StemCells should be in a position to respond today.

For at least these reasons, this Court should deny StemCells' unreasonable request for a three-month extension of time and strike Neurospheres' "acceptance" of a request to waive service that was never made.

## II.    DISCUSSION

### A.    Neurospheres May Not Waive Service Because Neuralstem Never Requested A Waiver

Neurospheres cannot unilaterally waive service of process where Neuralstem has not requested a waiver of service. The burden is on the plaintiff to serve the defendant, and, as such, it bears the burden and cost of service. In order to offset the costs of service, "[a] plaintiff may send a defendant notice of the action and a request for waiver of service, but there are numerous requirements meant to safeguard the defendant." *Trevino v. D.H. Kim Enterprises, Inc.*, 168 F.R.D. 181, 182 (D. Md. 1996) (*citing* Fed. R. Civ. P. 4(d)). The requirements for requesting the waiver of service under the Federal Rules of Civil Procedure are clear:

> (d) Waiving Service.
>
> (1) *Requesting a Waiver.* An individual, corporation, or association that is subject to service under Rule 4(e), (f), or (h) has a duty to avoid unnecessary expenses of serving the summons. The plaintiff may notify such a defendant that an action has been commenced and request that the defendant waive service of a summons. The notice and request must:
>
> (A) be in writing and be addressed:
>
> (i) to the individual defendant; or

2

(ii) for a defendant subject to service under Rule 4(h), to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process;

(B) name the court where the complaint was filed;

(C) be accompanied by a copy of the complaint, two copies of a waiver form, and a prepaid means for returning the form;

(D) inform the defendant, using text prescribed in Form 5, of the consequences of waiving and not waiving service;

(E) state the date when the request is sent;

(F) give the defendant a reasonable time of at least 30 days after the request was sent--or at least 60 days if sent to the defendant outside any judicial district of the United States--to return the waiver; and

(G) be sent by first-class mail or other reliable means.

FED. R. CIV. P. 4(d)(1). Allowing a defendant to unilaterally waive service would effectively create a default rule that extended the period to answer a complaint by 60-90 days in every case, regardless of the plaintiff's express desire to move the case forward faster.

On June 2, 2008, counsel for both sides had a telephone conversation to discuss StemCells' request for an extension of time. Declaration of Sanjay K. Murthy "hereinafter Murthy Decl." at ¶ 2. In an effort to work out a compromise, Neuralstem's counsel suggested that he might be able to obtain Neuralstem's agreement to an extension of time for StemCells, if Neuralstem received something in return. (Murthy Decl. at ¶ 2; Ex. A, Letter from Sanjay K. Murthy to John R. Fuisz dated June 2, 2008). One idea Neuralstem's counsel proposed was StemCells' counsel's acceptance of service of behalf of Neurospheres to avoid further delay caused by service under the Hague Convention.[2] (Id.) However, no agreement was reached.

---

[2] At the time of the conversation, Neurospheres was unrepresented in this matter. Murthy Decl. at ¶ 3. Now all defendants are represented by the same law firm.

(*Id.*)  Inexplicably, based on that hypothetical discussion, StemCells' counsel then claimed that Neuralstem had requested a formal waiver of service for Neurospheres.  (*See* Dkt. No. 16.)  At no time during this litigation did Neuralstem request that Neurospheres "waive" service.  (*Id.*)

Federal Rule of Civil Procedure 4(d) requires:  (1) a writing addressed to the defendant; (2) accompanied by a copy of the complaint, two copies of a waiver form, and a prepaid means for returning the form; (3) that informs the defendant of the consequences of waiving and not waiving service; and (4) that gives the defendant a reasonable time to return the waiver.  FED. R. CIV. PRO. 4(d)(1).  *None* of those requirements is met here.

Finally, Neuralstem initiated service under the Hague Convention on the day the Complaint was filed, for which it incurred a great expense.  *See* Declaration of Andrew Raphael at ¶¶ 2-5.  Thus, having already incurred the expense of service, Neuralstem obviously had *no* incentive—and nothing to gain—by allegedly requesting a "waiver" of service from Neurospheres.

Accordingly, Neuralstem respectfully requests that this Court strike Neurospheres' Notice of Wavier filed on June 2, 2008.[3]

## II.    StemCells' Request For A Three-Month Extension Of Time Should Be Denied

StemCells' motion to extend time should be denied for at least three reasons.  First, a decision in the StemCells' California Action will not simplify motion practice in this case. Second, StemCells and Neurospheres will not have identical filings.  Third, a three-month

---

[3]    Neuralstem's counsel made perfectly clear that it had not requested a "waiver" of service. (Murthy Decl. Ex. A.)  Neurospheres' filing of its misleading letter "accepting" a request to waive service with this Court *after* receiving Neuralstem's letter is disingenuous and evidence of bad faith.  (*See* Dkt. No. 16.)

4

extension of time for StemCells will prejudice Neuralstem.

It is undisputed that this case was filed *before* the StemCells' California Action and presumably involves both the same accused infringing activity and the same patents at issue here. Under the first-to-file rule this case should move forward. Moreover, Judge Wilken has decided this issue three times in the last two years and repeatedly held that any balance of convenience analysis or determination about an exception to the first-to-file rule should be done by the first-filed court. *Intuitive*, 2007 WL 1150787, at *3. Judge Wilken's practice of deferring to the court of the first-filed action is clear:

> As stated above, however, the court in the first-filed action should decide whether there is an exception to the first-to-file rule. Therefore, this Court will not address Plaintiffs' arguments that the complaint filed in Guam was anticipatory and evidenced forum shopping and that a balancing of convenience weighs in favor of litigation in Northern California. The Court defers to the Guam district court to decide the appropriate forum and whether the first-filed rule is applicable. Likewise, the Court will not address whether the District of Guam is a proper venue or whether the Guam district court has personal jurisdiction over Fujitsu Limited and FMA. As Defendants note, that is a determination to be made by the Guam district court, not this Court.

*Fujitsu Ltd v. Nanya Tech. Corp.*, 2007 WL 484789, at *3 (N.D. Cal. Feb. 9, 2007) (Wilken, J.) (emphasis added)(internal citation omitted); *see also Marini v. Samuel Cabot Inc. Employees' Stock Ownership Plan,* 2006 WL 3147690, at * 1 (N.D. Cal. Nov. 1, 2006) (Wilken, J.) (same).

Thus, StemCells' argument that this Court's motion practice will be "simplified" by waiting on the Court in California to "rule" of any issues is demonstrably wrong. If StemCells' intends on filing a motion to dismiss arguing an exception to the first-to-file rule, it should do so now, so that this case continues to move forward. StemCells has offered no explanation for why it needs a three-month extension of time to file the same motion it could file now, especially

5

when both cases have been pending for almost a month.

Moreover, there is no need for StemCells and Neurospheres to respond at the same time and in the same manner. It is Neuralstem's understanding that Neurospheres is the patent owner but has allegedly licensed its enforcement rights to StemCells. If that is indeed true, StemCells and Neurospheres will not be raising identical defenses or counterclaims in this matter and, therefore, coordination of a response time will not assist the Court in this matter.

StemCells never explains why it needs an additional three months to answer when it has already filed a mirror-image complaint in another forum. If StemCells could file a complaint asserting patent infringement and state law claims in early May, it can certainly answer the first-filed declaratory judgment complaint.

The longer this litigation is extended the more prejudice Neuralstem suffers. As stated in its Complaint, StemCells has represented in its press releases that anyone practicing stem cell technology infringes on StemCells' patent portfolio. Neuralstem does not wish to remain under the cloud of StemCells' baseless patent infringement claims. Allowing StemCells a *three month* extension will unnecessarily prolong this litigation. Service upon Neurospheres will be perfected shortly and its Answer will be due well before September 1, 2008.

Accordingly, StemCells' request for a three-month extension of time should be denied. StemCells should be required to respond to the complaint today and not permitted to wait for service upon an unrelated company, Neurospheres.

## III.    CONCLUSION

For the foregoing reasons, Neuralstem respectfully requests this Court strike Neurospheres' Request To Waive Service Of A Summons dated June 2, 2008 and deny

6

StemCells' Motion to Extend Time to Answer Neuralstem's Amended Complaint.

Respectfully submitted,

BELL, BOYD & LLOYD LLP


/s/     Sanjay K. Murthy

Michael T. Murphy
D. Md. Bar # 11357
Mmurphy@bellboyd.com
BELL, BOYD & LLOYD LLP
1615 L Street, N.W.
Suite 1200
Washington, DC 20036
(202) 466-6300 (tel)
(202) 463-0678 (fax)

Of Counsel:

Alan L. Barry (*pro hac vice*)
abarry@bellboyd.com
Michael J. Abernathy (*pro hac vice*)
mabernathy@bellboyd.com
Sanjay K. Murthy (*pro hac vice*)
smurthy@bellboyd.com
Brian J. Arnold (*pro hac vice*)
barnold@bellboyd.com
Christian G. Stahl (*pro hac vice*)
cstahl@bellboyd.com
BELL, BOYD & LLOYD LLP
70 West Madison
Suite 3100
Chicago, IL 60602
(312) 372-1121
(312) 827-8000

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 4, 2008.

/s/ Sanjay K. Murthy
Sanjay K. Murthy

# Exhibit 12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

NEURALSTEM, INC.,                      *
                                        *
        Plaintiff,                      *
                                        *
    v.                                  *        Civil Action No. AW-08-1173
                                        *
STEMCELLS, INC., *et al.*,              *
                                        *
        Defendants.                     *
*****************************************************************************

## ORDER

Currently pending before the Court is Defendants StemCells, Inc. and StemCells California, Inc.'s (collectively, "StemCells") Motion for Extension of Time to File Answer or Otherwise Respond to Plaintiff Neuralstem, Inc.'s Amended Complaint (Doc. No. 17). Per the discussion during the telephone conference held on this afternoon, IT IS this **4th day of June, 2008**, by the United States District Court for the District of Maryland, hereby **ORDERED**:

1.    That Defendants' Motion for Extension of Time to File Answer or Otherwise Respond to Amended Complaint (Doc. No. 17) BE, and the same hereby IS, **GRANTED**;

2.    That Defendants shall have up to and including **July 15, 2008**, to answer or otherwise respond to Plaintiff's Amended Complaint; AND

3.    That the Clerk of the Court transmit a copy of this Order to all counsel and parties of record.

                                        _____/s/_____
                                        Alexander Williams, Jr.
                                        United States District Judge

# Exhibit 13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STEMCELLS, INC. and STEMCELLS CALIFORNIA, INC., | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| vs. | * | Civil Action No.  AW-06-1877 |
| | * | |
| NEURALSTEM, INC., | * | |
| | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### ORDER

UPON CONSIDERATION of pending Motion To Stay Pending Reexamination (Paper No. 69), IT IS, this **25th day of June, 2007**, by the United States District Court for the District of Maryland hereby **ORDERED**:

1.    That the Motion to Stay (Paper No. 69) BE, and the same hereby IS, **GRANTED**;

2.    That the instant litigation is hereby **STAYED and ADMINISTRATIVELY CLOSED** given the reexamination proceedings in the United States Patent & Trademark Office for U.S. Patent Nos. 5,851,832; 6,294,346; 6,497,872; and 7,101,709 ("reexamination proceedings");

3.    That, notwithstanding the completion status of the reexamination proceedings, StemCells may move the Court to lift the stay should it feel circumstances warrant it.  However, Neuralstem may oppose such motion;

4.    That, notwithstanding the stay of this matter:

    a.    Neuralstem shall comply fully with Magistrate Judge Connelly's April 18, 2007 Order granting-in-part and denying-in-part StemCells' motion to compel ("Order"). [*See* Paper No. 65].  Thus, Neuralstem shall provide all documents in response to Paragraph (a) of the Order, contact its collaborators and request production of documents in response to Paragraph (b) of the Order, and on a rolling basis produce all documents received from its

collaborators in response to Paragraphs (b) and (c) of the Order. Additionally, Neuralstem shall update StemCells as to the status of Neuralstem's compliance with the Order. StemCells may raise any and all issues concerning Neuralstem's compliance with the Order with the Court during the stay and/or once the stay has been lifted.

b.   Neuralstem and its affiliated entities shall preserve all documents and information (including all documents and information stored electronically) in their possession, custody and control relating to any issue in this lawsuit.

c.   Neuralstem shall contact its third party collaborators, inform each of them that this matter has been stayed, request that all documents and information (including all documents and information stored electronically) be preserved, and take necessary measures to assist with / facilitate such preservation if necessary, including receiving production of any such materials during the stay. Neuralstem shall provide StemCells with copies of its correspondence and any and all responsive documents Neuralstem receives from any of its third party collaborators in a timely fashion not exceeding ten business days from the date it receives any such documents; AND

5.   That the Clerk of the Court transmit a copy of the Order to all counsel of record.

SO ORDERED this   25th   day of June , 2007.

_____/s/_____
Alexander Williams, Jr.
United States District Judge

2

## Larkin, Alison

| | |
|---|---|
| **From:** | Cronin, Paul |
| **Sent:** | Monday, June 25, 2007 11:25 AM |
| **To:** | Larkin, Alison |
| **Subject:** | FW: Activity in Case 8:06-cv-01877-AW Stemcells, Inc. et al v. Neuralstem, Inc. Order on Motion to Stay |

---

**From:** MDD_CM-ECF_Filing@mdd.uscourts.gov [mailto:MDD_CM-ECF_Filing@mdd.uscourts.gov]
**Sent:** Monday, June 25, 2007 11:06 AM
**To:** MDDdb_ECF@mdd.uscourts.gov
**Subject:** Activity in Case 8:06-cv-01877-AW Stemcells, Inc. et al v. Neuralstem, Inc. Order on Motion to Stay

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT
RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once without
charge. To avoid later charges, download a copy of each document during this first viewing.

### U.S. District Court

### District of Maryland

## Notice of Electronic Filing

The following transaction was entered on 6/25/2007 at 11:05 AM EDT and filed on 6/25/2007
**Case Name:**        Stemcells, Inc. et al v. Neuralstem, Inc.
**Case Number:**      8:06-cv-1877
**Filer:**
**Document Number:** 70

**Docket Text:**
ORDER granting [69] MOTION to Stay Pending Reexamination; that the instant litigation is hereby
STAYED AND ADMINISTRATIVELY CLOSED. Signed by Judge Alexander Williams Jr. on
6/25/07. (aap, Deputy Clerk)

**8:06-cv-1877 Notice has been electronically mailed to:**
David Barmak dbarmak@mintz.com
Michael Thomas Murphy mmurphy@bellboyd.com
Michael J Abernathy mabernathy@bellboyd.com
Jeffrey J Howell jhowell@bellboyd.com
Alan Lynn Barry abarry@bellboyd.com
Sanjay Krishna Murthy smurthy@bellboyd.com, barnold@bellboyd.com, gclark@bellboyd.com,
jjager@bellboyd.com
Paul J Cronin pcronin@mintz.com
Brian J Arnold barnold@bellboyd.com

6/25/2007

Thomas E Lent tlent@luriekrupp.com

**8:06-cv-1877 Notice will not be electonically delivered to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046883720 [Date=6/25/2007] [FileNumber=1499611-0
] [853865b915c918d06bc843f2391d8e73158b1a9779e52e631fa9d3b7fe5e6062c23
014bf2d76ffcc62621d4e79bb2882c25c9cb93480df681ded1b8db5e727e6]]

# Exhibit 14



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

*Ex Parte* Reexamination Filing Data  - December 31, 2007

1.  Total requests filed since start of ex parte reexam on 07/01/81 . . . . . . . . . . . . . . . . . . 9060[1]

  a.  By patent owner            3495  39%
  b.  By other member of public     5400  59%
  c.  By order of Commissioner      165  2%

2.  Number of filings by discipline

  a.  Chemical Operation        2703  30%
  b.  Electrical Operation        3023  33%
  c.  Mechanical Operation      3334  37%

3.  Annual Ex Parte Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|---|---|---|---|---|---|---|---|
| 1981 | 78 (3 mos.) | 1989 | 243 | 1997 | 376 | 2005 | 524 |
| 1982 | 187 | 1990 | 297 | 1998 | 350 | 2006 | 511 |
| 1983 | 186 | 1991 | 307 | 1999 | 385 | 2007 | 643 |
| 1984 | 189 | 1992 | 392 | 2000 | 318 | 2008 | 165 |
| 1985 | 230 | 1993 | 359 | 2001 | 296 | | |
| 1986 | 232 | 1994 | 379 | 2002 | 272 | | |
| 1987 | 240 | 1995 | 392 | 2003 | 392 | | |
| 1988 | 268 | 1996 | 418 | 2004 | 441 | | |

4.  Number known to be in litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2398  26%

5.  Determinations on requests  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8714

  a.  No. granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7998 . . . . . . . . . 92%

    (1)  By examiner           7885
    (2)  By Director (on petition)     113

  b.  No. denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 716 . . . . . . . . . 8%

    (1)  By examiner           681
    (2)  Order vacated          35

---

[1]Of the requests received in FY 2008, 23 requests have not yet been accorded a filing date, and preprocessing of 3 requests was terminated for failure to comply with the requirements of 37 CFR 1.510.  See Clarification of Filing Date Requirements for *Ex Parte* and *Inter Partes* Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

6.    Total examiner denials (includes denials reversed by Director) . . . . . . . . . . . . . . . . . . . . 794

    a.  Patent owner requester                                 439        55%
    b.  Third party requester                                   355        45%

7.    Overall reexamination pendency  (Filing date to certificate issue date)

    a.  Average pendency      24.0 (mos.)
    b.  Median pendency      18.6 (mos.)

8.  Reexam certificate claim analysis:

| | Owner Requester | 3rd Party Requester | Comm'r Initiated | Overall |
|---|---|---|---|---|
| a.  All claims confirmed | 23% | 29% | 12% | 26% |
| b.  All claims cancelled | 7% | 12% | 21% | 10% |
| c.  Claims changes | 70% | 59% | 67% | 64% |

9.    Total ex parte reexamination certificates issued (1981 - present) . . . . . . . . . . . . . . . . . 6066

    a.  Certificates with all claims confirmed    1556    26%
    b.  Certificates with all claims canceled     636    10%
    c.  Certificates with claims changes    3874    64%

10.  Reexam claim analysis - requester is patent owner or 3rd party; or Comm'r initiated.

    a.    Certificates - PATENT OWNER REQUESTER . . . . . . . . . . . . . . . . . . . . . . . . . . . 2607

        (1)  All claims confirmed     592    23%
        (2)  All claims canceled     194    7%
        (3)  Claim changes    1821    70%

    b.    Certificates - 3rd PARTY REQUESTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3313

        (1)  All claims confirmed     946    29%
        (2)  All claims canceled     413    12%
        (3)  Claim changes    1954    59%

    c.    Certificates - COMM'R INITIATED REEXAM . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

        (1)  All claims confirmed      18    12%
        (2)  All claims canceled      30    21%
        (3)  Claim changes      98    67%

# Exhibit 15

| 90/008,366 | METHODS OF SCREENING BIOLOGICAL AGENTS | 06-18-2008::14:39:50 |
|---|---|---|

## Transaction History

| Date | Transaction Description |
|---|---|
| 06-18-2008 | Reexam Litigation Search Conducted |
| 05-20-2008 | Certificate of Service |
| 05-20-2008 | Supplemental Response after Non-Final Rejection |
| 03-12-2008 | Certificate of Service |
| 03-12-2008 | Supplemental Response after Non-Final Rejection |
| 02-12-2008 | Examiner Interview Summary Record |
| 10-05-2007 | Certificate of Service |
| 10-05-2007 | Miscellaneous Incoming Letter |
| 10-05-2007 | Response after Non-Final Action |
| 09-08-2007 | Reexam Non-Final Action Mailed |
| 08-09-2007 | Certificate of Service |
| 08-09-2007 | Notice of concurrent proceeding(s) |
| 08-16-2007 | Date Forwarded to Examiner |
| 07-10-2007 | Reexam Litigation Search Conducted |
| 04-03-2007 | Notice of Reexam Published in Official Gazette |
| 02-16-2007 | Determination -- Reexam Ordered |
| 01-08-2007 | Case Docketed to Examiner in GAU |
| 12-24-2006 | Completion of Preprocessing - Released to Assigned GAU |
| 12-26-2006 | Notice of assignment of reexamination request |
| 12-26-2006 | Notice of reexamination request filing date |
| 12-13-2006 | Title Report |
| 12-07-2006 | Reexamination requested by third party requester |
| 12-26-2006 | Application Is Now Complete |
| 12-07-2006 | Receipt of Original Ex Parte Reexam Request |

**Close Window**

| 90/008,367 | USE OF MULTIPOTENT NEURAL STEM CELLS AND THEIR PROGENY FOR THE SCREENING OF DRUGS AND OTHER BIOLOGICAL AGENTS | 06-18-2008::14:36:13 |

## Transaction History

| Date | Transaction Description |
| --- | --- |
| 06-16-2008 | Reexam Litigation Search Conducted |
| 05-20-2008 | Certificate of Service |
| 05-20-2008 | Supplemental Response after Non-Final Rejection |
| 03-12-2008 | Certificate of Service |
| 03-12-2008 | Supplemental Response after Non-Final Rejection |
| 10-05-2007 | Certificate of Service |
| 10-05-2007 | Response after Non-Final Action |
| 09-08-2007 | Reexam Non-Final Action Mailed |
| 08-16-2007 | Date Forwarded to Examiner |
| 07-09-2007 | Reexam Litigation Search Conducted |
| 04-03-2007 | Notice of Reexam Published in Official Gazette |
| 02-16-2007 | Determination -- Reexam Ordered |
| 01-08-2007 | Case Docketed to Examiner in GAU |
| 12-28-2006 | Completion of Preprocessing - Released to Assigned GAU |
| 12-14-2006 | Title Report |
| 12-28-2006 | Notice of reexamination request filing date |
| 12-28-2006 | Notice of assignment of reexamination request |
| 12-28-2006 | Application Is Now Complete |
| 12-07-2006 | Receipt of Original Ex Parte Reexam Request |

**Close Window**

# Exhibit 16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| STEMCELLS, INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Civil Action No. AW 06 CV 1877 |
| v. | : | |
| | : | Judge Alexander Williams, Jr. |
| NEURALSTEM, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
## TO RE-OPEN THE CASE AND LIFT THE STAY

Defendant, Neuralstem, Inc. ("Neuralstem"), respectfully submits this Memorandum in Support of Defendant's Motion to Re-open the Case and Lift the Stay.

## I.    INTRODUCTION

Lifting the current stay will allow the Court to dispose of this entire litigation.  This case was stayed on June 25, 2007, pending the reexamination of the asserted patents.  That reexamination process is nearly complete.  This case should therefore proceed.

In light of substantial, substantive claim amendments made during the reexamination process to each claim of all the asserted patents, this case can and should be disposed of on summary judgment as soon as possible.  First, under 35 U.S.C. §§ 252, 307, StemCells' numerous claim amendments preclude it from obtaining damages for any past activities by Neuralstem.

Second, StemCells' claims for future damages and injunctive relief are also barred by statute because of the claim amendments.  Under 35 U.S.C. §§ 252, 307, Neuralstem has both absolute and equitable intervening rights to continue to use its technology it developed years ago and to continue to perform research into the treatment of disease that it began long before the United States Patent & Trademark Office ("PTO") deemed StemCells' original claims unpatentable and forced StemCells' to amend its claims.  Notably, no discovery is even needed to dispose of StemCells' claims for past or future damages and injunctive relief due to the substantial claim amendments made during reexamination.

Finally, before the Court stayed this case, Neuralstem filed a motion to dismiss based on a "safe harbor" defense.  The Court's consideration of that pending motion will also dispose of all of StemCells' remaining claims.   Neuralstem's current research activities into the treatment of disease are unquestionably statutorily protected under 35 U.S.C. § 271(e)(1) and are exempt from infringement

liability.  Re-opening of this case and lifting the stay will allow the Court to dismiss this litigation once and for all.

## II.    FACTUAL BACKGROUND

On October 6, 2006, StemCells filed its Second Amended Complaint alleging that Neuralstem infringes U.S. Patent Nos. 6,294,346 ("'346 patent"); 6,497,872 B1 ("'872 patent"); 5,851,832 ("'832 patent"); and 7,101,709 ("'709 patent") (collectively, the "patents-in-suit").  (Dkt. No. 23.)[1]  On October 30, 2006, Neuralstem Answered the Second Amended Complaint and asserted, *inter alia*, affirmative defenses that (1) Neuralstem does not infringe any valid or enforceable claim of the patents-in-suit; (2) its activities are protected from infringement under 35 U.S.C. § 271(e)(1); (3) each claim of the patents-in-suit is invalid; (4) StemCells' infringement claims are barred by laches, prosecution laches, prosecution history estoppel, and prosecution history disclaimer; (5) patent misuse; (6) and unclean hands.  (See Dkt. No. 32).  Additionally, Neuralstem filed counterclaims of non-infringement and invalidity of the patents-in-suit, as well as a counterclaim for a violation of Section 2 of the Sherman Antitrust Act for sham litigation.  (*Id.*)

On October 13, 2006, Neuralstem filed a Motion to Dismiss, or in the Alternative, for Summary Judgment pursuant to Fed. R. Civ. P. 12(b)(6) that all of Neuralstem's activities that StemCells alleges infringe its patent rights are exempt from infringement by statute and Supreme Court precedent.  (*See* Dkt. Nos. 27, 28.)  On October 30, 2006, the Court granted a joint motion to stay substantive patent discovery pending resolution of Neuralstem's motion to dismiss.  (Dkt. No. 31.)

On February 16, 2007, in response to requests by Neuralstem, the United States Patent & Trademark Office ordered reexamination of the '346 patent and '709 patent based on a substantial new

---

[1]    StemCells' motion for leave to file its second amended complaint was granted by paperless order on October 12, 2006.  (*See* Dkt. No. 24.)

question of patentability raised by the prior art.  On May 10, 2007, the PTO also ordered reexaminations of the claims of the other two patents involved in this lawsuit, the '872 patent and the '832 patent. Because all four of the patents-in-suit were undergoing concurrent reexamination at the PTO, on June 25, 2007, upon a joint motion by both parties, this Court stayed and administratively closed the instant litigation pending the reexamination proceedings in the PTO.  (Dkt. Nos. 69, 70.)

## III.    ARGUMENT

### A.    The Reexamination Proceedings Are Nearly Complete.

This Court should re-open this case and lift the stay of these proceedings because the basis upon which it was agreed to and granted no longer exists.  The power to decide whether to stay proceedings or lift a stay is incidental to the power inherent in every court to control the disposition of the causes on its docket.  *See Landis v. N. Am. Co*., 299 U.S. 248, 254 (1936).  The decision to stay pending the outcome of a reexamination rests entirely within the sound discretion of the district court.  *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988).  This Court granted a stay of the litigation on June 25, 2007, upon a joint motion by both parties, pending the reexamination proceedings in the PTO of the patents-in-suit.  (Dkt. Nos. 69, 70.)  That process is almost done.  As discussed in Section III.B., because StemCells has already substantially amended every claim of all the patents-in-suit, StemCells' claims will be ripe for disposal via summary judgment.

After this litigation was stayed, the PTO agreed with Neuralstem that the original claims in all four patents-in-suit were unpatentable.  The inventors twice made substantial amendments to all claims of the '872 patent in response to rejections by the PTO of the claimed inventions.  (*See* Exhibit A at 2-6.)  The claims in the reexamined '872 patent contain several substantive limitations not present in the original.  (*See* supra Section III.B.)  Based on these substantial amendments to the claims, on April 1,

3

2008, the PTO issued a notice of intent to issue a reexamination certificate for the '872 patent.  (*See* Exhibit B.)  Therefore, the reexamination for the '872 patent is complete.

Likewise, during the reexamination proceedings for the '832 patent, the inventors made up to three substantial amendments to all claims in response to rejections by the PTO of the claimed inventions.  (*See* Exhibit C at 2-13.)  The claims in the reexamined '832 patent also contain several substantive limitations not present in the original.  (*See* supra Section III.B.)  Based on these substantial amendments to the claims, on April 9, 2008, the PTO issued a notice of intent to issue a reexamination certificate for the '832 patent.  (*See* Exhibit D.)  Thus, the reexamination for the '832 patent is also complete.

Additionally, at the same time the inventors amended the claims of the '872 and '832 patents, they made similar claim amendments to the claims of the '346 and '709 patents.  (*See* Exhibit E at 2-3; Exhibit F at 2-3.)  While the PTO has not yet issued notices of intent to issue reexamination certificates for the '346 and '709 patents, the claim amendments to the '346 and '709 patents were similar to the amendments to the '872 and '832 patents and were made to allegedly distinguish over the same prior art.  (*Compare* Exhibit E at 2-7 and Exhibit F at 2-7 *with* Exhibit A at 2-11.)  Thus, the PTO is likely to also issue notices of an intent to issue reexamination certificates for the '346 and '709 patents.

Because the reexamination process is almost complete for the patents-in-suit, the stay in this case should be lifted.  Lifting the stay will allow Neuralstem to file motions for summary judgment that will dispose of all of StemCells' claims for damages or injunctive relief.

**B.    Lifting The Stay Will Allow The Court to Dispose Of The Entire Litigation**

    **i.    StemCells Cannot Claim Any Past Damages**

This Court will be able to dispose of all of StemCells' claims for damages for all of Neuralstem's past activities. According to 35 U.S.C. § 252, "[t]he surrender of the original patent shall take effect upon the issue of the reissued patent." This provision applies to reexamined patents. *See* 35 U.S.C. § 307. Thus, a patent holder of a reexamined patent is *not* entitled to damages for the period before a reexamined patent issues if the original and reexamined claims are not "identical." *See* 35 U.S.C. §§ 252, 307(b) (2006); *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998); *Bloom Eng'g Co. v. North Am. Mfg. Co.*, 129 F.3d 1247, 1249-50 (Fed. Cir. 1997); *Tennant Co. v. Hako Minuteman, Inc.*, 878 F.2d 1413, 1417 (Fed. Cir. 1989). Reexamined claims are "identical" to their original counterparts if they are "without substantive change." *Laitram*, 163 F.3d at 1346; *Seattle Box Co. v. Industrial Crating & Packaging*, 731 F.2d 818, 827-28 (Fed. Cir. 1984). In *Laitram*, the Federal Circuit held that because during reexamination the patentee narrowed its claims for a printer by adding the claim language "type quality" before the claim term "alphanumeric characters" it was not entitled to any damages for the period before the reexamined claims issued. 163 F.3d at 1348.

StemCells has amended all the asserted claims in all the patents-in-suit to a much greater degree than that in *Laitram*, rendering StemCells' claims for past damages null and void. For example, reexamined independent claim 1 of the '872 patent now claims "[a] method of transplanting multipotent neural stem cell progeny to a <u>human</u> host." (*See* Exhibit A at 2 (amendments underlined.)) Unlike the original claim, the cells can only be derived from human, as opposed to mammalian, tissue. The reexamined claim further requires that the culture medium be "serum-free" and the proliferation of the stem cells "produce <u>undifferentiated human</u> neural stem cell progeny." (*Id.*)

Reexamined independent claim 22 of the '872 patent also contains significant amendments from its predecessor. While the original claim was directed to "[a] method of transplanting neural stem cell progeny to a host comprising (a) obtaining an in vitro cell culture comprising mammalian neural stem cells," the reexamined claim now reads: "A method of transplanting neural stem cell progeny to a <u>human</u> host comprising: (a) obtaining an in vitro cell culture <u>of undifferentiated, non-immortalized</u> <u>human neural cells, not treated with serum in vitro enriched in human</u> CNS <u>multipotent</u> neural stem cells <u>compared to primary tissue</u>, wherein one of more <u>neural stem</u> cells in the culture . . . ." (*See* Exhibit A at 4-5 (amendments underlined.))

Likewise, every claim of all the asserted patents-in-suit have been similarly substantively amended. (*See* Exhibits C, E, and F.) Therefore, by lifting the stay and allowing this case to proceed, the Court will be able to streamline the issues and dispose of StemCells' claims for past damages based on the new amended claims.

### ii. NeuralStem Has Intervening Rights

This Court will be also able to dispose of StemCells' remaining claims for any present or future damages and injunctive relief because Neuralstem has acquired absolute and equitable intervening rights in any alleged "invention" of the patents-in-suit.[2] An accused infringer has the absolute right to use or sell a product that was made, used, or purchased before the grant of the reexamined patent if the claims of the reexamined patent are not identical to the original claims. 35 U.S.C. §§ 252, 307; *BIC Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1220-1221 (Fed. Cir. 1993). ***This right is absolute.*** *BIC Leisure*, 1 F.3d at 1221. Moreover, the doctrine of "equitable" intervening rights is broader and permits

---

[2]    Neuralstem uses a unique and patented technology invented by its founder, Karl Johe Ph.D, and does not believe its technology infringes any of the patents-in-suit and further maintains that each of the patents-in-suit is invalid. However, because StemCells has modified the claims in the patents-in-suit so extensively, a resolution of non-infringement and validity is unnecessary.

the continued manufacture, use, or sale of additional products covered by the reexamined patent when the defendant made, purchased, or used identical products, or made substantial preparations to make, use, or sell identical products, before the reexamined patent issues.  *Id*.

Because Neuralstem's present research activities began years ago and/or are based on its stem cell product lines and methods it developed years ago, it has intervening rights in any alleged "invention" of the new claims of the reexamined patents-in-suit.

### iii.    NeuralStem's Activities Are Statutorily Protected

Moreover, even if Neuralstem did not have intervening rights in the newly-minted claims of the reexamined patents-in-suit, this Court can dismiss all of StemCells' claims as statutorily protected activities exempt from infringement under 35 U.S.C. § 271(e)(1).  Prior to the stay of the proceedings, Neuralstem filed a motion to dismiss or, in the alternative, for summary judgment because StemCells has failed to identify any commercial conduct that gives rise to patent infringement liability.  (*See* Dkt. Nos. 27, 28.)  This Court has yet to rule on the motion as discovery related to the motion was also stayed.

35 U.S.C. § 271(e)(1) states unequivocally that it is ***not*** an act of patent infringement to make, use or sell a "patented invention" "solely for uses reasonably related to the development and submission of information"  to the United States Food and Drug Administration  ("FDA").  35 U.S.C. § 271(e)(1) West (2005).  In *Merck KGaA v. Integra Lifesciences I, Ltd.*, the Supreme Court created an extremely broad safe harbor exemption, holding that "the use of patented compounds in preclinical studies is protected under 35 U.S.C. § 271(e)(1) as long as there is a ***reasonable basis*** for believing that the experiments will produce 'the types of information that are relevant to an IND or NDA.'"  125 S.Ct. 2372, 2383-84 (2005) (emphasis added).

7

Because all of Neuralstem's current activities unquestionably relate to obtaining clinical approval for therapeutic treatments of disease, they are by definition "reasonably related to the development and submission of information" to the FDA and are exempt from infringement liability. Therefore, Neuralstem's pending motion to dismiss will also dispose of all of StemCells' claims for infringement liability for Neuralstem's current research activities.

## CONCLUSION

For the foregoing reasons, Neuralstem respectfully requests this Court re-open the present litigation and lift the stay, allowing Neuralstem to file motions for summary judgment that will dispose of all of StemCells' claims.[3]

BELL, BOYD & LLOYD LLP


/s/  Sanjay K. Murthy

Michael T. Murphy  Bar # 11357
Mmurphy@bellboyd.com
Jeffrey J. Howell
D. Md Bar #16229
Jhowell@bellboyd.com
1615 L Street, N.W.
Suite 1200
Washington, DC 20036
(202) 466-6300 (tel)
(202) 463-0678 (fax)

Of Counsel

Alan L. Barry (*pro hac vice*)
abarry@bellboyd.com

---

[3]  Neuralstem acknowledges that the agreed motion and order to stay this case pending reexamination of StemCells' patents-in-suit only grant StemCells the ability to move this Court to lift the stay. (Dkt. Nos. 69, 70.)  However, Neuralstem is compelled to re-institute this litigation because of incorrect public statements made by StemCells' CEO that the "action by the PTO, [] ***preserves intact*** the basis of our infringement action against Neuralstem." (Exhibit G.) (emphasis added).

Michael J. Abernathy (*pro hac vice*)
mabernathy@bellboyd.com
Sanjay K. Murthy (*pro hac vice*)
smurthy@bellboyd.com
Brian J. Arnold (*pro hac vice*)
barnold@bellboyd.com
BELL, BOYD & LLOYD LLP
70 West Madison
Suite 3100
Chicago, IL 60602
(312) 372-1121
(312) 827-8000

Attorneys for Defendant
Dated: May 6, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 6, 2008.

/s/ Sanjay K. Murthy
Sanjay K. Murthy

# Exhibit 17

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

_____

|  |  |  |
|---|---|---|
| STEMCELLS, INC. and STEMCELLS CALIFORNIA, INC., | ) ) ) | |
| | ) | CIVIL ACTION NO. 06-CV-1877 AW |
| Plaintiffs, | ) ) | Honorable Alexander Williams, Jr. |
| vs. | ) ) | |
| NEURALSTEM, INC., | ) ) | |
| Defendants. | ) ) | |

_____

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION TO RE-OPEN THE CASE AND LIFT THE STAY**

Neuralstem's motion to re-open the case and lift the stay should be denied for the following three reason:

First, it is contrary to this Court's June 25, 2007 Order, that granted StemCells only the right to move to lift the stay.

Second, granting the motion would result in needlessly fractured and undefined litigation because reexamination is not nearing its completion on two of the asserted patents.

Third, the intervening rights and Section 271(e)(1) exemptions Neuralstem raises rest on highly-contested factual and legal issues that do not lend themselves to a quick and summary disposition of the case.

## INTRODUCTION

The current stay was entered into as the result of a carefully crafted compromise between Neuralstem and StemCells[1] to have the Patent Office resolve Neuralstem's prior art invalidity contentions through reexamination proceedings. As part of this compromise, the parties agreed, and the Court approved, granting only StemCells the right to move to lift the assented-to stay. Neuralstem's motion concedes this point, acknowledging that "the agreed motion and order to stay this case pending reexamination of StemCells' patents-in-suit **only grant StemCells the ability to move this Court** to lift the stay." (Dkt. No. 72 at 8, n.3 (emphasis added).) Lifting the stay now would be contrary to this carefully assented-to Order, thereby depriving StemCells of the benefit of its bargain.[2]

More importantly, granting this motion will not result in a quick and summary resolution. Neuralstem's justification for rushing the case rests in part on the flawed premise that the end of the reexaminations is imminent. Neuralstem is simply wrong: Reexamination on two asserted patents, U.S. Patent No. 6,294,346 and U.S. Patent No. 7,101,709 (the "'346 and '709 patents"), is continuing with new claim sets having been recently submitted to the Patent Office. Lifting the stay now, when reexamination is not complete, would throw the case into procedural disarray. Consider:

- First, any resumption of the case would require StemCells to file an amended complaint containing the issued reexamination certificates. That obligation cannot be fulfilled until all four reexamination certificates are issued.

---

[1] "StemCells" refers collectively to StemCells, Inc. and StemCells California, Inc.

[2] Neuralstem's footnote contention that it needs to rush this case in light of a public statement that StemCells contends the reexamination process to date has left its claims against Neuralstem intact is a contested point at the heart of the case to be decided at trial. It clearly is not a justification to re-open the case prematurely.

- Second, until the four reexamination certificates are issued, StemCells cannot make a reasoned determination about what, if any, claims or patents should be pursued consistent with its Rule 11 obligations.  If granted, Neuralstem's motion would deprive StemCells of having clarity about the significance of the prior art Neuralstem cited, if there are any, before continuing the litigation.[3]

- Third, Neuralstem's promise of a quick adjudication on intervening rights is an illusion because the Court lacks the power to adjudicate whether intervening rights have occurred for any claim unless and until the reexamination certificates are issued.  With the prosecution on the '346 and '709 patents still continuing, the Court will be put in the position of guessing the scope of claims that the Patent Office will issue.  There will not be a quick resolution to many of these issues of fact and law.

Even if these procedural issues could be overcome, Neuralstem's one-sided view that its defenses may be adjudicated summarily and quickly does not withstand substantive scrutiny.  These defenses will raise contested and complex factual and legal issues that will require discovery and trial.  For example, Neuralstem's contention that it will have the defense of equitable intervening rights raises complex issues of fact and equity that will need to be tried.  *See, e.g., Seattle Box Co. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 830 (Fed. Cir. 1984) (trial court must carefully weigh standard equitable considerations and make findings on equities).  Likewise, the absolute intervening rights allegation raises issues of expert testimony and would require a close analysis of the patents' intrinsic and extrinsic records.  *Laitram Corp. v. NEC Corp.*, 952 F.2d 1357, 1362-63 (Fed. Cir. 1991) (rejecting a *per se* rule that any claim

---

[3] StemCells has a fundamental disagreement with Neuralstem on intervening rights and does not concede that intervening rights are applicable to any patent or claims.  StemCells will revisit this issue at the time it files an amended complaint consistent with its obligations to this Court.

amendment gives rise to intervening rights); *see also Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998) (reiterating rule of *Laitram* I). Neuralstem's 35 U.S.C. § 271(e)(1) affirmative defense also raises issues of fact that will require discovery and trial. *See Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193, 208 (2005) (jury instruction on Section 271(e)(1) approved and case remanded for further consideration); *Amgen Inc. v. ITC*, 519 F.3d 1343, 1349-50 (Fed. Cir. 2008) (reversing dismissal and remanding because factual questions on Section 271(e)(1) application not resolved).

In sum, as much as Neuralstem's continued infringement is a concern, until all four patents have finished the reexamination process, re-opening the case will only lead to fractured litigation that the carefully-crafted compromise between the parties was designed to prevent. The appropriate time to re-open the case will be when the Patent Office has issued all four reexamination certificates. At that time, consistent with the Court's June 25, 2007 Order, StemCells will move to re-open this case. But doing so now is premature, contrary to the Court's June 25, 2007 Order, and would result in piecemeal and potentially wasteful litigation. Neuralstem's motion should be denied.

## ARGUMENT

On June 19, 2007, Neuralstem filed an "Assented-To Motion To Stay Pending Reexamination." (Dkt. Nos. 69, 70). The Court granted the motion on June 25, 2007. As part of that motion, Neuralstem and StemCells negotiated certain concessions.[4] StemCells assented to a stay that has so far allowed the Patent Office to review the allegedly invalidating prior art in the first instance. StemCells relied on this agreement. That process is underway and largely

---

[4] The assented-to motion represented to the Court: "In response [(to Neuralstem's request to StemCells to stay the suit)], the sides worked together to resolve certain outstanding discovery matters and negotiate the terms of an acceptable stay." (Dkt. No. 69 at 2-3.)

complete for two of the patents, U.S. Patent No. 6,407,872 and U.S. Patent No. 5,851,832 (the "'872 and '832 patents"). However, the reexamination process is not complete for the '346 and '709 patents. On May 20, 2008, for example, StemCells filed supplemental amendments and supporting materials with the Patent Office. (Fuisz Decl.,[5] Exs. A and B.) The only fact that has changed since this process began is that Neuralstem cited prior art turned out not to be invalidating of the '872 and '832 patents. This favors StemCells by depriving Neuralstem of an invalidity defense in the litigation.[6] Faced with the loss of this defense, Neuralstem wants to break the agreed upon stay to assert new, and likely equally unfounded, affirmative defenses of intervening rights. Just because the agreed stay has not worked out as planned for Neuralstem is not a justification for depriving StemCells of the benefit of the bargain to allow the Patent Office to finish its work before this litigation recommences.[7]

Under this Court's June 25, 2007 Order, only StemCells has the ability to move to re-open the case prior to completion of the reexamination proceedings. This was negotiated between the parties and made an express part of this Court's Order. The Order states:

> 3. That notwithstanding the completion status of the reexamination proceedings, StemCells may move the Court to lift the stay should it feel circumstances warrant it. However, Neuralstem may oppose such motion.

(Dkt. No. 70.) Neuralstem's motion acknowledges that only StemCells has the right to move to re-open the case prior to completion of the reexamination proceedings, stating:

---

[5] "Fuisz Decl." refers to the Declaration of John Fuisz in Support of Plaintiffs' Opposition to Defendant's Motion to Re-Open the Case, submitted herewith.

[6] Neuralstem has no legitimate non-infringement defenses and has thus espoused an array of ill-crafted "dispositive" defenses, none of which apply to this action.

[7] The parties agreed to a stay until all reexaminations were completed. The fact that half of the patents will be issuing in the near future, while half remain in reexamination, lends additional support to not allow the case to move forward at this time in a fractured manner that is contrary to the parties' agreement.

> Neuralstem acknowledges that the agreed motion and order to stay this case pending reexamination of StemCells' patents-in-suit **only grant StemCells the ability to move this Court to lift the stay**.

(Dkt. No. 72 at 8, n.3 (emphasis added).)

There is no legitimate basis as to why the Court's June 25, 2007 Order should be disregarded and Neuralstem should be allowed to take a position contrary to that which it previously took in this litigation. Indeed, the Supreme Court has consistently held that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). Opening up the case prematurely, prejudices StemCells by not allowing the validity of the two remaining patents to be confirmed first by the Patent Office.

Nevertheless, even if Neuralstem is authorized to move to re-open the case, its primary stated basis of quickly adjudicating alleged intervening rights fails for at least the following three reasons:

<u>First</u>, two of the four reexaminations are still pending. As such, the final language of the claims remains unknown. Until the claims are known, there is no way to proceed on the '346 and '709 patents, much less an ability to amend the complaint to allege the four reissued patents.

<u>Second</u>, intervening rights require a comparison of the claims prior to reexamination with the claims post-reexamination. *See* 35 U.S.C. § 307(b) and § 252. Because two of the four patents do not yet have final claims, there is absolutely no way to conduct this analysis.

<u>Third</u>, the doctrine of intervening rights is not automatically triggered simply because claim amendments are made. The inquiry is complex and fact intensive. For example, amendments to claims that make the claim more definite or merely restate their scope do not

trigger intervening rights. *Tennant Co. v. Kao Minuteman, Inc.*, 878 F.2d 1413 (Fed. Cir. 1989); *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109 (Fed. Cir. 1996).  "[W]hether amendments made to overcome rejections based on prior art are substantive depends on the nature and scope of the amendments, with due consideration 'to the facts in any given case that justice will be done.'"  *Bloom Eng'g Co., Inc. v. North Am. Mfg. Co..*, 129 F.3d 1247, 1250 (Fed. Cir. 1997). At the very least, a *Markman* hearing (claim interpretation) with full analysis of intrinsic and extrinsic evidence supported by expert testimony needs to occur prior to a determination on intervening rights.  *See Seattle Box Co.*, 731 F.2d at 830; *Laitram*, 952 F.2d at 1362-63.  As such, conducting a *Markman* hearing and any additional court proceedings, for just two of the four patents would not simplify the case as a whole, but would rather needlessly complicate the case. Neuralstem's representation that intervening rights can be divined simply by looking at the claim amendments and pronouncing them "substantive" lacks merit.[8]

Neuralstem's statutory protection defense under 35 U.S.C. § 271(e)(1) likewise does not justify lifting the stay.  The defense existed prior to the parties agreeing to the stay.  There is absolutely no reason why this alleged defense, which StemCells certainly disagrees with, and which existed prior to the stay, should in anyway justify lifting of the stay at this time.  In any event, the application of Section 271(e)(1) also raises factual questions that will need to be resolved in light of the re-issued claims.  *Merck*, 545 U.S. at 208; *Amgen*, 519 F.3d at 1349-50. The defense is anything but dispositive, and certainly is not ripe at this point for the Court to entertain a motion for, much less grant, summary adjudication on the four patents.

---

[8] After filing this motion, Neuralstem issued a press release entitled "Neuralstem Goes to Court for Summary Judgment Against StemCells, Inc."  The lack of analysis and conclusory statements in the motion itself, combined with this exaggerated press release, further suggests that Neuralstem's motion was brought more to influence public perception than to advance pressing interests in the litigation.

**CONCLUSION**

For the foregoing reasons, Neuralstem's motion should be denied.


Dated: May 23, 2008

By:  /s/ Jeremy I. Medovoy
      Jeremy I. Medovoy
      John R. Fuisz (admitted *pro hac vice*)
      MCDERMOTT WILL & EMERY LLP
      600 Thirteenth Street, N.W.
      Washington, D.C.  20005-3096
      Telephone:   202.756.8000
      Facsimile:    202.756.8087

      William G. Gaede, III (admitted *pro hac vice*)
      MCDERMOTT WILL & EMERY LLP
      3150 Porter Dr.
      Palo Alto, CA 94304-1212
      Telephone:  650.813.5000
      Facsimile:    650.813.5100

      *Counsel for Plaintiffs StemCells, Inc. and*
      *StemCells California, Inc.*

## CERTIFICATE OF SERVICE

I, Jeremy I. Medovoy, hereby certify that on May 23, 2008, I electronically filed the foregoing through the CM/ECF system which will send an electronic notice of the filing to the registered participants as identified on the Notice of Electronic Filing.


/s/ Jeremy I. Medovoy

# Exhibit 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| NEURALSTEM, INC.,<br>9700 Great Seneca Highway,<br>Rockville, Maryland, 20850,<br>Montgomery County,<br><br>      Plaintiff,<br><br>      v.<br><br>STEMCELLS, INC.; STEMCELLS<br>CALIFORNIA, INC.,<br>3155 Porter Drive, Palo Alto,<br>California 94304;<br>      and<br>NEUROSPHERES HOLDING LTD.,<br>83 Heritage Medical Research Center,<br>3330 Hospital Drive N.W.,<br>Calgary, Alberta, T2N 4N1, Canada,<br><br>      Defendants. | Civ. No. 08-cv-1173<br><br>Jury Trial Demanded<br><br>Judge Alexander Williams, Jr. |

**AMENDED COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT
UNENFORCEABILITY, INVALIDITY, NON-INFRINGEMENT, AND NON-LIABILITY
OF TRADE LIBEL AND UNFAIR COMPETITION**

Plaintiff, Neuralstem, Inc. ("Neuralstem"), by its attorneys, alleges as follows for its

Complaint for Declaratory Judgment against Defendants StemCells, Inc.; StemCells California,

Inc. (collectively, "StemCells"); and Neurospheres Holding, Ltd. ("Neurospheres") (collectively,

"Defendants"):

## I.     JURISDICTION, VENUE AND PARTIES

1.    This action arises under the Declaratory Judgment Act, 28 U.S.C §§ 2201 and

2202 and the patent laws of the United States, 35 U.S.C. § 1 *et seq.*  Venue for this case is proper

in this District and before this Court under 28 U.S.C. § 1391(b) and 1391(c).

2.      Plaintiff Neuralstem is a corporation organized under the laws of the State of Maryland with its principal place of business at 9700 Great Seneca Highway, Rockville, Maryland 20850.  Founded in 1996, Neuralstem is a publicly-traded biotherapeutics company whose mission is to use stem cell research and its patented human neural stem cell technology to treat diseases of the central nervous system including Ischemic Paraplegia, Traumatic Spinal Cord Injury, ALS, Stroke, and Parkinson's Disease.  Neuralstem's technology was pioneered and developed by its Scientific Founder and Chairman, Dr. Karl Johe.  Neuralstem's technology enables, for the first time, the ability to produce neural stem cells of the human brain and spinal cord in significant quantities, and the ability to control the differentiation of these cells into mature, physiologically relevant human neurons and glia.  Neuralstem sells no commercial products embodying this technology as it is engaged in the process of gathering data for submission to the Food and Drug Administration.

3.      Upon information and belief, Defendant StemCells, Inc. is a Delaware corporation, with its principal place of business located at 3155 Porter Drive, Palo Alto, California 94304.  StemCells is in the business of stem cell based treatments of diseases and conditions characterized by damage to or degeneration of the central nervous system ("CNS"), liver, pancreas and other tissue and stem cell based diagnostic and screening tools.

4.      Upon information and belief, Defendant StemCells California, Inc. is a wholly owned subsidiary of StemCells, Inc., with its principal place of business located at 3155 Porter Drive, Palo Alto, California 94304.

5.      Jurisdiction over StemCells is proper because StemCells has availed itself of the jurisdiction of this Court by filing lawsuits alleging patent infringement in the United States

District Court for the District of Maryland, including *StemCells, Inc. v. Neuralstem, Inc.*, Case No. 06-1877, which is currently pending.

6.    Upon information and belief, Defendant Neurospheres is a Canadian entity with its principal place of business at 83 Heritage Medical Research Center, 3330 Hospital Drive N.W., Calgary, Alberta, T2N 4N1, Canada.  Upon information and belief, Neurospheres is an intellectual property holding company that licenses all of its patents to its exclusive/non-exclusive licensee StemCells, Inc.  Upon information and belief, StemCells, Inc. has the right to sublicense the Neurospheres patents and has claimed all substantial rights in all Neurospheres patents, including the right to enforce them.

7.    This court has jurisdiction over Neurospheres based on its active and ongoing relationship with its exclusive licensee, StemCells, and StemCells' extensive contacts in this judicial district including, but not limited to, StemCells' filing of at least three different lawsuits alleging patent infringement in the United States District Court for the District of Maryland for patents that are owned by Neurospheres.

## FACTUAL ALLEGATIONS

8.    On April 22, 2008, the United States Patent and Trademark Office issued United States Patent No. 7,361,505 (the "'505 patent") for "Multipotent Neural Stem Cell Compositions" to Neurospheres.  (*See* Exhibit A.)

9.    The day after issuance, StemCells, Neurospheres' exclusive licensee for the '505 patent, issued a press release regarding the '505 patent and touting its "broad claims covering human neural stem cells derived from any tissue source, including embryonic, fetal, juvenile, or adult tissue."  (Exhibit B, StemCells April 23, 2008 Press Release.)  In that press release, StemCells' President and CEO, Martin McGlynn stated: "We are confident that *any third party wishing to commercialize neural stem cells as potential therapeutics or use them as drug*

*screening tools will have to seek a license* from us irrespective of how they derive the cells. *Id.* (emphasis added). According to StemCells it has granted many licenses to patents directed to neural stem cells, including licenses to Cambrex; ReNeuron, R&D Systems; and Stem Cell Therapeutics. (*See* Exhibit C, Amended Complaint in Case No. AW 06 CV 1877, at ¶ 10.)

10.    In addition, to issuing threatening statements to the market, StemCells has a history of aggressively enforcing its exclusively licensed patents. In 2001 StemCells filed suit against Sciencell Research Laboratories ("Sciencell") in the United States District Court for the District of Massachusetts alleging infringement of nine U.S. Patents. Civil Action No. 01-CV-11942 (REK). In 2004 and 2005, StemCells sued ReNeuron twice in the United States District Court for the District of Maryland. *See* Civil Action Nos. 04-CV-03973 and 05-CV-1125.

11.    In 2006, StemCells filed suit against Plaintiff NeuralStem in the United States District Court for the District of Maryland alleging infringement of five U.S. Patents. Civil Action No. AW-06-CV-1877. Judge Alexander Williams, Jr. has stayed that case pending the completion of the reexaminations related to the patents-in-suit in that case. (*See* Exhibit D, Case No. AW 06 CV 1877, Docket No. 70.)

12.    Based on its press release stating that no one can work in this field without a license from StemCells and its history of suing companies that refuse to take a license, including Neuralstem, a justiciable controversy exists between Neuralstem and Defendants regarding the '505 patent.

### StemCells' New California Action

13.    On May 7, *after* Neuralstem filed the present action, Stemcells' filed a Complaint in the United States District Court for the Northern District of California alleging patent infringement of U. S. Patents 7,115,418 (the "'418 patent") and the '505 patent at issue here.

(Civil Action No. 08-cv-02364, the "California Action").  A copy of the '418 patent is attached as Exhibit E.  On May 9, 2008, StemCells filed an Amended Complaint adding claims to the California Action for Trade Libel and Unfair Competition in violation of California Business & Professions Code § 17200 *et seq.*  According to StemCells, which purport to be based on statements made by Neuralstem's CEO concerning the reexamination of StemCells' patents-in-suit and the present action, these common law and state law claims have "common operative facts" to its patent infringement claims.  (*See* Exhibit F, Amended Complaint in California Action, at ¶¶ 2 and 22-37.)

14.    In light of StemCells' filing of the California Action, a justiciable controversy exists between Neuralstem and Defendants regarding the '505 patent, the '418 patent and the allegedly related claims for trade libel and unfair competition.  Nonetheless, Neuralstem's statements are protected by the Noerr-Pennington Doctrine, the First Amendment, and/or the litigation privilege, and consequently are immune from liability.

### Neuralstem's Injury

15.    Neuralstem has suffered injury due to StemCells' public threats of infringement and enforcement.  Through its overarching threats of litigation against all neural stem cell researchers, StemCells has knowingly and willfully engaged in a course of conduct designed to improperly obtain monopoly power in the neural stem cell market and the market for innovation in the field of neural stem cell technology in the United States.

16.    StemCells' threats of infringement are designed to prevent Neuralstem from obtaining research funding and/or adversely affect Neuralstem's financial position.  On the day of StemCells' April 23, 2008 press release, Neuralstem's stock price dropped 10%.

17. To remedy the damage StemCells has caused and continues to cause, Neuralstem seeks declaratory judgments of non-infringement and invalidity and/or unenforceability of the '505 patent.

## History Before the Patent Office and Inequitable Conduct

18. On June 7, 1995, Neurospheres filed application serial no. 08/480, 172 (the '505 patent Application") with the PTO for "Multipotent Neural Stem Cell Compositions." The '505 patent application was assigned to Examiner Robert Hayes. After nearly thirteen years in prosecution and extensive appellate review, Neurospheres obtained a Notice of Allowance on January 24, 2007. On February 5, 2007, Neurospheres paid the issue fee.

19. On July 24, 2006, StemCells filed a lawsuit in this Judicial District asserting infringement of U.S. Patent Nos. 6,294,346 ("'346 patent"); 7,101,709 ("'709 patent"); 6,497,872 ("'872 patent"); and 5,851,832 ("'832 patent"). The '346, '709, '872, and '832 patents are from the same family as the '505 patent and claim similar subject matter related to neural stem cells.

20. On December 7, 2006 and April 5, 2007, Neuralstem filed reexamination requests for the '346 patent (Reexamination Control No. 90/008,367); '709 patent (Reexamination Control No. 90/008,366); '872 patent (Reexamination Control No. 90/008,581); and the '832 patent (Reexamination Control No. 90/008,580). The reexamination requests cited at least eleven prior art references that had not been previously cited in the StemCells patent family.

21. The PTO determined the reexaminations raised multiple new issues of patentability. The reexaminations were assigned to Examiners Bennett Celsa, Padmashri Ponnaluri, Sharon Turner, and Deborah Jones who operate in a special group at the PTO. Notably, the three Examiners handling the reexaminations were not the same as the Examiner handling the '505 patent application.

22.     As a result of the reexaminations, StemCells and Neuralstem jointly agreed to stay the previous lawsuit between these parties.

23.     While the reexaminations and the '505 patent application were assigned to different Examiners, the attorneys prosecuting both the '505 patent and the concurrent reexaminations for the '346, '709, '872, and '832 patents were the same.  Moreover, the attorneys representing StemCells in *StemCells v. Neuralstem* (Civil Action No. AW-06-CV-1877) are also from the same law firm as those prosecuting patents on behalf of StemCells before the PTO.  Upon information and belief, the lead prosecuting attorney maintains his law firm's relationship with both StemCells and Neurospheres.  The lead prosecuting attorney participated in telephone conversations with opposing counsel regarding the *StemCells v. Neuralstem* litigation.

24.     Accordingly, the attorneys prosecuting the '505 patent were fully aware of the pending litigation with Neuralstem, the reexaminations filed by Neuralstem, and the prior art cited in those reexaminations.  The attorneys prosecuting the '505 patent were aware their firm was handling the concurrent reexaminations.

25.     The '346, '709, '872, and '832 patents are in the same family as the '505 patent and claim similar subject matter related to neural stem cells.  Accordingly, the attorneys prosecuting the '505 patent were aware that they had a duty to disclose the existence of the Neuralstem litigation and the reexaminations of the '346, '709, '872, and '832 patents to the PTO during the prosecution of the '505 patent.

26.     Under the Manual of Patent Examining Procedure ("MPEP") 2001.06, Patentees have the duty to disclose "all material information they are *aware* of regardless of the source of or how they become aware of the information."  MPEP 2001.06 (emphasis in original).  This

also includes when "the subject matter for which a patent is being sought is or has been involved in litigation, the existence of such litigation and any other material information arising therefrom **must** be brought to the attention of the [PTO]."  MPEP 2001.06(c) (emphasis added).

27.    The inventors and their attorneys failed to disclose the pending litigation with Neuralstem to the PTO during prosecution of the '505 patent.

28.    On December 7, 2006, Neuralstem filed reexamination requests for the '346 patent (Reexamination Control No. 90/008,367) and the '709 patent (Reexamination Control No. 90/008,366).  The PTO granted these requests on February 16, 2007.

29.    The inventors and their attorneys failed to disclose Reexamination Control Nos. 90/008,367 and 90/008,366 to Examiner Hayes during prosecution of the '505 patent.

30.    On April 5, 2007, Neuralstem filed reexamination requests for the '872 patent (Reexamination Control No. 90/008,581) and the '832 patent (Reexamination Control No. 90/008,580).  The PTO granted these requests on May 10, 2007.

31.    The inventors and their attorneys failed to disclose Reexamination Control Nos. 90/008,580 and 90/008,581 to Examiner Hayes during prosecution of the '505 patent.

32.    On September 7 and 8, 2007, the PTO Examiners handling the reexaminations issued four Office Actions rejecting the claims in the '346, '709, '872 and '832 patents as unpatentable.

33.    The inventors and their attorneys did not disclose the September 7 and 8, 2007 Office Actions to Examiner Hayes during prosecution of the '505 patent.

34.    The inventors and their attorneys amended the patent claims of the '346, '709, '872 and '832 patents in their Responses to overcome the rejections in the September 7 and 8, 2007 Office Actions.

35.     The inventors and their attorneys did not disclose their Responses to the September 7 and 8, 2007 Office Actions to Examiner Hayes during prosecution of the '505 patent.

36.     The inventors and their attorneys did not disclose the existence of any of the four concurrently pending reexamination proceedings to Examiner Hayes during prosecution of the '505 patent.

37.     Though Defendants submitted an Information Disclosure Statement ("IDS") to Examiner Hayes revealing the prior art cited in the four reexaminations on May 16, 2007, they did so after the patent issue fee was paid.   (Exhibit G, May 16, 2007 '505 patent IDS Submission.)

38.     The IDS is a filing with the PTO in which patent applicants bring to the attention of the Examiner any background art that bears on the patentability of the application.  Patentees have a duty to disclose to the PTO any information known to the individual to be material to the patentability of a claimed invention.  *See* MPEP § 609.

39.     Per the PTO regulations, the Defendants' untimely IDS submission would not be considered by the examiner:

> 37 CFR 1.97
>
> (a) In order for an applicant for a patent or for a reissue of a patent to have an information disclosure statement in compliance with § 1.98 considered by the Office during the pendency of the application, the information disclosure statement must satisfy one of paragraphs (b), (c), or (d) of this section.
>
> *****
>
> (d) An information disclosure statement shall be considered by the Office if filed by the applicant after the period specified in paragraph (c) of this section, provided that the information disclosure statement is filed on or before payment of the issue fee and is accompanied by:
>
> (1) The statement specified in paragraph (e) of this section; and

9

(2) The fee set forth in § 1.17(p).

Nevertheless, Defendants specifically requested "that the Examiner consider completely the cited information, along with any other information, in reaching a determination concerning the patentability of the present claims, and sign the enclosed form PTO-1449 to evidence that the cited information has been fully considered by the Patent and Trademark Office during the examination of this application." *Id*.

40.     In addition to being untimely, Defendants' IDS submission to Examiner Hayes also was incomplete and misleading because it failed to mention the pending reexaminations, the fact that four other PTO Examiners, Examiners Bennett Celsa, Padmashri Ponnaluri, Deborah Jones, and Sharon Turner had determined the prior art cited in those reexaminations raised "substantial new questions of patentability," and that those prior art references ultimately forced Defendants to substantially amend the claims in all four patents during the course of the reexamination proceedings.

41.     On January 9, 2008, Examiner Hayes sent a communication to Defendants' attorneys stating that the May 16, 2007 IDS was non-compliant because it was submitted after the patent issue fee was paid, and therefore the IDS was not considered.  (Exhibit H, '505 patent Examiner Response to IDS.)   Though Defendants could have responded to the PTO communication and prevented the '505 patent from issuing so that their IDS submission and information about the reexamination proceedings and the litigation could be considered, Defendants failed to do so.

42.     Although they had numerous opportunities to comply with their duty of candor before the PTO, Defendants repeatedly did not apprise the PTO of information highly material to

the patentability of '505 patent, including the pending litigation and concurrent reexamination proceedings.

43.     Defendants repeated failures to disclose material information and the submission of an after-the-fact and incomplete IDS show their conduct was not a mistake, but rather, suggests an intent to deceive the PTO by concealing highly material information.

44.     Defendants were aware of the adverse effect the prior art references cited in the non-compliant IDS had on the claims of the '346, '709, '872 and '832 patents during reexamination, and thus knew or should have known that those references were highly material to the '505 patent.  As a result of the conduct described above, the '505 patent is unenforceable.

45.     Moreover, the inventors' and attorneys' duty of candor extends throughout a patent's entire prosecution history.  Under the doctrine of infectious unenforceability all of Defendants' patents in the same patent family, including the '346, '709, '872 and '832 patents, are also infected and unenforceable due to inequitable conduct in the '505 patent application.

## COUNT I

(Declaratory Judgment of Unenforceability)

46.     Neuralstem incorporates all preceding Paragraphs of its Complaint as if fully set forth herein.

47.     Due to the failure to apprise the PTO of prior art and information highly material to the patentability of '505 patent, the '505 patent is unenforceable.

48.     A judicial declaration of unenforceability is necessary and appropriate to resolve this controversy.

## COUNT II

(Declaratory Judgment of Non-Infringement of the '505 Patent)

49.     Neuralstem incorporates all preceding Paragraphs of its Complaint as if fully set forth herein.

50.     Neuralstem's activities do not infringe, do not induce infringement, and do not contributorily infringe any valid, enforceable claims, if any, of the '505 patent.

51.     Neuralstem does not infringe the '505 patent because Neuralstem's activities do not constitute patent infringement under 35 U.S.C. § 271(e)(1).

52.     A judicial declaration of non-infringement is necessary and appropriate to resolve this controversy.

## COUNT III

(Declaratory Judgment of Invalidity of the '505 Patent)

53.     Neuralstem incorporates all preceding Paragraphs of its Complaint as if fully set forth herein.

54.     Upon information and belief, each claim of the '505 patent is invalid for failure to comply with one of more of the conditions for patentability specified in Part II of Title 35 of the United States Code, including at least Sections 101, 102, 103, and 112.

55.     A judicial declaration of invalidity is necessary and appropriate to resolve this controversy.

## COUNT IV

(Declaratory Judgment of Non-Infringement of the '418 Patent)

56.     Neuralstem incorporates all preceding Paragraphs of its Complaint as if fully set forth herein.

57.     Neuralstem's activities do not infringe, do not induce infringement, and do not contributorily infringe any valid, enforceable claims, if any, of the '418 patent.

58.     Neuralstem does not infringe the '418 patent because Neuralstem's activities do not constitute patent infringement under 35 U.S.C. § 271(e)(1).

59.     A judicial declaration of non-infringement is necessary and appropriate to resolve this controversy.

## COUNT V

(Declaratory Judgment of Invalidity of the '418 Patent)

60.     Neuralstem incorporates all preceding Paragraphs of its Complaint as if fully set forth herein.

61.     Upon information and belief, each claim of the '418 patent is invalid for failure to comply with one of more of the conditions for patentability specified in Part II of Title 35 of the United States Code, including at least Sections 101, 102, 103, and 112.

62.     A judicial declaration of invalidity is necessary and appropriate to resolve this controversy.

## COUNT VI

(Declaratory Judgment of Non-Liability for Trade Libel)

63.     Neuralstem incorporates all preceding Paragraphs of its Complaint as if fully set forth herein.

64.     Neuralstem has not embarked upon an intentional course of action to devalue and injure the intellectual property of Stemcells or effect the business honesty of Stemcells.

65.     Neuralstem has not made and does not continue to make wrongful and false statements about the PTO's actions regarding Stemcells' patents and actions before the PTO.

66.     Neuralstem's statements are protected by the Noerr-Pennington Doctrine, the First Amendment, and/or the litigation privilege, and consequently are immune from liability.

67.     A judicial declaration of non-liability is necessary and appropriate to resolve this controversy.

## COUNT VII

(Declaratory Judgment of Non-Liability for Unfair Competition)

68.     Neuralstem incorporates all preceding Paragraphs of its Complaint as if fully set forth herein.

69.     Neuralstem has not and does not engage in unfair competition with regard to Stemcells, its business, or its actions before the PTO.

70.     Neuralstem's actions are protected by the Noerr-Pennington Doctrine, the First Amendment, and/or the litigation privilege, and consequently are immune from liability.

71.     A judicial declaration of non-liability is necessary and appropriate to resolve this controversy.

## RELIEF REQUESTED

WHEREFORE, Neuralstem requests that the Court enter a judgment in Neuralstem's favor and against StemCells and provide Neuralstem the following relief:

A.     Order, adjudge, and decree that Neuralstem is not infringing the '505 patent, directly or indirectly;

B.     Order, adjudge, and decree that the '505 patent is unenforceable;

C.     Order, adjudge, and decree that the '505 patent is invalid;

D.     Order, adjudge, and decree that Neuralstem is not infringing the '418 patent, directly or indirectly;

E.     Order, adjudge, and decree that the '418 patent is invalid;

F.      Order, adjudge, and decree that Neuralstem is not liable for trade libel against StemCells;

G.      Order, adjudge, and decree that Neuralstem is not liable for unfair competition against StemCells;

H.      Order, adjudge, and decree that this is an exceptional case under 35 U.S.C. § 285 and award Neuralstem its reasonable attorneys' fees; and

I.      Award such other and further relief as the Court may deem just.

## JURY DEMAND

Neuralstem demands trial by jury.

Respectfully submitted,


BELL, BOYD & LLOYD LLP


/s/      Michael T. Murphy

Michael T. Murphy
D. Md. Bar # 11357
Mmurphy@bellboyd.com
Jeffrey J. Howell
D. Md Bar #16229
Jhowell@bellboyd.com
BELL, BOYD & LLOYD LLP
1615 L Street, N.W.
Suite 1200
Washington, DC 20036
(202) 466-6300 (tel)
(202) 463-0678 (fax)


Of Counsel:

Alan L. Barry (*pro hac vice* pending)
abarry@bellboyd.com
Michael J. Abernathy (*pro hac vice* pending)
mabernathy@bellboyd.com
Sanjay K. Murthy (*pro hac vice* pending)
smurthy@bellboyd.com

15

Brian J. Arnold (*pro hac vice* pending)
barnold@bellboyd.com
Christian G. Stahl (*pro hac vice* pending)
cstahl@bellboyd.com
BELL, BOYD & LLOYD LLP
70 West Madison
Suite 3100
Chicago, IL 60602
(312) 372-1121
(312) 827-8000

Attorneys for Plaintiff

# Exhibit 19

District of Maryland (CM/ECF Live 3.1.2)                                                                          Page 1 of 2

CLOSED

# U.S. District Court
## District of Maryland (Greenbelt)
### CIVIL DOCKET FOR CASE #: 8:04-cv-03973-MJG

| | |
|---|---|
| Stemcells, Inc. v. Reneuron Ltd. | Date Filed: 12/17/2004 |
| Assigned to: Judge Marvin J. Garbis | Date Terminated: 02/15/2005 |
| Cause: 28:1338 Patent Infringement | Jury Demand: None |
| | Nature of Suit: 830 Patent |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Stemcells, Inc.**                  represented by **David Barmak**
Mintz Levin Cohn Ferris Glovsky and Popeo
PC
701 Pennsylvania Ave NW Ste 900
Washington, DC 20004
12024347300
Fax: 12024347400
Email: dbarmak@mintz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Reneuron Ltd.**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/17/2004 | 1 | COMPLAINT against Reneuron Ltd. ( Filing fee $ 150 receipt number 4-3973.), filed by Stemcells, Inc.. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Civil Cover Sheet)(rank, Deputy Clerk) (Entered: 12/21/2004) |
| 12/21/2004 | 2 | NOTICE OF FILING mailed to the Commissioner of Patents and Trademarks (c/m 12/21/04 rk) (rank, Deputy Clerk) (Entered: 12/21/2004) |
| 12/21/2004 | 3 | Summons Issued 20 days as to Reneuron Ltd.. (rank, Deputy Clerk) (Entered: 12/21/2004) |
| 02/14/2005 | 4 | NOTICE of Voluntary Dismissal by Stemcells, Inc. (Barmak, David) (Entered: 02/14/2005) |
| 02/15/2005 | 5 | MARGINAL ORDER APPROVING 4 Notice of Voluntary Dismissal without Prejudice filed by Stemcells, Inc. Signed by Judge Marvin J. Garbis on 2/15/05. (mcb, Deputy Clerk) (Entered: 02/15/2005) |

| PACER Service Center |
|---|
| Transaction Receipt |

| 06/11/2008 22:31:10 | | | |
|---|---|---|---|
| PACER Login: | mw0425 | Client Code: | 081361-0011-08411 |
| Description: | Docket Report | Search Criteria: | 8:04-cv-03973-MJG |
| Billable Pages: | 1 | Cost: | 0.08 |

District of Maryland (CM/ECF Live 3.1.2)

Page 1 of 2

CLOSED

**U.S. District Court**
**District of Maryland (Baltimore)**
**CIVIL DOCKET FOR CASE #: 1:05-cv-01125-MJG**

StemCells, Inc. v. ReNeuron Ltd.
Assigned to: Judge Marvin J. Garbis
Cause: 35:145 Patent Infringement

Date Filed: 04/25/2005
Date Terminated: 05/27/2005
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

<u>Plaintiff</u>

**StemCells, Inc.**

represented by **David Barmak**
Mintz Levin Cohn Ferris Glovsky and Popeo
PC
701 Pennsylvania Ave NW Ste 900
Washington, DC 20004
12024347300
Fax: 12024347400
Email: dbarmak@mintz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

<u>Defendant</u>

**ReNeuron Ltd.**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/25/2005 | <u>1</u> | COMPLAINT and Exhibits 1-3 against ReNeuron Ltd. ( Filing fee $ 250 receipt number 84637001103.), filed by StemCells, Inc. (Attachments: # <u>1</u> Civil Cover Sheet)(elt, Deputy Clerk) Modified on 4/26/2005 (elt, Deputy Clerk). (FILED IN ERROR BY CLERK) (Entered: 04/26/2005) |
| 04/25/2005 | <u>2</u> | COMPLAINT against ReNeuron Ltd. ( Filing fee $ 250 receipt number 84637001103.), filed by StemCells, Inc. (Attachments: # <u>1</u> Exhibit 1 - Part 1# <u>2</u> Exhibit 1 - Part 2# <u>3</u> Exhibit 1 Part 3# <u>4</u> Exhibit 1 - Part 4# <u>5</u> Exhibit 1 - Part 5# <u>6</u> Exhibit 2# <u>7</u> Exhibit 3# <u>8</u> Civil Cover Sheet)(elt, Deputy Clerk) (Entered: 04/26/2005) |
| 04/25/2005 | | Jury Trial Demand by StemCells, Inc. (elt, Deputy Clerk) (Entered: 04/26/2005) |
| 04/26/2005 | <u>3</u> | Summons Issued 20 days as to ReNeuron Ltd. (elt, Deputy Clerk) (Entered: 04/26/2005) |
| 04/26/2005 | <u>4</u> | Correspondence mailed to the Commissioner of Patents and Trademarks (c/m 4/26/05) (elt, Deputy Clerk) (Entered: 04/26/2005) |
| 04/26/2005 | <u>5</u> | Correspondence re: ECF warning letter mailed to counsel (c/m 4/26/05) (elt, Deputy Clerk) (Entered: 04/26/2005) |

District of Maryland (CM/ECF Live 3.1.2)                                                    Page 2 of 2

| 05/27/2005 | 6 | NOTICE of Voluntary Dismissal by StemCells, Inc. (Barmak, David) (Entered: 05/27/2005) |
| 05/27/2005 | 7 | MARGINAL ORDER APPROVING 6 Notice of Voluntary Dismissal without prejudice filed by StemCells, Inc.,. Signed by Judge Marvin J. Garbis on 5/27/05. (jnl, Deputy Clerk) (Entered: 05/27/2005) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/11/2008 22:33:44 | | |
| PACER Login: | mw0425 | Client Code: | 081361-0011-08411 |
| Description: | Docket Report | Search Criteria: | 1:05-cv-01125-MJG |
| Billable Pages: | 1 | Cost: | 0.08 |

# Exhibit 20

(SCAN)

1  David L. Aronoff (SBN 152606),
   daronoff@winston.com
2  SAUL S. ROSTAMIAN (SBN 235292),
   srostamian@winston.com
3  **WINSTON & STRAWN LLP**
   333 South Grand Avenue, 38th Floor
4  Los Angeles, CA 90071
   (213) 615-1700; Fax (213) 615-1750
5
   Alan L. Barry (*pro hac vice* pending),
6  abarry@bellboyd.com
   Sanjay K. Murthy (SBN 212097),
7  smurthy@bellboyd.com
   Brian J. Arnold (*pro hac vice* pending),
8  barnold@bellboyd.com
   Christian G. Stahl (*pro hac vice* pending),
9  cstahl@bellboyd.com
   **BELL, BOYD & LLOYD LLP**
10 70 West Madison Street, Suite 3300
   Chicago, Illinois 60602
11 (312) 372-1121; Fax (312) 827-8000

12 Attorneys for Plaintiff
   NEURALSTEM, INC.
13

14            UNITED STATES DISTRICT COURT

15            CENTRAL DISTRICT OF CALIFORNIA

16
   NEURALSTEM, INC., a Maryland          Case No.: CV08-02168 R (AGRx)
17 corporation,
                                          **COMPLAINT FOR**
18           Plaintiff,
                                          **1) Misappropriation of Trade Secrets
19                                        (Uniform Trade Secrets Act: Cal. Civ.
                                          Code § 3426 et seq.);**
20      v.
                                          **2) Breach of Contract;**
21 RENEURON, LTD., a United
   Kingdom corporation,                   **3) Unfair Competition (Cal. Bus. &
22                                        Prof. Code § 17200 et seq.);**
             Defendant.
23                                        **4) Breach of the Implied Covenant of
                                          Good Faith and Fair Dealing**
24
                                          **JURY TRIAL DEMAND**
25
                                          **\*\*REDACTED\*\***
26
                                          **EXHIBITS A & B FILED
27                                        SEPARATELY UNDER SEAL**

28

FILED
CLERK, U.S. DISTRICT COURT

APR - 7 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

                          1
                       COMPLAINT

LA:209734.1

Plaintiff, Neuralstem, Inc. ("Neuralstem"), by its attorneys, alleges as follows:

## I.    BACKGROUND

1.    Over the last six years, ReNeuron, Ltd. ("ReNeuron") has deliberately and surreptitiously misappropriated Neuralstem's valuable stem cell technology. In addition to stealing this valuable technology, ReNeuron is also currently misleading the United States Patent & Trademark Office in an attempt to obtain patents on inventions that were created, at least in-part, using Neuralstem's intellectual property. Neuralstem brings this action to stop ReNeuron from its continued misappropriation of Neuralstem's confidential information and trade secrets, including its wrongful incorporation of Neuralstem's intellectual property into its stem cell lines.

2.    Neuralstem also brings this action to require ReNeuron to perform its obligations under the Material Transfer & Non-Exclusive Option Agreement executed in February 2002, and to pay damages caused by ReNeuron's breach of that agreement. ReNeuron's continuing disregard for Neuralstem's intellectual property has and is causing Neuralstem irreparable harm. Neuralstem seeks to secure the return of all Neuralstem trade secrets and proprietary materials in ReNeuron's possession and enjoin it from obtaining any further commercial advantage or unjust enrichment from its misappropriation of Neuralstem's trade secrets and confidential, proprietary information. Neuralstem also seeks an accounting, a constructive trust, compensatory and punitive damages, and Neuralstem's attorneys' fees and costs resulting from ReNeuron's wrongful conduct.

LA:209734.1

## II.  JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction is based on 28 U.S.C. § 1332. Supplemental jurisdiction over the state law claims is based on 28 U.S.C. § 1367.

4.     Venue for this case is proper in this District and before this Court under 28 U.S.C. § 1391(a) and 1391(c).  The Defendant, moreover, has what it describes as "an operational presence" at 2825 Santa Monica Blvd., Suite 200 Santa Monica, California 90404 which is located in the Central District of California.

### III.  THE PARTIES

5.     Plaintiff, Neuralstem, Inc., is a corporation organized under the laws of the State of Maryland with its principal place of business at 9700 Great Seneca Highway, Rockville, Maryland 20850.

6.     Founded in 1996, Neuralstem is a publicly-traded biotherapeutics company whose mission is to use stem cell research and its patented human neural stem cell technology to treat diseases of the central nervous system including Ischemic Paraplegia, Traumatic Spinal Cord Injury, ALS, Stroke, and Parkinson's Disease. Neuralstem's technology was pioneered and developed by its Scientific Founder and Chairman, Dr. Karl Johe. Neuralstem's technology enables, for the first time, the ability to produce neural stem cells of the human brain and spinal cord in significant quantities, and the ability to control the differentiation of these cells into mature, physiologically relevant human neurons and glia.

7.     Defendant, ReNeuron, Ltd., was founded in 1997 and is a business entity organized under the laws of the United Kingdom with its principal place of business at 10 Nugent Road, Surrey Research Park, Guildford, Surrey GU2 7AF, United Kingdom.  ReNeuron describes itself as "specializing in stem cell research and development."

# IV. FACTUAL ALLEGATIONS

8.    In the mid-1990s, Dr. Karl Johe developed a method for efficiently propagating the undifferentiated germinal cells, *i.e.*, stem cells of the central nervous system (CNS), in culture and defined conditions to effectively turn the undifferentiated cells into mature cell types.  These undifferentiated cells or "CNS stem cells" display the multipotential capacity to differentiate into the three major cell types of the brain—neurons, astrocytes, and oligodendrocytes.  Moreover, the same culture conditions enable isolation, expansion, and differentiation of equivalent multipotential cells from the adult brain.  After developing this entirely new method, Dr. Johe and Neuralstem invested considerable sums of money and time developing numerous technical solutions, standard operating procedures ("SOPs"), and protocols relating to the CNS stem cells.

9.    In early 2002, Neuralstem was looking for partners to help it further develop its CNS stem cell technology.  At that time, Neuralstem and ReNeuron were two of only a few  companies working in the area of stem cell research.  However, according to ReNeuron's then-CEO, Dr. Martin Edward, ReNeuron was having "genetic stability problems" with its stem cells.  In fact, because of those problems, ReNeuron's Board of Directors was considering getting out of the stem cell business all together.  ReNeuron decided it needed a new direction and became very interested in working with Neuralstem's CNS stem cells because they were, by Dr. Edward's admission, "stable genetically, [] they survive well *in vitro* and *in vivo* and differentiate readily *in vitro*."

10.    In February 2002, Neuralstem and ReNeuron met to discuss a potential joint venture and shortly thereafter executed a Material Transfer Agreement and Non-Exclusive Option Agreement ("MTA").  A copy of that MTA is attached as Exhibit A. ████████████████████████████

4
COMPLAINT

LA:209734.1

1

2    ███████████████████████ . *See* Exhibit A.  Under the MTA, ReNeuron

3    agreed not to use ███████████████████████

4

5    Exhibit A at ¶ 2.  ReNeuron further agreed ███

6

7

8

9    ███████████████████ *Id.* at 3.  Like most agreements of this

10   type, the MTA also had a provision regarding inventions made using the Material:

11

12

13   ███████████████ Exhibit A at ¶ 9.

14        11.   Once the MTA was in place, Neuralstem disclosed its CNS stem cell

15   technology to ReNeuron, including its stem cell lines, its SOPs for growing its

16   stem cell lines, and its protocols.  In addition, because ReNeuron lacked the

17   technical expertise to properly use Neuralstem's cell lines, Dr. Johe traveled to

18   England on multiple occasions to assist and provide oversight to ReNeuron in its

19   evaluation and use of Neuralstem's technology.

20        12.   After Neuralstem provided substantial expertise, ReNeuron's

21   experiments and evaluation of Neuralstem's CNS stem cells went well.  In fact,

22   ReNeuron's CEO, Dr. Edward, even admitted in an e-mail to Neuralstem's CEO

23   that its CNS stem cells were "just as good as you said they are."  In July 2002,

24   ReNeuron issued a Draft Interim Report (the "ReNeuron Report")  regarding its

25   evaluation of Neuralstem's CNS stem cells, as provided for under the MTA,

26   authored by one of its chief scientists, Dr. John Sinden.  A copy of the ReNeuron

27   Report is attached as Exhibit B.

28

5
COMPLAINT

13.    The ReNeuron Report acknowledged some of the technical assistance provided by Dr. Karl Johe during the evaluation period: ████████████████████████████████████████████████████████ Exhibit B at 3. The ReNeuron Report also admits that ReNeuron used ██████████████████████████████ *Id.* at 2. Finally, in its Conclusion, the ReNeuron Report acknowledged that Neuralstem's CNS stem cells ████████████████████████████████████████████████████████ *Id.* at 13. Despite the fact that the outcome of the studies were successful, ReNeuron decided not to move forward with creating a joint venture with Neuralstem and the parties went their separate ways.

14.    However, in November 2006, ReNeuron announced it had entered into an agreement with Millipore Corporation to sell its ReNcell™ cell lines as research tools for drug discovery purposes. A copy of the press release is attached as Exhibit C. Under its agreement with Millipore, ReNeuron would receive royalty payments on cell line and media sales. Exhibit C. On December 6, 2006, ReNeuron then announced it had filed a first Investigational New Drug ("IND") application with the United States Food and Drug Administration (FDA) to commence initial clinical studies in the United States using its stem cell lines to treat stroke. The description of the ReNCell™ line in ReNeuron's press release was virtually identical to the CNS stem cell lines disclosed under the MTA and described in the ReNeuron Report. The fact that ReNeuron, which was on the verge of exiting the stem cell business all together, suddenly shifted to mimic Neuralstem's technology after the MTA cannot be explained by mere coincidence, nor can the striking similarity of its technology be squared with independent development.    Upon information and belief, ReNeuron improperly used

LA:209734.1

Neuralstem's technology and trade secrets disclosed under the MTA to develop its ReNcell™ cell line.

15.     In addition to creating and then selling the ReNcell™ cell line in violation of the MTA, unbeknownst to Neuralstem, on September 29, 2005 and November 21, 2005, ReNeuron filed two patent applications (the "ReNeuron Patent Applications") with the United States Patent and Trademark Office.  The ReNeuron Patent Applications include John Sinden, the principal author of the ReNeuron Report, as the first-named inventor and describe a CNS stem cell line virtually identical to the CNS stem cell line disclosed by Neuralstem under the MTA.[1]  Once again, the similarity between the ReNeuron Patent Applications and Neuralstem's technology cannot be explained by coincidence.  Upon information and belief, ReNeuron improperly used Neuralstem's technology and trade secrets disclosed under the MTA to develop the cell line described in the ReNeuron Patent Applications.

## CLAIM 1—TRADE SECRET MISAPPROPRIATION

16.     Neuralstem re-alleges and incorporates by reference each of the preceding paragraphs of this Complaint.

17.     Upon information and belief, ReNeuron used Neuralstem's material disclosed under the MTA, including its CNS stem cells, SOPs, and protocols and derivatives thereof to develop its ReNcell™ cell line and the material described in the ReNeuron Patent Applications.

18.     ReNeuron has misappropriated Neuralstem's trade secrets within the meaning of the Uniform Trade Secret Act as enacted in California (California Civil

---

[1]     Further discovery may reveal that Dr. Karl Johe should have been named as a co-inventor on the ReNeuron Patent Applications.  If that is the case, Neuralstem may seek leave to amend its Complaint to assert a claim under 35 U.S.C. § 256 for correction of inventorship once any of the ReNeuron Patent Applications issues as a United States Patent.

LA:209734.1

1    Code §§ 3426 et seq.). Said trade secrets include, but are not limited to,

2    Neuralstem's information relating to its CNS stem cells, SOPs, protocols and other

3    information transferred by Dr. Karl Johe during various meetings with ReNeuron

4    conducted under the MTA.

5         19.    The subject trade secrets derive independent economic value, actual

6    and potential, from not being known generally to the public and/or other persons

7    who can obtain economic value from their disclosure and/or use. These trade

8    secrets have been the subject of efforts by Neuralstem that are reasonable under the

9    circumstances to maintain their secrecy.

10        20.    ReNeuron misappropriated Neuralstem's trade secrets and

11    information disclosed under the MTA when it knew or should have known them to

12    be Neuralstem's trade secrets, for its own profit, to the damage and detriment of

13    Neuralstem. On information and belief, ReNeuron has studied and used, and if

14    unrestrained by court order, will continue to study and use all or portions of

15    Neuralstem's trade secrets and related information for improper purposes.

16

17        21.    Because of the above-alleged acts and conduct of ReNeuron,

18    Neuralstem is entitled to recover its actual damages and ReNeuron's unjust

19    enrichment. At the very least, Neuralstem is entitled to payment of a reasonable

20    royalty. Because ReNeuron's acts of misappropriation were both willful and

21    malicious, Neuralstem is further entitled to an award of exemplary damages and

22    reasonable attorney's fees.

23        22.    Neuralstem is without an adequate remedy at law. Neuralstem,

24    therefore, is entitled to an injunction under Cal. Civ. Code § 3426.2, restraining

25    ReNeuron, its agents, employees, and all persons acting in concert with it, from

26    using, copying, publishing, disclosing, transferring, importing, or selling

27    Neuralstem's trade secret information, or any products based on or incorporating

28    all or part of Neuralstem's trade secret information, and restraining it from

obtaining any commercial advantage or unjust enrichment from the misappropriation of Neuralstem's trade secret information.

23.    In the interests of justice, Neuralstem is further entitled to an order requiring ReNeuron, its agents, employees, and all persons acting in concert with it, to return to Neuralstem any and all of its trade secret information, including but not limited to any and all materials created with, incorporating, or referencing Neuralstem's trade secret information.

## CLAIM II—BREACH OF CONTRACT

24.    Neuralstem re-alleges and incorporates by reference each of the preceding paragraphs of this Complaint.

25.    Neuralstem has complied with all of the obligations required by it to be performed under the MTA.

26.    As explained in detail above, ReNeuron breached its contractual obligations under the MTA by, among other things:  (1) using the Material, or any parts, progeny or derivatives made in whole or in part from the Material disclosed under the MTA for commercial purposes; (2) selling and distributing the Material, or any parts, progeny or derivatives made in whole or in part from the Material, to third parties (*e.g.* Millipore) without written permission from Neuralstem; (3) utilizing Neuralstem's trade secrets and confidential information to develop its own products (*e.g.,* ReNcell™ cell line); and (4) drafting and filing the ReNeuron Patent Applications without informing Neuralstem. *See* Exhibit A, ¶¶ 2-3, 9.

27.    Neuralstem has been damaged as a result of ReNeuron's breaches, and seeks damages at least sufficient to:  (1) compensate it for its actual losses including lost profits resulting from ReNeuron's breaches; and (2) recover to Neuralstem unjust enrichment of ReNeuron resulting from its breaches.  In accordance with the terms of the MTA, Neuralstem also seeks an order compelling

LA:209734.1

ReNeuron to assign to Neuralstem the ReNeuron Patent Applications, and any other unknown patent applications pending in the United States Patent and Trademark Office or any foreign country that were created using Neuralstem's trade secret or confidential information disclosed under the MTA.

## CLAIM III—UNFAIR COMPETITION

28.     Neuralstem re-alleges and incorporates by reference each of the preceding paragraphs of this Complaint.

29.     ReNeuron's actions described above constitute California common law unfair competition and violate California Business and Professions Code § 17200 *et seq.* These actions include, but are not limited to: (1) using the Material, or any parts, progeny or derivatives made in whole or in part from the Material disclosed under the MTA for commercial purposes; (2) selling and distributing the Material, or any parts, progeny or derivatives made in whole or in part from the Material, to third parties without written permission from Neuralstem; (3) utilizing Neuralstem's trade secrets and confidential information to develop its own products; and (4) drafting and filing the ReNeuron Patent Applications without informing Neuralstem. *See* Exhibit A, ¶¶ 2-3, 9.

30.     By reason of the alleged acts and conduct of ReNeuron, Neuralstem has suffered and will suffer further harm, including the loss of proprietary information and competitive position, the amount of which will be difficult to ascertain. Accordingly, Neuralstem will be without an adequate remedy at law.

31.     Because Neuralstem is without an adequate remedy at law, it is entitled to an injunction restraining ReNeuron and its officers, agents, employees, and all persons acting in concert with it, from using, copying, publishing, disclosing, transferring, importing, or selling Neuralstem's trade secrets or other confidential, proprietary information, or any product that is based on or

LA:209734.1

incorporates part or all of Neuralstem's trade secrets or other confidential, proprietary information, and from obtaining any commercial advantage or unjust enrichment from its misappropriation of Neuralstem's trade secrets or other confidential, proprietary information.

## CLAIM IV—BREACH OF THE IMPLIED

## COVENANT OF GOOD FAITH AND FAIR DEALING

32.     Neuralstem re-alleges and incorporates by reference each of the preceding paragraphs of this Complaint.

33.     As explained above, in its dealings with Neuralstem, ReNeuron breached the implied covenant of good faith and fair dealing by: (1) using the Material, or any parts, progeny or derivatives made in whole or in part from the Material disclosed under the MTA for commercial purposes; (2) selling and distributing the Material, or any parts, progeny or derivatives made in whole or in part from the Material, to third parties without written permission from Neuralstem; (3) utilizing Neuralstem's trade secrets and confidential information to develop its own products; and (4) drafting and filing the ReNeuron Patent Applications without informing Neuralstem. *See* Exhibit A, ¶¶ 2-3, 9.

34.     Neuralstem has been damaged as a result of ReNeuron's breaches, and seeks damages in accordance with proof at trial, but in any event sufficient to: (1) compensate it for its actual losses including lost profits resulting from ReNeuron's breaches; and (2) recover to Neuralstem unjust enrichment of ReNeuron resulting from its breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Neuralstem demands judgment in its favor and against Defendant ReNeuron as follows:

LA:209734.1

1.    That the Court enter judgment in favor of Neuralstem and against ReNeuron on all counts alleged herein;

2.    That the Court issue a preliminary and thereafter a permanent injunction against ReNeuron, and its officers, agents, servants, employees, and all others acting in concert or participation with ReNeuron with notice, enjoining and restraining them from the following:

> a)    Using, copying, publishing, disclosing, transferring, importing, selling or otherwise distributing, directly or indirectly, any of Neuralstem's trade secret, confidential, and proprietary information; and

> b)    Selling any product incorporating or derived from all or part of Neuralstem's trade secret, confidential, and proprietary information; selling or licensing such information to any third party; providing any good or service that incorporates such information to any third party; or any other means.

3.    That the Court order ReNeuron to return any of Neuralstem's trade secret, confidential, and proprietary information still retained by ReNeuron;

4.    That the Court Order ReNeuron to account for all gains, profits, and advantages derived from its acts of misappropriation and other violations of law; and all gains, profits and advantages derived by ReNeuron's acts of misappropriation and other violations of law.

5.    Award Neuralstem compensatory damages, unjust enrichment, or royalties stemming from ReNeuron's misappropriation of trade secrets pursuant to Cal. Civ. Code § 3426.3;

6.    Award Neuralstem double damages pursuant to Cal. Civ. Code § 3426.3, as a result of Defendants' willful and malicious misappropriation of trade secrets;

7.    Award Neuralstem its attorney fees pursuant to Cal. Civ. Code § 3426.4;

8.    Award Neuralstem restitution, unjust enrichment, and compensatory damages according to proof at trial;

LA:209734.1

1        9.    Award Neuralstem statutory exemplary damages and punitive damages

2 according to proof at trial;

3       10.   Award Neuralstem attorneys fees and costs of suit herein incurred; and

4       11.   Award Neuralstem such other and further relief as the Court may deem

5 proper.

6

7 Dated: April 1, 2008                  Respectfully submitted,

8                             WINSTON & STRAWN LLP

9

10                             BELL, BOYD & LLOYD LLP

11                             By: _____

12                               David L. Aronoff
                              Saul S. Rostamian

13

14                               Alan L. Barry (*pro hac vice* pending)
                              Sanjay K. Murthy

15                               Brian J. Arnold (*pro hac vice*
                                  pending)

16                               Christian G. Stahl (*pro hac vice*
                                  pending)

17                               ATTORNEYS FOR PLAINTIFF

18

19

20

21

22

23

24

25

26

27

28

LA:209734.1

# EXHIBIT A

# TO BE FILED UNDER SEAL

# Exhibit 21

CASREF, CLOSED, STAY

## U.S. District Court
## District of Maryland (Greenbelt)
## CIVIL DOCKET FOR CASE #: 8:06-cv-01877-AW

Stemcells, Inc. et al v. Neuralstem, Inc.
Assigned to: Judge Alexander Williams, Jr
Referred to: Magistrate Judge William Connelly
Related Case: 8:08-cv-01173-AW
Cause: 35:145 Patent Infringement

Date Filed: 07/24/2006
Date Terminated: 06/25/2007
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Stemcells, Inc.**                    represented by  **David Barmak**
Mintz Levin Cohn Ferris Glovsky and
Popeo PC
701 Pennsylvania Ave NW Ste 900
Washington, DC 20004
12024347300
Fax: 12024347400
Email: dbarmak@mintz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremy I Medovoy**
McDermott Will and Emery LLP
600 13th St NW
Washington, DC 20005
12027568000
Fax: 12027568087
Email: jmedovoy@mwe.com
*ATTORNEY TO BE NOTICED*

**John R Fuisz**
McDermott Will and Emery
600 13th St NW
Washington, DC 20005
12027568029
Fax: 12027568087
Email: jfuisz@mwe.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael T Renaud**
Mintz Levin Cohn Ferris Glovsky and
Popeo PC

One Financial Cntr
Boston, MA 02111
16173484403
Fax: 16175422241
Email: mrenaud@mintz.com
*TERMINATED: 02/28/2007*

**Paul J Cronin**
Mintz Levin Cohn Ferris Glovsky and
Popeo PC
One Financial Cntr
Boston, MA 02111
16175426000
Fax: 16175422241
Email: pcronin@mintz.com
*ATTORNEY TO BE NOTICED*

**Thomas E Lent**
Lurie and Krupp LLP
One McKinley Sq
Boston, MA 02109
16173671970
Fax: 16173671971
Email: tlent@luriekrupp.com
*ATTORNEY TO BE NOTICED*

**William G Gaede, III**
McDermott Will and Emery LLP
3150 Porter Dr
Palo Alto, CA 94304
16508135000
Fax: 16508135100
Email: wgaede@mwe.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Stemcells California, Inc.**           represented by **David Barmak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremy I Medovoy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John R Fuisz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael T Renaud**
(See above for address)
*TERMINATED: 02/28/2007*

**Paul J Cronin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas E Lent**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William G Gaede, III**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

Neuralstem, Inc.                    represented by    **Michael Jay Schrier**
Bell Boyd and Lloyd LLP
1615 L Street, N.W.
Suite 1200
Washington, DC 20036
12029556821
Fax: 12028354135
Email: mschrier@bellboyd.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan Lynn Barry**
Bell Boyd and Lloyd LLC
70 W Madison St Ste 3100
Chicago, IL 60602
13123721121
Fax: 13128278196
Email: abarry@bellboyd.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian J Arnold**
Bell Boyd and Lloyd LLP
70 W Madison St Ste 3100
Chicago, IL 60602
13125587388
Fax: 13123459998
Email: barnold@bellboyd.com
*ATTORNEY TO BE NOTICED*

**Jeffrey J Howell**
Bell Boyd and Lloyd PLLC
1615 L St NW Ste 1200
Washington, DC 20036
12029556832
Fax: 12028354139
Email: jhowell@bellboyd.com
*ATTORNEY TO BE NOTICED*

**Michael J Abernathy**
Bell Boyd and Lloyd LLC
70 W Madison St Ste 3100
Chicago, IL 60602-4207
13128074257
Fax: 13128278032
Email: mabernathy@bellboyd.com
*ATTORNEY TO BE NOTICED*

**Michael Thomas Murphy**
Bell Boyd and Lloyd PLLC
1615 L St NW Ste 1200
Washington, DC 20036
12024666300
Fax: 12024630678
Email: mmurphy@bellboyd.com
*ATTORNEY TO BE NOTICED*

**Sanjay Krishna Murthy**
Bell Boyd and Lloyd LLC
70 W Madison St Ste 3100
Chicago, IL 60602
13128074416
Fax: 13128278138
Email: smurthy@bellboyd.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Neuralstem, Inc.**                  represented by  **Michael Jay Schrier**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan Lynn Barry**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian J Arnold**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey J Howell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael J Abernathy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Thomas Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sanjay Krishna Murthy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*


V.

**Counter Defendant**

**Stemcells, Inc.**                   represented by   **Jeremy I Medovoy**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*


**Counter Defendant**

**Stemcells California, Inc.**        represented by   **Jeremy I Medovoy**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*


| Date Filed | # | Docket Text |
| --- | --- | --- |
| 07/24/2006 | 1 | COMPLAINT against Neuralstem, Inc. ( Filing fee $ 350 receipt number 8463706250), filed by Stemcells, Inc., Stemcells California, Inc. (Attachments: # 1 Notice of Lengthy Exhibits# 2 Civil Cover Sheet)(elt, Deputy Clerk) (Entered: 07/24/2006) |
| 07/24/2006 | | Jury Trial Demand by Stemcells, Inc., Stemcells California, Inc. (elt, Deputy Clerk) (Entered: 07/24/2006) |
| 07/24/2006 | 2 | Correspondence re: CM/ECF warning letter mailed to counsel. (c/m 7/24/06) (elt, Deputy Clerk) (Entered: 07/24/2006) |
| 07/24/2006 | 3 | Summons Issued 20 days as to Neuralstem, Inc. (elt, Deputy Clerk) (Entered: 07/24/2006) |
| 07/24/2006 | 4 | Correspondence mailed to the Director of the U.S. Patents. (c/m 7/24/06) (elt, Deputy Clerk) (Entered: 07/24/2006) |

| 08/18/2006 | 5 | Affidavit of Service by Stemcells, Inc., Stemcells California, Inc. Neuralstem, Inc. served on 8/4/2006, answer due 8/24/2006. (elt, Deputy Clerk) (Entered: 08/18/2006) |
| 08/18/2006 | 6 | Correspondence re: CM/ECF warning letter mailed to counsel. (c/m 8/18/06) (elt, Deputy Clerk) (Entered: 08/18/2006) |
| 08/18/2006 | 7 | Consent MOTION for Extension of Time to File Response/Reply *Pleading or Motion* by Stemcells, Inc., Stemcells California, Inc., Neuralstem, Inc.. Responses due by 9/5/2006 (Murphy, Michael) (Entered: 08/18/2006) |
| 08/18/2006 | 8 | NOTICE of Appearance by Michael Thomas Murphy on behalf of all defendants (Murphy, Michael) (Entered: 08/18/2006) |
| 08/18/2006 | 9 | NOTICE of Appearance by Jeffrey J Howell on behalf of all defendants (Howell, Jeffrey) (Entered: 08/18/2006) |
| 08/21/2006 | 10 | PAPERLESS ORDER "Granting" 7 Consent Motion for Extension of Time to File Response/Reply Signed by Judge Alexander Williams Jr. on 8/21/06 (ajh, Chambers) (Entered: 08/21/2006) |
| 08/22/2006 | 11 | MOTION for Sanjay K. Murthy to Appear Pro Hac Vice by Neuralstem, Inc. (elt, Deputy Clerk) (Entered: 08/22/2006) |
| 08/22/2006 | 12 | MARGINAL ORDER granting 11 Motion for Sanjay K. Murthy to Appear Pro Hac Vice. Signed by the Clerk on 08/22/2006. (elt, Deputy Clerk) (Entered: 08/22/2006) |
| 08/22/2006 | 13 | MOTION for Alan L. Barry to Appear Pro Hac Vice by Neuralstem, Inc. (elt, Deputy Clerk) (Entered: 08/22/2006) |
| 08/22/2006 | 14 | MARGINAL ORDER granting 13 Motion for Alan L. Barry to Appear Pro Hac Vice. Signed by the Clerk on 08/22/2006. (elt, Deputy Clerk) (Entered: 08/22/2006) |
| 08/30/2006 | 17 | Correspondence re: CM/ECF filed in error letter mailed to counsel. (elt, Deputy Clerk) (Entered: 08/30/2006) |
| 09/06/2006 | 18 | MOTION of Michael T. Renaud to Appear Pro Hac Vice by Stemcells, Inc., Stemcells California, Inc.. (rank, Deputy Clerk) (Entered: 09/07/2006) |
| 09/06/2006 | | ORDER granting 18 Motion of Michael T. Renaud to Appear Pro Hac Vice. Signed by the Clerk on 9/6/06. (c/m 9/7/06 rk) (rank, Deputy Clerk) (Entered: 09/07/2006) |
| 09/06/2006 | 19 | MOTION of Paul J.Cronin to Appear Pro Hac Vice by Stemcells, Inc., Stemcells California, Inc.. (rank, Deputy Clerk) (Entered: 09/07/2006) |
| 09/06/2006 | | ORDER granting 19 Motion of Paul J.Cronin to appear Pro Hac Vice. Signed by the Clerk on 9/6/06. (c/m 9/7/06 rk) (rank, Deputy Clerk) (Entered: 09/07/2006) |
| 09/07/2006 | 20 | AMENDED COMPLAINT against Neuralstem, Inc., filed by Stemcells, Inc.. (Attachments: # 1 Exhibit Stem Cell Exhibit 1# 2 Exhibit Stem Cell Exhibit 2# 3 Exhibit Stem Cell Exhibit 3# 4 Exhibit Stem Cell Exhibit 4# 5 Exhibit Stem |

| | | Cell Exhibit 5)(Barmak, David) (Entered: 09/07/2006) |
|---|---|---|
| 09/11/2006 | 21 | Second MOTION for Extension of Time *IN WHICH TO FILE RESPONSIVE PLEADING OR MOTION* by Neuralstem, Inc.. Responses due by 9/28/2006 (Howell, Jeffrey) (Entered: 09/11/2006) |
| 09/18/2006 | 22 | PAPERLESS ORDER "Granting" re 21 Second Consent MOTION for Extension of Time IN WHICH TO FILE RESPONSIVE PLEADING filed by Neuralstem, Inc. Signed by Judge Alexander Williams Jr. on 9/18/06 (ajh, Chambers) (Entered: 09/18/2006) |
| 10/06/2006 | 23 | MOTION to Amend/Correct by Stemcells, Inc.. Responses due by 10/23/2006 (Attachments: # 1 # 2)(Barmak, David) (Entered: 10/06/2006) |
| 10/12/2006 | 24 | PAPERLESS ORDER "Granting" 23 Consent Motion for Leave to File Second Amended Complaint Signed by Judge Alexander Williams Jr. on 10/12/06 (ajh, Chambers) (Entered: 10/12/2006) |
| 10/13/2006 | 25 | MOTION for Michael J. Abernathy to Appear Pro Hac Vice by Neuralstem, Inc. (elt, Deputy Clerk) (Entered: 10/13/2006) |
| 10/13/2006 | 26 | ORDER granting 25 Motion for Michael J. Abernathy to Appear Pro Hac Vice. Signed by Clerk on 10/12/2006. (elt, Deputy Clerk) (Entered: 10/13/2006) |
| 10/13/2006 | 27 | MOTION to Dismiss *, or in the Alternative, for Summary Judgment* by Neuralstem, Inc.. Responses due by 10/30/2006 (Attachments: # 1 Text of Proposed Order)(Murthy, Sanjay) (Entered: 10/13/2006) |
| 10/13/2006 | 28 | Memorandum In Support of its Motion to Dismiss or, in the Alternative, for Summary Judgment by Neuralstem, Inc. Responses due by 10/30/2006 (Attachments: # 1 Exhibit Exhibits 1 to 6)(Murthy, Sanjay) Modified on 10/16/2006 (elt, Deputy Clerk). (Entered: 10/13/2006) |
| 10/13/2006 | 29 | AFFIDAVIT re 27 MOTION to Dismiss *, or in the Alternative, for Summary Judgment,* 28 MOTION to Dismiss *Memorandum In Support of its Motion to Dismiss or, in the Alternative, for Summary Judgment of Karl Johe Ph.D.* by Neuralstem, Inc.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G# 8 Exhibit H# 9 Exhibit I# 10 Exhibit J# 11 Exhibit K# 12 Exhibit L# 13 Exhibit M)(Murthy, Sanjay) (Entered: 10/13/2006) |
| 10/24/2006 | 30 | Joint MOTION for Joinder by Stemcells, Inc.. Responses due by 11/13/2006 (Attachments: # 1)(Barmak, David) (Entered: 10/24/2006) |
| 10/30/2006 | 31 | ORDER granting 30 Joint Motion to Stay Substantive Patent Discovery Pending Resolution of Defendants' Motion to Dismiss and to Set a Discovery and Briefing Schedule for Issues Presented in Defendants' Motion to Dismiss. Signed by Judge Alexander Williams Jr. on 10/30/2006. (elt, Deputy Clerk) (Entered: 10/30/2006) |
| 10/30/2006 | 32 | ANSWER to Amended Complaint, COUNTERCLAIM against all plaintiffs by Neuralstem, Inc.. (Attachments: # 1 Exhibit A to G)(Murthy, Sanjay) (Entered: 10/30/2006) |
| | | |

| 11/10/2006 | 33 | Joint MOTION to Stay *Defendant's Counterclaims and Extend the Deadline for Plaintiffs to File a Reply or Otherwise Respond to Defendant's Counterclaims Until After the Court has Resolved Defendant's Motion to Dismiss* by Stemcells, Inc., Stemcells California, Inc., Neuralstem, Inc.. Responses due by 11/27/2006 (Attachments: # 1 Text of Proposed Order A)(Barmak, David) (Entered: 11/10/2006) |
| --- | --- | --- |
| 11/13/2006 | 34 | PAPERLESS ORDER "Granting" 33 Joint Motion to Stay and Extending Deadline Signed by Judge Alexander Williams Jr. on 11/13/06 (ajh, Chambers) (Entered: 11/13/2006) |
| 12/12/2006 | 35 | MOTION for Protective Order by Stemcells, Inc.. Responses due by 12/29/2006 (Attachments: # 1 Exhibit Stipulated Protective Order)(Barmak, David) (Entered: 12/12/2006) |
| 12/13/2006 | 36 | STIPULATED PROTECTIVE ORDER, that the provisions of this Protective Order regarding confidentiality shall govern, nunc pro tunc, and control the disclosure, dissemination, and use of information in this action. Signed by Judge Alexander Williams Jr. on 12/12/2006. (Attachments: # 1 Exhibit A) (elt, Deputy Clerk) (Entered: 12/13/2006) |
| 01/05/2007 | 37 | MOTION for Extension of Time to Complete Discovery *[Assented-To]* by Stemcells, Inc., Stemcells California, Inc.. Responses due by 1/22/2007 (Attachments: # 1 Text of Proposed Order)(Cronin, Paul) (Entered: 01/05/2007) |
| 01/09/2007 | 38 | ORDER granting 37 Assented-to Motion to Modify the Discovery and Briefing Schedule Established by the Court's October 30, 2006 Order. Signed by Judge Alexander Williams Jr. on 1/8/07. (elt, Deputy Clerk) (Entered: 01/09/2007) |
| 01/12/2007 | 39 | MOTION by Brian J. Anrold to Appear Pro Hac Vice by Neuralstem, Inc.. (rank, Deputy Clerk) (Entered: 01/16/2007) |
| 01/12/2007 | | ORDER granting 39 Motion by Brian J. Arnold to Appear Pro Hac Vice. Signed by the Clerk on 1/12/07. (c/m 1/16/07 rk) (rank, Deputy Clerk) (Entered: 01/16/2007) |
| 01/18/2007 | 40 | MOTION for Thomas E. Lent to appear Pro Hac Vice by Stemcells, Inc., Stemcells California, Inc. (elt, Deputy Clerk) (Entered: 01/18/2007) |
| 01/18/2007 | 41 | ORDER granting 40 Motion for Thomas E. Lent to Appear Pro Hac Vice. Signed by Clerk on 01/17/2007. (elt, Deputy Clerk) (Entered: 01/18/2007) |
| 02/06/2007 | 42 | MOTION to Compel *Documents and Interrogatory Responses* by Stemcells, Inc., Stemcells California, Inc.. Responses due by 2/23/2007 (Cronin, Paul) (Entered: 02/06/2007) |
| 02/06/2007 | 43 | Memorandum re 42 MOTION to Compel *Documents and Interrogatory Responses* filed by Stemcells, Inc., Stemcells California, Inc.. (Cronin, Paul) (Entered: 02/06/2007) |
| 02/06/2007 | 44 | Local Rule 104.7. (Cronin, Paul) (Entered: 02/06/2007) |
| 02/06/2007 | 45 | AFFIDAVIT re 42 MOTION to Compel *Documents and Interrogatory Responses* by Stemcells, Inc., Stemcells California, Inc.. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Exhibit A# <u>2</u> Exhibit B# <u>3</u> Exhibit C# <u>4</u> Exhibit D# <u>5</u> Exhibit E# <u>6</u> Exhibit F) (Cronin, Paul) (Entered: 02/06/2007) |
| 02/06/2007 | <u>46</u> | MOTION to Seal *Exhibits B-E to Plaintiff's Motion To Compel Documents and Interrogatory Responses* by Stemcells, Inc., Stemcells California, Inc.. Responses due by 2/23/2007 (Cronin, Paul) (Entered: 02/06/2007) |
| 02/07/2007 | <u>47</u> | Sealed Document. (ch, Deputy Clerk) (Entered: 02/08/2007) |
| 02/13/2007 | <u>48</u> | ORDER REFERRING CASE to Magistrate Judge William Connelly for discovery. Signed by Judge Alexander Williams Jr. on 2/13/07. (jmw, Chambers) (Entered: 02/13/2007) |
| 02/20/2007 | <u>49</u> | MOTION to Seal *Defendant's Memorandum and Exhibits 10-33 in Opposition to Plaintiffs' Motion to Compel Documents and Interrogatory Responses* by Neuralstem, Inc.. Responses due by 3/9/2007 (Arnold, Brian) (Entered: 02/20/2007) |
| 02/20/2007 | <u>50</u> | RESPONSE in Opposition re <u>42</u> MOTION to Compel *Documents and Interrogatory Responses* filed by Neuralstem, Inc..Replies due by 3/6/2007. (Attachments: # <u>1</u> Appendix A# <u>2</u> Notice of Filing Under Seal)(Arnold, Brian) Modified on 2/21/2007 (elt, Deputy Clerk). (Copy received - FILED UNDER SEAL) (Entered: 02/20/2007) |
| 02/20/2007 | <u>51</u> | AFFIDAVIT re <u>50</u> Response in Opposition to Motion *by I. Richard Garr in Support of Defendant's Opposition to Plaintiffs' Motion to Compel* by Neuralstem, Inc.. (Arnold, Brian) (Entered: 02/20/2007) |
| 02/20/2007 | <u>52</u> | AFFIDAVIT re <u>50</u> Response in Opposition to Motion *by Sanjay K. Murthy in Support of Defendant's Opposition to Plaintiffs' Motion to Compel* by Neuralstem, Inc.. (Attachments: # <u>1</u> Exhibit 1# <u>2</u> Exhibit 2A# <u>3</u> Exhibit Exhibit 2B# <u>4</u> Exhibit Exhibit 3A# <u>5</u> Exhibit Exhibit 3B# <u>6</u> Exhibit Exhibit 4# <u>7</u> Exhibit Exhibit 5# <u>8</u> Exhibit Exhibit 6# <u>9</u> Exhibit Exhibit 7# <u>10</u> Exhibit Exhibit 8# <u>11</u> Exhibit Exhibit 9# <u>12</u> Notice of Filing Exhibits 10-33 Under Seal# <u>13</u> Exhibit Exhibit 34# <u>14</u> Exhibit Exhibit 35)(Arnold, Brian) (Entered: 02/20/2007) |
| 02/22/2007 | <u>53</u> | NOTICE by Stemcells, Inc. *Plaintiffs' Notice of Withdrawal of Appearance* (Barmak, David) (Entered: 02/22/2007) |
| 03/01/2007 | <u>54</u> | MOTION for Other Relief *Plaintiffs' Motion to Modify the Court's Discovery and Briefing Schedule* by Stemcells, Inc.. Responses due by 3/19/2007 (Barmak, David) (Entered: 03/01/2007) |
| 03/02/2007 | 55 | PAPERLESS ORDER GRANTING <u>54</u> Plaintiffs' Assented-To Motion to Modify the Court's Discovery and Briefing Schedule. Signed by Judge William Connelly on 03/02/07. (Connelly, William) (Entered: 03/02/2007) |
| 03/05/2007 | <u>56</u> | MOTION to Seal by Stemcells, Inc., Stemcells California, Inc.. Responses due by 3/22/2007 (Cronin, Paul) (Entered: 03/05/2007) |
| 03/05/2007 | <u>57</u> | REPLY to Response to Motion [Redacted Copy} re <u>42</u> MOTION to Compel *Documents and Interrogatory Responses* filed by Stemcells, Inc., Stemcells California, Inc.. (Cronin, Paul) Modified on 3/6/2007 (elt, Deputy Clerk). |

| | | (original rec'd - FILED UNDER SEAL) (Entered: 03/05/2007) |
|---|---|---|
| 03/05/2007 | 58 | AFFIDAVIT re 57 Reply to Response to Motion *of Joseph H. Corselli* by Stemcells, Inc., Stemcells California, Inc.. (Attachments: # 1 Exhibit 1# 2 Exhibit 2)(Cronin, Paul) (Entered: 03/05/2007) |
| 03/13/2007 | 59 | Correcting Earlier Submission (re: 58 - signed affidavit)(Cronin, Paul) Modified on 3/14/2007 (elt, Deputy Clerk). (Entered: 03/13/2007) |
| 03/20/2007 | 60 | PAPERLESS ORDER GRANTING 46 Defendant's Motion to Seal its Memorandum and Exhibits 10-33 to Defendant's Opposition to Plaintiffs' Motion to Compel Documents and Interrogatory Responses. Signed by Judge William Connelly on 03/20/07. (Connelly, William) (Entered: 03/20/2007) |
| 03/20/2007 | 61 | AMENDED PAPERLESS ORDER GRANTING 49 Defendant's Motion to Seal its Memorandum and Exhibits 10-33 to Defendant's Opposition to Plaintiffs' Motion to Compel Documents and Interrogatory Responses. Signed by Judge William Connelly on 03/20/2007. (Connelly, William) (Entered: 03/20/2007) |
| 03/20/2007 | 62 | PAPERLESS ORDER GRANTING 46 Plaintiffs' Motion to Seal Exhibits B-E to Plaintiffs' Motion to Compel Documents and Interrogatory Responses. Signed by Judge William Connelly on 03/20/07. (Connelly, William) (Entered: 03/20/2007) |
| 03/22/2007 | 63 | PAPERLESS ORDER SCHEDULING Motions Hearing on April 10, 2007 at 2:00 p.m. in Courtroom 3B, U.S. Courthouse, Greenbelt regarding 42 Motion to Compel Documents and Interrogatory Responses. Signed by Judge William Connelly on 03/22/07. (Connelly, William) (Entered: 03/22/2007) |
| 04/06/2007 | 64 | PAPERLESS ORDER GRANTING 56 Plaintiffs' Motion to Seal Plaintiffs' Reply to Defendants' Memorandum in Opposition. Signed by Judge William Connelly on 04/06/07. (Connelly, William) (Entered: 04/06/2007) |
| 04/10/2007 | | Motion Hearing held on 4/10/2007 re 42 MOTION to Compel Documents and Interrogatory Responses filed by Stemcells California, Inc., Stemcells, Inc. held before Judge William Connelly. (Fosbrook 3-B.) (pkf, Deputy Clerk) Modified on 4/10/2007 (pkf, Deputy Clerk). (Entered: 04/10/2007) |
| 04/18/2007 | 65 | Proposed Order re Joint Motion to Compel by Neuralstem, Inc., Stemcells, Inc., Stemcells California, Inc., Paul J Cronin. Responses due by 5/7/2007 (Cronin, Paul) Modified on 4/19/2007 (elt, Deputy Clerk). (Entered: 04/18/2007) |
| 04/18/2007 | 66 | ORDER granting in part and denying in part 42 Motion to Compel. Signed by Judge William Connelly on 4/18/2007. (elt, Deputy Clerk) (Entered: 04/18/2007) |
| 04/24/2007 | 67 | TRANSCRIPT of Proceedings held on 4/10/07 before Judge William Connelly. (FILED SEPARATELY)(krc, Deputy Clerk) (Entered: 04/27/2007) |
| 05/22/2007 | 68 | TRANSCRIPT of Proceedings held on 4/10/07 before Judge William Connelly. (Compuscribe) (FILED SEPARATELY) (krc, Deputy Clerk) (Entered: 05/23/2007) |
| | | |

| 06/19/2007 | 69 | MOTION to Stay *Pending Reexamination* by Neuralstem, Inc.. Responses due by 7/6/2007 (Attachments: # 1 Text of Proposed Order)(Murthy, Sanjay) (Entered: 06/19/2007) |
| 06/25/2007 | 70 | ORDER granting 69 MOTION to Stay Pending Reexamination; that the instant litigation is hereby STAYED AND ADMINISTRATIVELY CLOSED. Signed by Judge Alexander Williams Jr. on 6/25/07. (aap, Deputy Clerk) (Entered: 06/25/2007) |
| 05/06/2008 | 71 | MOTION to Reopen Case *And Lift Stay* by Neuralstem, Inc. Responses due by 5/23/2008 (Attachments: # 1 Text of Proposed Order)(Howell, Jeffrey) (Entered: 05/06/2008) |
| 05/06/2008 | 72 | Memorandum re 71 MOTION to Reopen Case *And Lift Stay* filed by Neuralstem, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Howell, Jeffrey) (Entered: 05/06/2008) |
| 05/07/2008 | 73 | NOTICE of Appearance by Jeremy I Medovoy on behalf of Stemcells, Inc., Stemcells California, Inc. (Medovoy, Jeremy) (Entered: 05/07/2008) |
| 05/07/2008 | 74 | [FILED IN ERROR] NOTICE of Appearance by Jeremy I Medovoy on behalf of Stemcells, Inc., Stemcells California, Inc. (Medovoy, Jeremy) Modified on 5/7/2008 (elt, Deputy Clerk). (Entered: 05/07/2008) |
| 05/07/2008 | 75 | Correspondence re: Filed in error letter to counsel. (elt, Deputy Clerk) (Entered: 05/07/2008) |
| 05/12/2008 | 76 | MOTION to Appear Pro Hac Vice for William G. Gaede on behalf of Stemcells, Inc., Stemcells California, Inc., Stemcells, Inc., Stemcells California, Inc. Filing fee $ 50, receipt number 04160000000001725014. by Stemcells, Inc., Stemcells California, Inc. (Attachments: # 1 Text of Proposed Order) (Medovoy, Jeremy) (Entered: 05/12/2008) |
| 05/12/2008 | 77 | MOTION to Appear Pro Hac Vice for John R. Fuisz on behalf of Stemcells, Inc., Stemcells California, Inc., Stemcells, Inc., Stemcells California, Inc. Filing fee $ 50, receipt number 04160000000001725019. by Stemcells, Inc., Stemcells California, Inc. (Medovoy, Jeremy) (Entered: 05/12/2008) |
| 05/13/2008 | 78 | PAPERLESS ORDER granting 76 Motion to Appear Pro Hac Vice for attorney William G Gaede, III on behalf of Stemcells, Inc. and Stemcells California, Inc. Directing attorney William G Gaede, III to register on-line for CM/ECF at http://www.mdd.uscourts.gov/attorney/registration.asp.. Signed by Clerk on 5/13/08. (cmns, Deputy Clerk) (Entered: 05/13/2008) |
| 05/13/2008 | 79 | PAPERLESS ORDER granting 77 Motion to Appear Pro Hac Vice for attorney John R Fuisz on behalf of Stemcells, Inc. and Stemcells California, Inc. Directing attorney John R Fuisz to register on-line for CM/ECF at http://www.mdd.uscourts.gov/attorney/registration.asp.. Signed by Clerk on 5/13/08. (cmns, Deputy Clerk) (Entered: 05/13/2008) |
| 05/23/2008 | 80 | RESPONSE in Opposition re 71 MOTION to Reopen Case *And Lift Stay* filed by Stemcells, Inc., Stemcells California, Inc.. Replies due by 6/6/2008. (Attachments: # 1 Declaration, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Medovoy, |

| | | Jeremy) (Entered: 05/23/2008) |
|---|---|---|
| 06/06/2008 | 81 | NOTICE of Appearance by Michael Jay Schrier on behalf of Neuralstem, Inc. (Schrier, Michael) (Entered: 06/06/2008) |
| 06/06/2008 | 82 | REPLY to Response to Motion re 71 MOTION to Reopen Case *And Lift Stay* filed by Neuralstem, Inc.. (Attachments: # 1 Declaration of Sanjay K. Murthy, # 2 Exhibit, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4)(Murthy, Sanjay) (Entered: 06/06/2008) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/17/2008 17:10:42 | | |
| **PACER Login:** mw0425 | **Client Code:** | 081361-0010-09249 |
| **Description:** Docket Report | **Search Criteria:** | 8:06-cv-01877-AW |
| **Billable Pages:** 7 | **Cost:** | 0.56 |